**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRIUMVIRATE, LLC, <br> d/b/a TORDRILLO MOUNTAIN <br> LODGE, 3705 Arctic Blvd., #429, <br> Anchorage, AK 99503, <br><br>      Plaintiff, <br><br>      v. <br><br> RYAN ZINKE, in his capacity as <br> Secretary of the Interior, U.S. <br> DEPARTMENT OF THE INTERIOR, <br> U.S. BUREAU OF LAND <br> MANAGEMENT, an agency <br> of the U.S. Department of the <br> Interior, and BRIAN STEED, Deputy <br> Director, U.S. Bureau of Land <br> Management, exercising authority of <br> the Director, 1849 C Street NW, <br> Washington, DC 20240, <br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Case No. _____ |

---

**COMPLAINT FOR JUDICIAL REVIEW OF AGENCY ACTION**

---

     Plaintiff Triumvirate, LLC, doing business as Tordrillo Mountain Lodge ("Triumvirate"),

brings the following Complaint against Defendants Ryan Zinke, Secretary of the United States

Department of the Interior ("Interior"), the United States Bureau of Land Management ("BLM"),

an agency within Interior, and Brian Steed, Deputy Director of the BLM, exercising authority of

the Director of the BLM.

## INTRODUCTION

1.    This Complaint seeks an order enjoining, vacating, and setting aside a January 29, 2018 BLM decision to issue a special recreation permit to Alaska Snowboard Guides ("ASG") for helicopter skiing on BLM lands in Alaska (the "Decision") on the grounds it is unlawful, arbitrary, capricious, and undertaken without observance of procedure required by law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2). See Alaska Snowboard Guides – Decision Record, Exhibit 1.  The Decision issued a helicopter skiing permit to an entity to operate in the same area that Triumvirate conducts helicopter skiing today under a permit that the BLM issued to Triumvirate in 2014.  Prior to issuing the Decision the BLM: did not provide any public notice or opportunity to comment for Triumvirate or the public; failed to evaluate the significant impacts to safety and the operational hazards created by "stacking" a new helicopter ski operator on top of an existing one in the same terrain; and made no effort to analyze the environmental impacts on wildlife and other resources, and the cumulative impacts of authorizing more helicopters in the same area.  The Decision violates the BLM's non-discretionary statutory obligations under the National Environmental Policy Act ("NEPA"), Federal Land Management Policy Act ("FLPMA"), and binding agency regulations promulgated pursuant to those statutes.

2.    Triumvirate owns and operates a commercial helicopter skiing, or "heli-skiing," operation in Judd Lake, Alaska.  Triumvirate transports clients via airplane and helicopter from the Tordrillo Mountain Lodge (the "Lodge") to nearby mountains and provides guide services to clients seeking backcountry skiing and snowboarding experiences in rugged and remote terrain.

3.    In 2014, Triumvirate applied for and received a special recreation permit issued by the BLM authorizing it to conduct heli-skiing operations in Alaska's Tordrillo Mountains and

2

Neacola Mountains Area of Critical Environmental Concern ("ACEC") near Lake Clark

National Park and Preserve.  See Triumvirate, LLC – Decision Record, Exhibit 2.  Before issuing

the permit the BLM, as required by NEPA, prepared an environmental assessment and

determined that issuance of the permit to Triumvirate would not result in unmanageable risks to

public safety or significant environmental impacts.  See Triumvirate, LLC – Environmental

Assessment, Exhibit 3; Triumvirate, LLC – Finding of No Significant Impact, Exhibit 4.  At the

time the BLM issued the permit to Triumvirate, no other active commercial heli-skiing

operations existed in the Tordrillo or Neacola Mountains.  The only other operators filmed heli-

skiers a few days a year, but did not operate commercially as does Triumvirate.

4.      The topography in the area where Triumvirate operates is characterized by jagged

peaks, narrow and steep couloirs, glaciers, crevasses, ice fields, and steep snowfields.  Heli-

skiing presents considerable risks due to the topography and remoteness of the areas in which

Triumvirate operates, as well as the extreme and unpredictable conditions regularly present in the

Tordrillo and Neacola Mountains.  These risks are present during skiing and snowboarding

activities as well as during aircraft travel to and from skiing and snowboarding locations.

Triumvirate employs seasoned pilots and highly qualified guides with significant skill and

experience in navigating the unforgiving terrain and extreme conditions regularly present in the

Tordrillo and Neacola Mountains.

5.      After it granted Triumvirate a special recreation permit in 2014, the BLM issued

two additional special recreation permits for heli-skiing operations in the same area, greatly

increasing the number of aircraft landings in the few locations that are safe to use as landing and

staging areas.  The BLM issued these permits—the second permit was issued to Silverton

Mountain Guides on February 27, 2017, see Silverton Mountain Guides – Decision Record,

Exhibit 5, and the third permit to ASG on January 29, 2018—without soliciting input from Triumvirate or the public at large, without any opportunity for comment, and without considering the safety impacts of authorizing three heli-skiing operations in the same limited terrain.[1] This failure cut off any opportunity for public input on critical issues of safety and environmental impacts and violates cornerstone provisions of NEPA and FLPMA.

6. This failure is more than just procedural; it displays a willful disregard of the high-consequence risks of conducting aircraft travel and commercial heli-skiing operations in a high-altitude Alaskan winter environment. As a result of the Decision, the likelihood of an aircraft accident or avalanche occurring where Triumvirate operates has increased. When too many helicopters are flying in too close quarters, especially when attempting to access the same limited areas in difficult-to-navigate terrain and extreme and unpredictable weather conditions, the risk of an accident is substantial. When too many guides and skiers attempt to ski the limited terrain that is safe enough to ski, the risk that a group of skiers will trigger an avalanche, burying and injuring or killing other skiers downslope, is substantial. Triumvirate and its clients should not be subjected to these risks without a full evaluation of the impacts that resulted from the Decision. The BLM considered none of these factors—none—before issuing a permit to ASG.

7. By failing to seek input from the public or from Triumvirate—the party most experienced and knowledgeable regarding the risks of conducting heli-skiing operations in that area—the BLM failed to consider the risks of permitting an additional heli-skiing operation to public safety, as required by NEPA. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.27(b)(2).

---

[1] Triumvirate does not seek judicial review of the BLM's decision record approving issuance of a special recreation permit to Silverton Mountain Guides or seek to enjoin activities conducted pursuant to that permit.

8.     Rather than analyze the impacts of granting a third permit to public safety or the environment in an environmental assessment or environmental impact statement as required by NEPA, the BLM did not prepare a NEPA document at all before it issued the permit to ASG. The BLM instead prepared, without any public notice, a brief determination that concluded that it did not need to prepare a NEPA document because the effects of issuing a third heli-skiing permit were already analyzed in the environmental assessment it prepared before it issued the permit to Triumvirate in 2014. That brief determination—styled a "Determination of NEPA Adequacy"—perfunctorily summarizes the BLM's arbitrary and irrational conclusion that no further NEPA analysis of a third heli-skiing operation on top of Triumvirate's operation was necessary because there is "no new information or any new circumstances to consider." See Alaska Snowboard Guides – Determination of NEPA Adequacy, Exhibit 6. The BLM reasoned that no additional analysis was necessary because the environmental assessment prepared for Triumvirate's permit application (the "Triumvirate EA") had already considered the impacts to public safety and the environment presented by a third commercial heli-skiing operation in the Tordrillo and Neacola Mountains.

9.     But the Triumvirate EA did not—indeed, could not—consider the impacts to safety and the environment presented by *three* heli-skiing operations in the same area and the same terrain because it addressed only one—Triumvirate. By failing to consider the additional direct and cumulative effects of authorizing a third heli-skiing operation in the same area as Triumvirate and Silverton, and instead relying on an environmental assessment prepared years earlier that addressed only Triumvirate's operations, the BLM violated its statutory obligation under NEPA to considerable the effects of issuing the permit to ASG. See 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27(b)(2).

10.     The BLM's barebones determination that underlies the Decision concludes that it has already analyzed the environmental effects of issuing the permit to ASG.  But that is an irrational and even nonsensical position.  The environmental assessment the BLM relied upon to avoid preparing an environmental assessment or environmental impact statement prior to issuing the ASG permit considered only the Triumvirate permit, not the additional flights, safety hazards, and environmental impacts that accompany ASG's permit.  The BLM ignored entirely the direct and cumulative effects on public safety of authorizing additional aircraft landings, as well as the direct and cumulative effects on wildlife and the environment presented by additional aircraft operations and landings.  This analysis fails to take the "hard look" that NEPA requires and violates the statute.  42 U.S.C. § 4332(2)(C).

11.     The BLM failed entirely to seek any public input on the appropriateness of issuing a permit to ASG, violating FLPMA.  43 U.S.C. § 1701 et seq.  Recognizing the critical need for transparency and public input in managing the unique natural resources in the areas where Triumvirate operates, the governing BLM land use plan requires the BLM to work collaboratively with existing recreation users such as Triumvirate and other stakeholders to ensure effective land management.  See Ring of Fire Resource Management Plan and Record of Decision, Exhibit 7 at 10.  FLPMA requires all BLM actions, including issuing a special recreation permit, to conform to the provisions of that land use plan.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

12.     But the BLM never notified Triumvirate of ASG's permit application.  In December 2017, Triumvirate heard from a third party that a third entity had requested a permit to operate in the same terrain as Triumvirate, and that the BLM was planning to issue it.  On information and belief, ASG filed its application earlier in 2017, yet the BLM chose for many

months not to give Triumvirate or the public any notice. Triumvirate contacted the BLM in December 2017 and learned for the first time that the BLM had decided to issue the permit to ASG. See Emails Between Michael Overcast (Triumvirate) and Stephanie Kuhns (BLM), Exhibit 8. This is not the meaningful notice that NEPA requires. An informal and private email—sent at the eleventh hour and, in all likelihood, after the decision to grant the permit had already been made internally—is not adequate under NEPA. Notice given after a decision has been made is not notice at all. The BLM's failure to provide adequate notice, and its failure to seek input from the public, violates its duty under the land use plan to work collaboratively with existing recreation users like Triumvirate and, therefore, violates FLPMA. 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).

13. Nor did the BLM provide an opportunity for Triumvirate to comment on the proposal to issue a permit to ASG to operate in the same terrain as Triumvirate. If it had, Triumvirate would have submitted detailed written comments identifying the safety hazards, avalanche risks, and increased potential for catastrophic accidents and loss of life that accompany forcing additional heli-skiing operators upon the same terrain used by an existing operator.

14. By failing to consider impacts to safety or impacts to Triumvirate's existing permitted use of the area, the BLM also violated its own FLPMA special recreation permit regulations. Those regulations require the BLM to consider public safety and conflicts with other uses (among other factors) in determining whether to issue a special recreation permit. 43 C.F.R. § 2932.26(b), (c). The Decision authorizing ASG's permit makes no mention of either of these factors, despite being made aware of Triumvirate's specific concerns that issuing a permit to ASG would pose serious risks to aircraft and skier safety, conflict with Triumvirate's

operations, and degrade the overall quality of recreation in the Tordrillo and Neacola Mountains. The BLM violated its own binding permitting regulations.

15.     The BLM's Decision has resulted in untenable conditions for Triumvirate and its clients.  Triumvirate seeks preliminary injunctive relief staying the effect of the BLM's decision to issue a special recreation permit to ASG.  Triumvirate respectfully requests that the Court vacate the BLM's Decision and remand this matter to the BLM so that the agency can comply with NEPA, FLPMA, agency regulations, and the APA.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2).

17.     This Court has authority to review the January 29, 2018 Decision under the APA. 5 U.S.C. §§ 702, 706.  This Court may grant declaratory and injunctive relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C § 2202 (injunctive relief), and the APA, 5 U.S.C. §§ 701-706.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e). Defendants Secretary Ryan Zinke, U.S. Department of the Interior, U.S. Bureau of Land Management and Brian Steed reside in this judicial district.

## FINAL AGENCY ACTION

19.     The BLM's decision to issue a special recreation permit to ASG is a final agency action reviewable under the APA.  5 U.S.C. §§ 702, 704.

20.     On February 16, 2018, two days after the BLM first provided a copy of the January 29, 2018 Decision to Triumvirate, counsel for Triumvirate sent a letter to Bonnie Million, Field Office Manager for the BLM's Anchorage, Alaska office, to request information

8

regarding the status of ASG's permit.  See Letter from Ezekiel Williams to Bonnie Million (Feb. 16, 2018), Exhibit 9.  On February 27, 2018, Ms. Million responded via letter affirming that the ASG "Decision Record was signed on January 29, 2018 and the associated permit is in effect at this time."  Letter from Bonnie Million to Ezekiel Williams (Feb. 27, 2018), Exhibit 10.  Ms. Million indicated that the terms of the permit authorized ASG to conduct heli-skiing activities in the permitted area from February 1 through June 30, 2018.  Id.

21.     Triumvirate has no obligation to exhaust administrative remedies because the Decision is in full force and effect.  See Darby v. Cisneros, 509 U.S. 137, 154 (1993).

## PARTIES

22.     Plaintiff, Triumvirate, LLC, is an Alaska limited liability company that owns and operates the Tordrillo Mountain Lodge in Judd Lake, Alaska.

23.     Defendant Ryan Zinke is Secretary of the United States Department of the Interior.  Defendant United States Bureau of Land Management, is an agency within the United States Department of the Interior.  The BLM administers approximately 245 million surface acres of federal public lands, including the lands that ASG is authorized to fly within and ski on under the Decision at issue in this proceeding.

## LEGAL BACKGROUND

### A.     National Environmental Policy Act

24.     The National Environmental Policy Act establishes a "national policy" "to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may . . . attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences."  42 U.S.C. § 4331(b)(3).

9

25.     The heart of NEPA is a procedural requirement instructing federal agencies to "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement" addressing the proposed action's "environmental impact," any adverse environmental effects which cannot be avoided should the proposal be implemented," "alternatives to the proposed action," and other topics.  42 U.S.C. § 4332(2)(C).

26.     Issuance of a special recreation permit for heli-skiing on BLM-managed lands is major federal action subject to NEPA within the meaning of 42 U.S.C. § 4332(2)(C).

27.     The Council on Environmental Quality ("CEQ"), in the Executive Office of the President of the United States, has promulgated regulations providing guidance to federal agencies on when an EIS or an environmental assessment must be prepared and the analysis it must contain.  See 40 C.F.R. Parts 1500-1508.  Interior has also promulgated its own regulations guiding its own compliance with CEQ's regulations.  See 43 C.F.R. Part 46.

28.     Under CEQ regulations, an agency may prepare an environmental assessment ("EA") before or in lieu of preparing an EIS.  40 C.F.R. §§ 1501.3, 1508.13.  An EA must include a discussion of the proposed action's environmental impacts and alternatives to the proposed action.  40 C.F.R. § 1508.9(b).

29.     After preparing an EA, an agency may also prepare a "finding of no significant impact."  This document "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment," and, therefore, why an EIS will not be prepared. 40 C.F.R. § 1508.13.  An EA must take a "hard look" at the proposed action's environmental impacts.  Colorado Wild Horse v. Jewell, 130 F. Supp. 3d 205, 215 (D.D.C. 2015) (quoting Grand Canyon Tr. v. F.A.A., 290 F.3d 339, 340-41 (D.C. Cir. 2002)).

30.     Agencies are required to consider the "reasonably foreseeable" effects of the proposed major federal action, including effects that are direct, indirect, or cumulative.  40 C.F.R. §§ 1508.7, 1508.8, 1508.25.

31.     As part of its required analysis of cumulative effects, the BLM must consider "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.

32.     NEPA requires agencies to consider the impact of a proposed action on public safety, and risks to safety that may arise from an action.  42 U.S.C. § 4331(b)(3); 40 C.F.R. §§ 1508.8, 1508.27(b)(2).

33.     As part of its environmental analysis, agencies are required to "[r]igorously explore and objectively evaluate all reasonable alternatives [to the proposed action], and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  The requirement to consider alternatives "is the heart" of the environmental analysis.  40 C.F.R. § 1502.14.  Agencies must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits."  40 C.F.R. § 1502.14(b).  Each EA must include a discussion of alternatives.  40 C.F.R. § 1508.9(b).

34.     The BLM's NEPA Handbook provides a mechanism permitting the agency, instead of issuing an EA or EIS, to issue a Determination of NEPA Adequacy (or DNA) under certain circumstances.  A DNA is not a NEPA document, but merely summarizes the agency's review as to whether an existing NEPA document covers a particular proposed action.  BLM,

NEPA Handbook (Jan. 2008), https://www.ntc.blm.gov/krc/uploads/366/NEPAHandbook_H-1790_508.pdf, at 22-25.

35.     A DNA is appropriate if the proposed action is "essentially similar to" an action analyzed in an existing NEPA document, provided "the existing analysis [remains] valid in light of any new information or circumstances." Id. at 23.  A DNA is appropriate only if "the direct, indirect, and cumulative effects that would result from implementation of the new proposed action [are] similar (*both quantitatively and qualitatively*) to those analyzed in the existing NEPA document." Id. (emphasis added).

36.     The BLM may not satisfy its obligation to consider the effects of a proposed major federal action under NEPA by preparing a DNA that itself relies upon a prior environmental assessment or EIS if the environmental assessment or EIS does not consider the direct, indirect, and cumulative effects of the proposed action.

37.     NEPA also requires that agencies give notice to "interested parties" and allow opportunities for public participation in agency decision making processes.  40 C.F.R. §§ 1506.6, 1501.7(a)(1).  Agencies are required to solicit appropriate information from the public to aid in their decision making process.  40 C.F.R. § 1506.6(d).

## B.     Federal Land Management Policy Act

38.     FLPMA establishes land use planning procedures and requirements for management of certain types of federal lands, including the federal lands at issue in this matter.  43 U.S.C. § 1701 et seq.   Under FLPMA, the BLM is required to engage in a planning process for the management of federal lands that accommodates multiple uses of the land and achieves sustained yields of natural resources.  To effect these objectives, FLPMA requires the BLM to

issue land use plans—called "resource management plans"—and to periodically update these plans.  43 U.S.C. § 1712.

39.     As the guiding document for the BLM's land management decisions, all land use decisions, actions, and permits issued by the agency must conform with the applicable resource management plan.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a).  The BLM is prohibited from taking actions that are not consistent with a resource management plan, and a court may set aside actions that do not conform with the resource management plan under the APA.  Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69 (2004).

40.     A decision by the BLM to issue a special recreation permit for heli-skiing on BLM-managed lands must conform with the provisions of the applicable resource management plan.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3(a); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 69 (2004).

41.     As with NEPA, public involvement is critical to land use planning and decision making under FLPMA.  The agency is required to solicit public involvement in the development and revision of resource management plans.  43 U.S.C. § 1712(a); 43 C.F.R. § 1610.2.  A resource management plan provision itself may also require the BLM to solicit public input, fulfill procedural obligations, or consider particular factors before making a decision to authorize activities on the subject lands.

C.     **BLM Ring of Fire Resource Management Plan**

42.     In March 2008, the BLM issued a Record of Decision ("ROD") approving a resource management plan for the Ring of Fire area (the "Ring of Fire RMP"), which covers certain areas of southern Alaska including the Tordrillo and Neacola Mountains.  See Exhibit 7.

The Ring of Fire RMP sets forth "specific program objectives and quantifiable desired conditions" for the management of the Ring of Fire region. Id. (ROD) at 5.

43.     The Ring of Fire RMP incorporates specific management decisions, including decisions for Special Recreation Management Areas and Areas of Critical Environmental Concern. Id. (ROD) at 9-12.

44.     The Ring of Fire RMP sets forth specific management goals and "preliminary management objectives" and provisions for the Neacola Mountains ACEC (where Triumvirate currently operates). Those provisions provide that the BLM will:

    i.     Create the Neacola Mountains ACEC to preserve identified values and outstanding natural scenery in an unspoiled setting.
    ii.    Manage the ACEC to maintain the visual resource and scenic values.
    iii.   *Manage recreation to maintain the existing opportunities.*

Id. (ROD) at 10 (emphasis added).

45.     The Ring of Fire RMP also directs the BLM to:

    i.     Manage the [Neacola Mountains] ACEC to maintain the existing Recreational Opportunity Spectrum classifications.
    ii.    Maintain the area for existing (Class II) VRM classification.
    iii.   Develop further guidance for limitations to OHV use.
    iv.   *Work collaboratively* with landowners in the area, *recreation users*, and adjacent communities to develop management strategies and define enforcement responsibilities.

Id. (ROD) at 10 (emphases added).

46.     Under the terms of the Ring of Fire RMP, the BLM may issue land use permits under FLPMA (including special recreation permits) only "if it is determined that the use conforms to agency plans, policies and programs, local regulations, and other requirements, and will not cause appreciable damage or disturbance to the public lands, their resources or improvements." Id. (RMP) at 9.

14

**D.     BLM's Special Recreation Permit Program**

47.     Under authority granted by FLPMA, see 43 U.S.C. § 1740, the BLM may issue special recreation permits, which authorize commercial use and organized group activities on appropriate lands managed by the BLM.  See 43 C.F.R. Part 2930.

48.     The BLM special recreation permit regulations require the agency, in determining whether to issue a special recreation permit, to consider certain factors, including public safety, conflicts with other uses, resource protection, the public interest, and conformance with laws and land use plans.  43 C.F.R. § 2932.26.

49.     The BLM issues special recreation permits for commercial heli-skiing and filming in the Tordrillo and Neacola Mountains.

**E.     Administrative Procedure Act**

50.     The APA provides a right to judicial review to any "person suffering legal wrong because of agency action."  5 U.S.C. § 702.

51.     A court "shall" "hold unlawful and set aside agency action" found to be: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

52.     The APA defines agency action to "include[] the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof."  5 U.S.C. §§ 551(13), 701(b)(2).  In order for an agency action to be reviewable under the APA, it must be "final."  5 U.S.C. § 704.

## STATEMENT OF FACTS

**A.    Triumvirate Applies for and Receives a Special Recreation Permit**

       **a.    Permit Application and the BLM Environmental Review**

53.      In 2013, Triumvirate applied for a special recreation permit, seeking authorization to operate commercial heli-skiing and filming operations in the Tordrillo and Neacola Mountains.

54.      The BLM prepared an EA under NEPA to consider the proposal to issue a special recreation permit to Triumvirate to conduct commercial heli-skiing operations in the Tordrillo and Neacola Mountains, the project area, alternatives to the proposal, and the direct, indirect, and cumulative effects of the proposed commercial heli-skiing permit on the environment and public safety.  See Exhibit 3.

55.      The BLM gave public notice of the proposal to issue the special recreation permit to Triumvirate, and requested public comments.

56.      The BLM had authorized three other limited-duration heli-skiing operations for filming in the same terrain in the approximately three years before Triumvirate applied for a permit, but no commercial heli-skiing operations were being conducted in the area at the time the BLM conducted the Triumvirate EA or granted a permit to Triumvirate.  Id. at 2.

57.      As directed by FLPMA, the BLM considered a number of factors in determining whether to issue a permit to Triumvirate.  These factors include: conformance with land use plans and laws, public safety, conflicts with other uses, resource protection, the public interest, and others.  Id. at 3.  The BLM recognized that it could issue land use permits only if "the use conforms to agency plans, policies and programs . . . and will not cause appreciable damage or disturbance to the public lands, their resources or improvements."  Id. at 4.

58. The BLM considered the impacts of the activities that Triumvirate would conduct under the requested permit, but did not consider these impacts in the context of other activities—for example, other commercial heli-skiing operations, use of aircraft by other entities, or any other human activity—in the project area. The BLM assessed the impact of operations of up to two helicopters and two airplanes transporting clients to and from the Tordrillo and Neacola Mountains for skiing and snowboarding activities—and nothing more. Id. at 6-7.

59. At the time of Triumvirate's application, the BLM determined that the project area was subject to extremely low levels of human visitation—less than 100 people annually. Id. at 10. The BLM noted that due to a number of factors, it did not "anticipate[]" a large increase "in aircraft-supported use [in the area] in the next 5-10 years. Id. at 11.

60. The BLM determined that, due to the intermittent nature of the proposed use, dispersed landing areas, and the permit stipulations, the proposed project would not permanently impair the project area's existing wilderness characteristics. Id.

61. For these and other reasons, the BLM determined that granting the permit would conform to the Ring of Fire Resource Management Plan. Id. at 3-4.

62. The Triumvirate EA concluded there would be minimal impacts on wildlife, particularly on Dall sheep, as a result of noise associated with Plaintiff's two helicopters and one airplane. Id. at 12-13.

63. The Triumvirate EA noted that the Triumvirate proposal was the first proposed commercial heli-skiing operation in the Neacola Mountains ACEC. Id. at 12. The environmental effects analysis, therefore, was based on a single commercial heli-skiing operation, with defined parameters. If additional permits were to be granted in the area, the

BLM noted, it would increase the cumulative effects, particularly to Dall sheep.  Id. at 13.  The EA did not describe or analyze these potential cumulative effects.

64.     The Triumvirate EA did not evaluate the direct, indirect, and cumulative effects of three commercial helicopter ski operations utilizing the same terrain in the Neacola ACEC and the Tordrillo Mountains.  The EA evaluated the direct, indirect, and cumulative effects of one commercial helicopter ski operation by Triumvirate.

65.     Following issuance of the EA, the BLM prepared a Finding of No Significant Impact ("FONSI"), in which the agency concluded that (1) none of the proposed project's environmental effects are "significant" as defined in the CEQ regulations; (2) the proposed project and alternative conform with the Ring of Fire Resource Management Plan; and (3) the proposed project does not constitute a major federal action having a significant effect on the human environment.  Exhibit 4 at 4.  Therefore, the BLM concluded that an EIS was not necessary.

66.     In determining that Triumvirate's proposed operations would not have a significant impact, the BLM emphasized that Triumvirate was a single commercial operation.  In assessing any "unique or unknown risks" of the proposed action, the BLM noted that there "is neither uncertainty nor unknown risk associated with the requested use, particularly at this scale, i.e., one operator in a remote setting."  Id. at 3.  The BLM also found that there was "no potential" for the project to directly affect public health and safety, and there was "no known controversy" concerning the effects of the project.  Id. at 2, 3.

67.     On February 20, 2014, the BLM issued a Decision Record approving the issuance of a special recreation permit for commercial heli-skiing to Triumvirate.  The initial permit was

for one year.  Exhibit 2 at 1.  On February 10, 2015, BLM issued a ten-year permit authorizing Triumvirate to conduct commercial heli-skiing operations through 2024.  That permit is in effect.

68.     The BLM's foremost stated reasons for granting the requested permit was that the "proposed activity is not currently occurring within the Neacola Mountains ACEC" and recreational use in the project area is "extremely low."  Id. at 2.  Thus, because "recreation potential for the Neacola Mountains is largely unmet," the BLM determined that "[a]uthorizing the requested SRP will provide a unique recreational experience in a remote and primitive setting, consistent with" relevant land use goals "without compromising other resource values." Id.

69.     Soon after the BLM issued the permit, the BLM communicated that Mike Overcast, General Manager of Triumvirate, would be notified in the event the BLM considered issuing any additional permits.  See Emails Between Michael Overcast (Triumvirate) and Jeff Kowalczyk (BLM), Exhibit 11.

**b. Triumvirate's Operations**

70.     Triumvirate conducts helicopter skiing under its BLM permit during the February to July operating season by flying guests from the Lodge approximately 40 miles west to a staging area, and then flying helicopters in the Tordrillo and Neacola Mountains to deposit skiers on mountain peaks, ridges, and other land forms, in the company of one or more guides.  The skiers descend the route chosen by the guide to a designated landing zone to meet the helicopter. During the day, an airplane flies to and from the Lodge and the staging area, bringing fuel and support.  At the end of the day, Triumvirate flies the guests back to the Lodge.

71.     Triumvirate employs experienced guides to assess conditions and guide clients while skiing and snowboarding.  The guides meet daily to discuss and evaluate snow conditions

and avalanche risks based on weather, snowfall patterns, length of time since the last snowfall, snowpack stability, climate, wind, atmospheric trends, and other factors. The guides identify potentially suitable slopes to ski based on that daily evaluation. The evaluation continues on-site, where the guides evaluate the site-specific snowpack conditions by digging snow pits, observing specific conditions, and exercising professional judgment. Because conditions are highly variable day-to-day and may change with little to no notice, guides frequently make decisions and revise conclusions regarding which slopes are safe to ski, and which are to be avoided.

72.     Although Triumvirate is permitted to operate in a large area, only approximately 10% of that area is skiable terrain. The remaining terrain is too flat, too steep, too prone to avalanches, is located beneath large and heavy cornices, or is made up of rock bands, cliffs, crevasses, and other natural features that render most areas off-limits to skiing. Suitable landing zones for helicopters to drop off and collect skiers are also limited by terrain, weather, and snow conditions. Snow safety and avalanche risks change with the weather, and require dynamic on-site evaluation and identification of suitable and unsuitable terrain. As a result, Triumvirate typically takes clients to a revolving but small number of areas in the permitted terrain, based on that client's skill level and expectations, based on the weather, and based on the daily and site-specific avalanche risks.

**B.      Silverton Mountain Guides Permit**

73.     In October 2016, a second operator, Silverton Mountain Guides, submitted to the BLM a request for a special recreation permit seeking authorization to conduct commercial heli-skiing and filming in the same terrain.

74.     Rather than issuing an EA or EIS analyzing the effects of the requested permit, the BLM issued a shorter and far less comprehensive "Determination of NEPA Adequacy Worksheet" (the "Silverton DNA"), in which the agency determined that because the proposed Silverton permit was "nearly identical" to the Triumvirate permit as analyzed in the Triumvirate EA, there was "no new information or any new circumstances to consider."  Silverton Mountain Guides – Determination of NEPA Adequacy, Exhibit 12 at 3, 4.  Therefore, the BLM reasoned, no additional NEPA analysis was necessary.

75.     The Silverton DNA largely repeats verbatim portions of the analysis in the EA issued for Triumvirate's application.  The BLM did not seek or receive public comment on the proposed action.  Id. at 4.

76.     The BLM did not consider any alternatives to the requested permit.  Instead, the BLM stated that there were "no new issues around which to develop additional alternatives for the current Proposed Action."  Id.

77.     The BLM then issued a Decision Record approving issuance of the Silverton permit.  Exhibit 5.  As its rationale for the decision, the BLM noted: "The decision was made because the proposed activity is nearly identical to that which already occurs in the same area; however, the new activity will be smaller and therefor have fewer impacts on the landscape."  Id. at 2.  Thus, the BLM determined that the proposed project "involves no significant impact to the human environment and no further analysis is necessary."  Id.

78.     The Decision Record includes no discussion of the cumulative or marginal effects on public safety or the environment of granting the Silverton Mountain Guides permit.  The BLM did not consider the effects of the proposed Silverton Mountain Guides permit when added to, or in the context of, the effects of granting the Triumvirate permit.  The BLM did not analyze

whether authorizing a second commercial heli-skiing operation in the same area would present safety or use conflicts not addressed in the Triumvirate EA.

79.     The BLM did not give Triumvirate notice of the Silverton Mountain Guides application or request comments from Triumvirate before the BLM issued the permit to Silverton Mountain Guides.  Triumvirate learned of the Silverton Mountain Guides permit when it encountered it while flying.  Mike Overcast, General Manager for Triumvirate, contacted Jeff Kowalczyk, Outdoor Recreation Planner at the BLM, and complained that the agency did not provide any notice of its decision to issue a second permit or seek input from Triumvirate or the public during the agency's decision making process, despite Mr. Kowalczyk's promise that Mr. Overcast and Triumvirate "would be involved in the permitting of any further operations." Exhibit 11.

**C.      Alaska Snowboard Guides Permit**

80.     In December 2017, Mr. Overcast heard through a contact that the BLM was poised to authorize a third entity to conduct commercial heli-skiing operations in the same terrain as Triumvirate.  On December 11, 2018, Mr. Overcast emailed Stephanie Kuhns, Outdoor Recreation Planner at the BLM, to inquire about the rumored BLM decision to issue a third permit.  Kuhns responded the following day that the BLM was considering granting a permit to ASG and requested that Overcast inform her of his "thoughts and concerns."  Kuhns added: "I'm worried we may be reaching capacity for the area, but you know the land much better than I." Exhibit 8.

81.     On December 15, 2018, Mr. Overcast telephoned Douglas Ballou, Natural Resources Group Manager at the BLM, in which Mr. Overcast made clear his concerns with granting a third permit in the area—specifically, that:

- "Aircraft and passenger safety" would be adversely impacted;

- The skiable terrain in the Neacola Mountains was "too small and concentrated for three permittees to safely operate;

- The quality of Triumvirate's clients' experience would be degraded; and

- The existing EA did not adequately assess the impacts of two additional heli-skiing operations in the same terrain.

See Exhibit 13.

82. On December 18, 2018, Mr. Overcast identified his concerns further in an email

to Stephanie Kuhns:

> I am adamantly opposed to[] further permitting in the Neacolas.
> Especially, where we operate. There is a long history of problems
> associated with shared areas on federal lands with helicopter
> skiing. This is why I was so concerned that the BLM had permitted
> Silverton without any input from the current Permittee
> [Triumvirate]. Adding yet another would compound the issues and
> really compromise public safety. We are a member of Heli US.
> This trade organization focuses on best practices with the industry.
> If needed, I will engage the organization and get their input on
> shared use areas. They would agree that any additional use by
> other companies would not be recommended. Please keep me
> informed.

Id.

83. On December 22, 2018, Mr. Overcast again emailed Stephanie Kuhns to express

his concern that certain "industry conflicts" existed that needed to be addressed before granting a

third permit. He also expressed concern that the Silverton Mountain Guides permit was granted

"without any public input and acknowledgement of other outfitters." Id.

84. Ms. Kuhns responded by stating that "the Anchorage Field Office has decided to

permit them. They will base their operations off [local private property]." Kuhns added: "As the

Neacolas are public lands, it is important for people to have access to them—in a safe manner.

Due to the relatively small size of the area and the compressed operating season, the field office

team feels that three operators is near the limit of what can occur safely." Id.

85.     The BLM did not give any formal public notice or provide an opportunity to comment before granting the permit to ASG.

86.     The BLM did not provide any formal notice to Triumvirate of the agency's plan to issue a third permit in the area.

87.     Only after Mr. Overcast heard of the agency's plan to grant a third permit, and only after he contacted the BLM to confirm the accuracy of this rumor, did the BLM inform Mr. Overcast that it was planning to grant a permit to ASG.

88.     Given this timeline—(1) upon information and belief, ASG filed its application for a permit months prior to the BLM's decision to issue its permit, (2) the BLM informed Overcast of the pending application on December 12, 2017, and (3) the BLM noted on December 22, 2017 that it had determined to grant the requested permit—the "notice" given to Overcast on December 12, 2017 was provided so late in the decision making process that it could not have been adequately considered in the determination of whether to grant the permit.  This information, provided at the eleventh hour, is no notice at all, and does not satisfy NEPA's requirement that public notice and comment inform and assist in the agency's decision making process.

89.     The BLM did not prepare an EA or EIS to assess the potential effects of issuing the permit to ASG.  Instead, on January 28, 2018, the BLM issued another DNA (the "ASG DNA") in which it concluded that, because the proposed ASG permit was "nearly identical" to the proposed Triumvirate permit analyzed in the Triumvirate EA, there was "no new information or any new circumstances to consider," and an EA or EIS was therefore unnecessary.  Exhibit 6 at 3, 4.

90. The BLM did not address or analyze the potential safety hazards or environmental effects of authorizing a third commercial operator in the same terrain on top of two other heli-skiing operations. Instead, the BLM simply stated that the direct, indirect, and cumulative effects resulting from granting the ASG permit will be "nearly similar to those that have been previously analyzed . . . as both Triumvirate and Alaska Snowboard Guides will have two helicopters and one airplane." Id. at 4.

91. The faulty premise of this statement is glaring. An EA prepared for one commercial heli-skiing operation does not suffice to analyze the effects, including the obvious safety hazards, of three commercial heli-skiing operations "stacked" in the same terrain and operating on top of one another.

92. The Triumvirate EA analyzed the impacts of only two helicopters and one airplane. BLM ignored the fact that the addition of ASG (not to mention Silverton Mountain Guides) would result in far more than two helicopters and one airplane operating in the same terrain and, correspondingly, a greater amount of impacts to safety and the environment. This fact necessarily means that the impacts to safety and the environment of the proposed ASG permit cannot be "nearly similar" to those of the Triumvirate permit.

93. The BLM did not give public notice or request public comments prior to issuing the permit to ASG.

94. The BLM represented that "the Outdoor Recreation Planner did reach out to the two previously permitted guides for their opinions on the possibility of a new operator entering the same area" and that "[t]he original operator (Triumvirate) was vehemently opposed to allowing another operator." Id. at 4.

95.     The ASG DNA does not identify why Triumvirate was opposed to issuance of the permit to ASG, or respond to the safety and operational hazard issues that Mr. Overcast identified to the BLM.

96.     The Triumvirate EA did not assess the direct, indirect, and cumulative environmental effects of granting the ASG permit, or make any mention of the direct, indirect, and cumulative effects on Dall sheep caused by multiple helicopters from three operators flying near and above Dall sheep habitat.  This is so even though the BLM noted in the Triumvirate EA that the issuance of additional permits in the area would increase the cumulative effects to Dall sheep.  Exhibit 3 at 13.

97.     On January 29, 2018, the BLM issued the Decision approving the issuance of the ASG permit.  The entirety of the Decision's substantive analysis is as follows:

>    Anchorage Field Office staff has reviewed the proposed action and appropriate project Design Features, as specified, will be incorporated into the project. Based on the review of the DNA worksheet, I have determined that the proposed action involves no significant impact to the human environment and no further analysis is required.

Exhibit 1 at 1.  As with the ASG DNA, and the Silverton DNA and Decision Record, the BLM did not acknowledge, address, or mention the significant adverse impacts on public safety, risks of accidents and avalanches, and operational hazards, and the adverse impact on the quality of the recreation under Triumvirate's existing special recreation permit of authorizing another commercial heli-skiing operator to operate on top of Triumvirate in the same terrain.

98.     The BLM's conclusion that the effects resulting from issuance of the ASG permit will be "nearly similar" to the effects analyzed in the Triumvirate EA fails to satisfy NEPA's "hard look" standard.  The Triumvirate EA contained no discussion of the safety hazards of three commercial heli-ski operators operating at the same time in the same terrain because Triumvirate

was the only commercial heli-ski operation proposed at the time. The Triumvirate EA contained no discussion of the heightened risk of avalanches caused by three operators competing to access the same limited terrain.

99.    The BLM's conclusion in the ASG DNA that the direct, indirect, and cumulative effects of issuing the ASG permit were analyzed in the Triumvirate EA is nonsensical. The effects of operating *three* commercial heli-skiing operations in a single concentrated area, relative to the effects of operating a *single* commercial heli-skiing operation, are fundamentally different, and certainly not similar enough to permit the BLM to rely on the prior Triumvirate EA to discharge its NEPA obligations. The BLM violated its obligation under NEPA to consider the direct, indirect, and cumulative effects of issuing the permit to ASG. The BLM's reliance on the DNA to conclude that the Triumvirate EA analyzed the effects of the ASG permit is arbitrary and capricious.

100.    By issuing the Decision without any public notice, public opportunity to comment, or notice to or meaningful opportunity for input from Triumvirate, the BLM violated the Ring of Fire Resource Management Plan provision that, in managing the Neacola Mountains ACEC, the BLM must "[w]ork collaboratively with … recreation users … to develop management strategies and define enforcement responsibilities." Exhibit 7 (ROD) at 10.

101.    By issuing the Decision, the BLM violated its duty under its special recreation permit regulations that, in determining whether to grant a special recreation permit, the BLM must consider conformance with laws and land use plans, public safety, conflicts with other uses, resource protection, and the public interest. 43 C.F.R. § 2932.26.

102.    The BLM did not consider any alternatives to the permit requested by ASG, for instance issuing a permit to ASG to operate in different terrain than authorized to Triumvirate.

Instead, the BLM stated that there were "no new issues around which to develop additional alternatives for the current Proposed Action." Exhibit 6 at 4.

103. The requirement to consider reasonable alternatives is the "heart" of the environmental analysis required by NEPA. 40 C.F.R. § 1502.14. The BLM's failure to consider any alternative, when numerous reasonable alternatives could and should have been evaluated, violates NEPA. Such reasonable alternatives to granting the requested permit include:

a. Granting a permit to ASG to operate in areas outside the Tordrillo and Neacola Mountains;

b. Granting a permit to ASG to operate in limited areas in the Tordrillo and Neacola Mountains to minimize use conflicts among the three operators;

c. Designation of protected Dall sheep areas with restrictions on flying and skiing in those areas to minimize impacts; and

d. Other reasonable alternatives with safety- or environmental-related conditions to address cumulative impacts of issuing a third permit in the area.

104. On February 28, 2018, to implement the Decision to issue the permit to ASG authorizing it to fly and ski in the same terrain as Triumvirate, BLM Field Office Manager Bonnie Million amended Triumvirate's special recreation permit to include conditions specific to the presence of ASG in the Triumvirate operating area. See Exhibit 14 at 1, 4 (Condition 10).

**D.     Triumvirate Has Constitutional and Prudential Standing to Seek Judicial Review of the Decision**

105. The ASG permit is in full force and effect. The BLM has not stayed the effect of the Decision.

106. The BLM has issued a permit to ASG authorizing it to conduct commercial heli-skiing operations for the period of February 1, 2018 through June 30, 2018.

107. The January 29, 2018 Decision, the special recreation permit it authorizes, and the activities conducted pursuant to the permit injure Triumvirate.

108.     The Decision increases the risk of harm, including of catastrophic accident, by allowing a third heli-skiing operator to fly in the same terrain and same area as Triumvirate. The Decision stacks a third operator on top of two existing ones in the same terrain. Permitting multiple helicopter skiing operators to use the same terrain creates operational conflicts, safety hazards, and increases risks that do not exist when fewer operators may use that terrain.

109.     The Decision injures Triumvirate because it allows more skiers and more helicopters into the same terrain, thereby increasing the risk of avalanches and loss of life, as well as creating competition for the prime skiing locations.

110.     The Decision injures Triumvirate because it results in more helicopters accessing the same limited terrain. The Decision requires Triumvirate to avoid terrain that it previously accessed because it introduces a third operator into the same area. The Decision increases the risk of a potentially catastrophic accident between two helicopters from different operators.

111.     The Decision degrades the overall quality of the powder skiing resource that the BLM authorized Triumvirate to access via its commercial helicopter skiing operation, and in which Triumvirate has invested millions of dollars. The Decision allocates terrain that was viable for two operators – Triumvirate and Silverton – among three operators. The more the powder skiing resource is reduced, the more risk Triumvirate is forced to bear to find other runs to ski with which it is less familiar, and that pose greater hazards.

112.     The Decision injures Triumvirate because the BLM did not respond to or address the concerns about safety, public hazards, user conflicts, impacts on the recreational resource, and impacts to the environment that Triumvirate identified when Mr. Overcast contacted the BLM about the rumored ASG permit.

113.     The Decision to authorize ASG to fly and ski in the same terrain as Triumvirate and Silverton increases the risks of loss of life and catastrophic accident.  Triumvirate is harmed because the BLM has forced Triumvirate to lower its safety standards to use the same terrain during the 2018 operating season.

114.     The Decision caused these injuries.  Absent the Decision, a third helicopter skiing operator could not operate within the same area.

115.     The Court may redress the injuries to Triumvirate caused by the Decision by vacating the Decision, thereby preventing flights pursuant to the third special recreation permit, and remanding this matter to the agency with direction to comply with NEPA, FLPMA, and agency regulations.

116.     Triumvirate is within the zone of interests protected by NEPA.  The safety, recreational, and environmental interests it seeks to protect are aspects of the human environment that NEPA requires the BLM to consider.  42 U.S.C. § 4331(b)(3).

117.     Triumvirate is within the zone of interests of FLPMA because the safety, recreational, and environmental interests it seeks to protect are within the zone of interests of the RMP provisions to which FLPMA requires the BLM to conform its Decision to issue the ASG permit.  Exhibit 7 (ROD) at 10.

118.     Triumvirate is within the zone of interests of the BLM's special recreation permit regulations because it seeks to protect safety and minimize recreational conflicts, two mandatory requirements for the BLM to consider prior to issuing a special recreation permit.  43 C.F.R. § 2932.26(b), (c).

119.     Triumvirate is within the zone of interests of the APA, 5 U.S.C. § 706, because it requests this Court to order the BLM to follow its own procedures, provide notice and an

opportunity to comment as required by agency procedural regulations, and issue decisions that are not arbitrary and capricious. Those are interests that Congress enacted 5 U.S.C. § 706 to protect.

**COUNT I**
**Failure to Prepare a NEPA Document**
**NEPA (42 U.S.C. § 4332(2)(C); 43 C.F.R. § 46.120(c))**

120.    Triumvirate incorporates and re-alleges every allegation set forth above.

121.    Issuance of a BLM special recreation permit to authorize heli-skiing in the Tordrillo and Neacola Mountains is major federal action subject to evaluation under NEPA. 42 U.S.C. § 4332(2)(C).

122.    The BLM satisfied its duties under NEPA prior to issuing the special recreation permit to Triumvirate in 2014 because it gave public notice, requested public comment, and prepared an environmental assessment of the proposed Triumvirate commercial heli-skiing special recreation permit, and considered the direct, indirect, and cumulative effects of that proposal. In the Triumvirate EA, the BLM analyzed the impacts to public safety and the environment of one commercial heli-skiing operation by Triumvirate, involving the use of up to two helicopters and one airplane for use in commercial heli-skiing operations.

123.    The Triumvirate EA did not consider the direct, indirect, or cumulative effects of three commercial heli-skiing operations operating in the Tordrillo and Neacola Mountains.

124.    The BLM issued the January 29, 2018 Decision authorizing the ASG permit without preparing a new environmental assessment or EIS to evaluate the direct, indirect, or cumulative effects of the ASG permit.

125.    The BLM's reasoning in the Determination of NEPA Adequacy and in the Decision that it need not prepare an environmental assessment or EIS to consider the effects of

the ASG permit because it already considered the effects of the ASG permit in the environmental assessment it prepared prior to issuing the permit to Triumvirate is arbitrary.

126.    The Determination of NEPA Adequacy and Decision document the BLM's arbitrary and irrational conclusion that no NEPA analysis of a second heli-skiing operation on top of Triumvirate's operation was necessary because there is "no new information or any new circumstances to consider" beyond that disclosed in the Triumvirate environmental assessment. See Exhibit 6. The BLM reasoned that no additional analysis was necessary because the environmental assessment prepared for Triumvirate's permit application had already considered the impacts to safety and the environment presented by a third commercial heli-skiing operation in the Tordrillo and Neacola Mountains.

127.    The BLM violated NEPA by not preparing an environmental assessment or EIS prior to issuing the permit to ASG. The Triumvirate EA did not—indeed, could not—consider the impacts to safety and the environment presented by *three* heli-skiing operations in the same area and the same terrain because it addressed only one—Triumvirate. By failing to consider the additional direct, indirect, and cumulative effects of authorizing a third heli-skiing operation in the same area as Triumvirate and Silverton, and instead relying on an environmental assessment prepared years earlier that addressed only Triumvirate's operations, the BLM violated its statutory obligation under NEPA to prepare an EA or EIS to consider the impacts of the ASG permit before issuing the permit. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1508.25, 1508.27(b)(2); 43 C.F.R. § 46.120(c); NEPA Handbook at 22-25.

**COUNT II**
**Failure to Consider Public Safety**
**NEPA (42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1508.27(b)(2))**

128.    Triumvirate incorporates and re-alleges every allegation set forth above.

32

129.     The BLM is required under NEPA and applicable regulations to consider the direct, indirect, and cumulative effects of a proposed action on safety.  42 U.S.C. § 4331(b)(3); 40 C.F.R. § 1508.27(b)(2).

130.     The 2013 Triumvirate EA analyzed the safety and environmental impacts of Triumvirate's then-proposed commercial heli-ski operation.  The EA did not consider the safety impacts of three commercial heli-skiing operations flying and skiing in the same terrain, with many more helicopters and airplanes, and opportunities for user conflicts and catastrophic accidents.

131.     The BLM's authorization of a third heli-skiing operation by ASG in the same terrain poses additional, material safety risks and hazards that do not exist with a single heli-skiing operation conducted by Triumvirate as a single operator.

132.     The BLM did not assess the safety risks and consequences of issuing the permit to ASG in the Determination of NEPA Adequacy.

133.     The BLM did not assess the safety risks and consequences of three commercial heli-ski operations flying and skiing at the same time in the same terrain in the 2013 Triumvirate EA.

134.     The BLM violated its non-discretionary obligation under NEPA to take the requisite "hard look" at the safety and hazard consequences of issuing the permit to ASG.  42 U.S.C. § 4331(b)(3); 40 C.F.R. § 1508.27(b)(2).

**COUNT III**
**Failure to Consider Environmental Effects**
**NEPA (42 U.S.C. § 4332(2)(C)(i), (ii), (iv); 40 C.F.R. §§ 1508.7, 1508.8)**

135.     Triumvirate incorporates and re-alleges every allegation set forth above.

136.     The Triumvirate EA analyzed the safety and environmental impacts of one commercial heli-skiing operation.  The Triumvirate EA did not consider the environmental impacts of three commercial heli-skiing operations flying and skiing in the same area.

137.     The BLM's authorization of two additional heli-skiing operations in the same terrain creates additional impacts to wildlife and the environment from aircraft, noise, and human presence.

138.     The Triumvirate EA concluded there would be minimal impacts on wildlife, including on Dall sheep, as a result of noise associated with Triumvirate's heli-ski operations.

139.     In issuing the ASG permit, the BLM failed to analyze the additional direct, indirect, and cumulative environmental impacts resulting from noise, additional aircraft, and aircraft activity on wildlife, including Dall sheep.  The BLM failed to consider the incremental impact of issuing the special recreation permit to ASG when added to the existing use by Triumvirate.

140.     The BLM did not assess these environmental impacts in its Determination of NEPA Adequacy issued for the ASG permit.

<u>COUNT IV</u>
<u>Failure to Consider Reasonable Alternatives</u>
<u>NEPA (42 U.S.C. § 4332(2)(C)(iii), (2)(E); 40 C.F.R. §§ 1502.14(a); 1508.9(b))</u>

141.     Triumvirate incorporates and re-alleges every allegation set forth above.

142.     To comply with NEPA, agencies are required to "[r]igorously explore and objectively evaluate all reasonable alternatives [to the proposed action], and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  Agencies must "[d]evote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate

their comparative merits."  40 C.F.R. § 1502.14(b).  An EA must include a discussion of alternatives.  40 C.F.R. § 1508.9(b).

143.    The BLM did not consider any alternatives to the proposal to issue a special recreation permit to ASG to operate in the exact same terrain as Triumvirate prior to issuing the permit to ASG.

144.    The BLM was required to consider reasonable alternatives that, for example, would minimize safety issues, avoid conflicts with Triumvirate, avoid increased recreational use of the same terrain, decrease hazards from overlapping operations, and decrease cumulative impacts to wildlife from repeated aircraft landings and activity.

145.    The BLM's failure to consider alternatives prior to issuing the permit to ASG violates the "heart" of NEPA.  40 C.F.R. § 1502.14; see also 42 U.S.C. § 4332(2)(C)(iii) (requiring consideration of alternatives).

### COUNT V
### Failure to Solicit Public Involvement or Notify Interested Persons
### NEPA (42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1506.6, 1501.7(a); 43 C.F.R. § 46.200)

146.    Triumvirate incorporates and re-alleges every allegation set forth above.

147.    Public involvement is a fundamental goal of NEPA.  Dep't of Transp. v. Public Citizen, 541 U.S. 752, 768-69 (2004).

148.    NEPA requires agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," and "to inform those persons and agencies who may be interested or affected," of a pending proposed action, including by mailing such notice to any person who has requested it.  40 C.F.R. § 1506.6(a), (b), (b)(1).  To aid in the decision making process, agencies are required to "solicit appropriate information from the public."  40 C.F.R. § 1506.6(d).

149. Agencies are obligated to engage in "an early and open process for determining the scope of issues to be addressed," and that as part of this process, the agency "invite the participation" of "interested persons." 40 C.F.R. § 1501.7(a)(1). Interior's NEPA regulations provide that the BLM "must solicit the participation of all those persons or organizations that may be interested or affected as early as possible, such as at the time an application is received or when the bureau initiates the NEPA process for a proposed action." 43 C.F.R. § 46.200(b).

150. The BLM was required to give Mr. Overcast, General Manager of Triumvirate, written notice of the ASG permit application because he is an "interested person" within the meaning of 40 C.F.R. § 1506.6(b), 40 C.F.R. § 1501.7(a)(1), and 43 C.F.R. § 46.200(b) in BLM decisions involving heli-ski special recreation permits in the Tordrillo and Neacola Mountains.

151. The BLM was required to give Mr. Overcast written notice of the ASG permit application under 40 C.F.R. § 1506.6(b)(1) because Mr. Overcast requested the BLM in 2017 to keep him informed about heli-ski special recreation permits in the Tordrillo and Neacola Mountains.

152. Mr. Overcast learned of the ASG permit application by contacting the BLM. The BLM did not contact Mr. Overcast to provide him notice, did not provide him with written notice, and did not give Mr. Overcast and Triumvirate a meaningful opportunity to comment on the ASG permit application.

153. The BLM disclosed to Triumvirate that ASG had filed a permit application only after Triumvirate contacted the BLM, too late in the decision making process to satisfy the BLM's obligations to provide notice to, and an opportunity for comment by, Triumvirate under 40 C.F.R. §§ 1506.6, 1501.7(a); 43 C.F.R. § 46.200.

154.     The limited input Mr. Overcast was able to provide after he contacted the BLM was not incorporated by the BLM in the decision making process, and does not satisfy the BLM's obligation to provide notice and a meaningful opportunity for comment.

155.     The BLM violated its obligations under 40 C.F.R. § 1506.6(b)(1), 40 C.F.R. § 1501.7(a)(1), and 43 C.F.R. § 46.200(b) to provide written notice to Mr. Overcast and Triumvirate of the ASG permit application.

## COUNT VI
## Failure to Conform to Resource Management Plan
## FLPMA (43 U.S.C. § 1732(a); 43 C.F.R. §§ 1610.2(a), 1610.5-3)

156.     Triumvirate incorporates and re-alleges every allegation set forth above.

157.     FLPMA mandates that all actions taken by the BLM must conform to the provisions of the applicable RMP.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3.

158.     The Ring of Fire RMP applies to BLM-managed lands in the Neacola and Tordrillo Mountains.

159.     The Ring of Fire RMP requires the BLM to "work collaboratively" with "recreation users … to develop management strategies and define enforcement strategies."  The Ring of Fire RMP requires the BLM to "[m]anage recreation to maintain existing opportunities." Exhibit 7 (ROD) at 10.

160.     Issuance of the special recreation permit to ASG is a BLM action that must conform to the provisions of the Ring of Fire RMP.  43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3.

161.     The BLM did not work collaboratively with Triumvirate, an existing recreation user, in the Neacola ACEC and Tordrillo Mountains, to develop management strategies before the BLM issued the permit to ASG.

162.    The Decision to issue the ASG permit does not maintain existing opportunities for recreation in the Neacola ACEC and Tordrillo Mountains. The Decision degrades the quality of current heli-skiing operations by Triumvirate.

163.    The Decision to issue the ASG permit violated the provisions of the Ring of Fire RMP and violated the agency's mandatory duty under FLPMA to ensure that its actions conform to the RMP. See Exhibit 7 (ROD) at 10; 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3.

**COUNT VII**
**Failure to Consider Public Safety and User Conflicts in Issuing Permit**
**FLPMA (43 U.S.C. § 1740; 43 C.F.R. § 2932.26)**

164.    Interior's special recreation permit regulations, issued pursuant to FLPMA, require the BLM to consider certain factors, including public safety, conflicts with other uses, resource protection, the public interest, and conformance with laws and land use plans, in determining whether to issue a special recreation permit. 43 C.F.R. § 2932.26.

165.    The Decision to issue the special recreation permit to ASG is subject to the procedural requirement that the BLM consider the factors listed at 43 C.F.R. § 2932.26.

166.    The BLM failed to consider the factors listed in 43 C.F.R. § 2932.26 before issuing the Decision. The Decision contains no discussion of these factors beyond noting that Triumvirate is "vehemently opposed to allowing another operator." The BLM did not address the basis of Triumvirate's opposition in the decision documents although those grounds were known, in part, to the agency.

167.    The BLM violated 43 C.F.R. § 2932.26 by failing to consider impacts of the ASG permit on public safety, operating and safety conflicts caused by issuing the ASG permit, resource protection, the public interest, or whether the requested permit would conform with laws and land use plans, including NEPA, FLMPA, and the Ring of Fire RMP.

## COUNT VIII
## Arbitrary and Capricious Agency Action
## APA (5 U.S.C. § 706(2))

168.     The APA provides that courts shall "hold unlawful and set aside agency action" found to be arbitrary, capricious, an abuse of discretion, or without observance of procedure required by law.  5 U.S.C. § 706(2)(A), (D).

169.     The Decision to issue ASG a special recreation permit to operate on top of two existing heli-ski operators at the same time and in the same terrain is an arbitrary and capricious agency decision.

170.     In determining to grant the permit, the BLM failed to consider the single most important factor that heli-skiing operators are concerned with: safety.  The BLM did not acknowledge, analyze or even mention the safety impacts presented by authorizing a third heli-skiing operator to fly and ski in the same terrain as two existing permitted operators.  The BLM made no effort to consider the grounds for opposition from Triumvirate although Mr. Overcast explained them to agency staff after he learned that the BLM was planning to issue the permit to ASG.  The record on which the BLM made its decision does not address the consequences of the Decision: the increased risk of avalanches, increased potential for helicopter accidents, and increased risk of catastrophic accident and loss of life.

171.     The BLM also failed to consider the cumulative impacts to wildlife and the environment caused by granting the permit.

172.     The BLM failed to alert Triumvirate, the party adversely affected by the Decision, until the decision making process had progressed so far that a decision had effectively been made.

173.     The BLM Decision to grant the ASG permit is arbitrary and capricious.

## RELIEF REQUESTED

WHEREFORE, Triumvirate demands judgment in its favor and against Defendants, and respectfully requests the following relief:

a. A declaration that Defendants have violated NEPA, FLPMA, binding regulations issued pursuant to those statutes, and the APA.

b. Vacatur of the BLM's January 29, 2018 Decision Record approving issuance of a special recreation permit to Alaska Snowboard Guides;

c. Preliminary injunctive relief to permit the Court time to rule upon the claims while preventing irreparable harm to Triumvirate;

d. Triumvirate's attorneys' fees and costs as permitted under the Equal Access to Justice Act and other authorities; and

e. All such other relief this Court deems appropriate.

Respectfully submitted this 5th day of March, 2018,

LEWIS BESS WILLIAMS AND WEESE, P.C.

s/ Ezekiel J. Williams
Ezekiel J. Williams (Bar No. CO0056)
Carlos R. Romo (Bar No. TX0140)
John H. Bernetich (Bar No. 1018769)
1801 California St., Suite 3400
Denver, CO 80202
(303) 228-2529
zwilliams@lewisbess.com
cromo@lewisbess.com
jbernetich@lewisbess.com

*Attorneys for Triumvirate, LLC*

**List of Exhibits**

1. Alaska Snowboard Guides Decision Record (Jan. 29, 2018)

2. Triumvirate LLC Decision Record (Feb. 20, 2014)

3. Environmental Assessment – Triumvirate LLC (2014)

4. Finding of No Significant Impact – Triumvirate LLC (Feb. 20, 2014)

5. Silverton Mountain Guides Decision Record (Feb. 16, 2017)

6. Alaska Snowboard Guides Determination of NEPA Adequacy Worksheet (Jan. 28, 2018)

7. BLM, Ring of Fire: Record of Decision and Approved Management Plan (Mar. 2008)

8. Emails between Michael Overcast (Triumvirate) and Stephanie Kuhns (BLM) (Dec. 3-22, 2017)

9. Letter from Ezekiel J. Williams (Lewis Bess Williams & Weese, P.C.) to Bonnie Million (BLM) (Feb. 16, 2018)

10. Letter from Bonnie Million (BLM) to Ezekiel J. Williams (Lewis Bess Williams & Weese, P.C.) (Feb. 27, 2018)

11. Emails between Michael Overcast (Triumvirate LLC) and Jeff Kowalczyk (BLM) (Feb. 2-24, 2015)

12. Silverton Mountain Guides Determination of NEPA Adequacy Worksheet (Feb. 16, 2017)

13. Summary of telephone conversation between Michael Overcast (Triumvirate LLC) and Douglas Ballou (BLM) (Dec. 15, 2017)

14. Letter from Bonnie Million (BLM) to Michael Overcast (Triumvirate) (Feb. 28, 2018)

Case 3:18-cv-00091-HRH   Document 1   Filed 03/05/18   Page 41 of 41