# EXHIBIT 7



U.S. Department of the Interior
Bureau of Land Management

BLM

# Ring of Fire

**Record of Decision and
Approved Management Plan**

March 2008

Anchorage Field Office, Alaska

# The Bureau of Land Management Today

*Our Vision*
To enhance the quality of life for all citizens through the balanced
stewardship of America's public lands and resources.

*Our Mission*
To sustain the health, diversity, and productivity of the public lands
for the use and enjoyment of present and future generations.

**BLM/AK/PL-08/013+1610+010**

**BLM File Photos:**

1. Aerial view of the Chilligan River north of Chakachamna
   Lake in the northern portion of Neacola Block
2. OHV users on Knik River gravel bar
3. Mountain goat
4. Helicopter and raft at Tsirku River

# Ring of Fire

RECORD OF DECISION
AND
APPROVED RESOURCE MANAGEMENT PLAN

March 2008

U.S. Department of the Interior
Bureau of Land Management
Anchorage Field Office
Anchorage, Alaska

# Table of Contents

FIGURE 1 - OVERVIEW MAP OF RING OF FIRE PLANNING AREA

RECORD OF DECISION

I. Introduction .................................................................................................................1
II. Results of the Protest Review and Governor's Consistency Review .........................2
    A. Protests ................................................................................................................2
    B. Governor's Consistency Review...........................................................................4
III. Decision ...................................................................................................................4
    A. Notice of Modifications ........................................................................................4
    B. What the ROD/Approved Plan Will Provide ........................................................4
    C. What the ROD/Approved Plan Will Not Provide ..................................................5
IV. Overview of the Alternatives, Including the Environmentally Preferable Alternative ..........6
    A. Alternative Description .........................................................................................6
    B. The Environmentally Preferable Alternative.........................................................7
V. Management Considerations in Selecting the Approved Plan....................................8
VI. Land Use Management Decisions ............................................................................9
    Rights-of-Way.............................................................................................................9
    Specially Designated Areas.........................................................................................9
    Visual Resource Management......................................................................................11
    Off-Highway Vehicles ................................................................................................11
    Land Ownership Adjustments......................................................................................11
    Fire Management ........................................................................................................12
    Withdrawal Management..............................................................................................12
    No Surface Occupancy (NSO) and Minor Constraints on Mineral Development....................12
    Required Operating Procedures and Stipulations .........................................................12
    Wild and Scenic River Suitability Determination.........................................................12
VII. Mitigation Measures ...............................................................................................12
VIII. Plan Monitoring .....................................................................................................13
IX. Public Involvement...................................................................................................13
X. Implementation .........................................................................................................14
XI. Availability of the Plan ............................................................................................15
XII. Field Manager Recommendation and State Director Approval ...........................................16

APPROVED RESOURCE MANAGEMENT PLAN

I. INTRODUCTION.........................................................................................................1
    A. Purpose and Need...............................................................................................1
    B. Consideration of Other BLM Policies, Plans, and Programs .................................1
    C. Collaboration ......................................................................................................2
    D. Maintaining the Plan ..........................................................................................2

  E. Changing the Plan.............................................................................................................2
  F. Plan Implementation .........................................................................................................3
  G. Plan Evaluation .................................................................................................................3
 II. MANAGEMENT DECISIONS ..............................................................................................4
  A. Air Resources....................................................................................................................4
  B. Cultural Resources ............................................................................................................4
  C. Fisheries............................................................................................................................5
  D. Floodplains.......................................................................................................................5
  E. Forestry ............................................................................................................................5
  F. Grazing (Livestock and Reindeer)....................................................................................6
  G. Hazardous Materials.........................................................................................................6
  H. Iditarod and National Historic Trail.................................................................................7
  I. Lands and Realty ...............................................................................................................7
  J. Minerals - Fluid Leasable................................................................................................12
  K. Minerals - Solid Leasable...............................................................................................13
  L. Minerals - Locatable and Saleable..................................................................................13
  M. Off-Highway Vehicles...................................................................................................14
  N. Paleontology..................................................................................................................15
  O. Recreation .....................................................................................................................15
  P. Renewable Energy ..........................................................................................................16
  Q. Soils...............................................................................................................................16
  R. Subsistence ....................................................................................................................17
  S. Vegetation......................................................................................................................17
  T. Visual Resources............................................................................................................17
  U. Water Resources............................................................................................................18
  V. Wetlands/Riparian .........................................................................................................18
  W. Wildland Fire and Fuels ................................................................................................19
  X. Wildlife .........................................................................................................................19
  Y. Wild and Scenic Rivers..................................................................................................20

APPENDIX A: REQUIRED OPERATING PROCEDURE, STIPULATIONS, AND
STANDARD LEASE TERMS



Bureau of Land Management
**Figure 1. Overview Map of Ring of Fire Planning Area.**

# Ring of Fire Record of Decision

# I. Introduction

This Record of Decision (ROD) approves the Bureau of Land Management's (BLM) proposal to manage the public lands within the Anchorage Field Office (AFO) and the Ring of Fire planning area as presented in the attached Resource Management Plan (referred to as the Approved Plan). This Approved Plan was described as Alternative D in the July 2006 Proposed Ring of Fire Resource Management Plan and Final Environmental Impact Statement (PRMP/FEIS). This ROD provides the background on the development of the plan and the rationale for approving the proposed decisions contained in Alternative D, and describes modifications made to address protests received on the plan. The Approved Plan describes the decisions themselves.

The planning area encompasses BLM-managed public lands and mineral estate managed by the AFO from slightly above Dixon Entrance in Southeast Alaska to Attu Island near the end of the Aleutian Chain (Figure 1). The planning area spans a distance of 2,500 miles, longer than the distance from Seattle to Washington, D.C. The resources, social and economic conditions, climate, and topography within the planning area vary widely. Because of these factors and the size of the planning area, the BLM divided the planning area into four distinct regions; Southeast, Southcentral, Kodiak Island, and the Alaska Peninsula/Aleutian Chain.

The BLM Anchorage Field Office manages approximately 1.3 million acres in the planning area. Nearly 60,000 acres of this area are withdrawn and managed for military purposes. Of the remaining lands, nearly 798,000 acres are selected by, but not yet conveyed to, the State of Alaska (State) or Native corporations under the entitlements provided by the Statehood Act of 1959 and the Alaska Native Claims Settlement Act (ANCSA) of 1971. Within the planning area, the BLM manages approximately 480,000 acres that are not selected.

Also within or adjoining the planning area are federally-managed sub-surface estate beneath national forest lands, national wildlife refuge lands, and private lands. Due to over-selection by the State of Alaska and ANCSA corporations, the BLM will retain management of some of the selected lands. However, nothing in this plan encumbers State-selected or Native-selected lands following the transfer of title out of Federal ownership.

Development of this RMP formally began with the publication of the Notice of Intent in the *Federal Register* on March 19, 2003. Over the next three years, the BLM conducted an outreach effort, held public open houses and meetings, and provided the standard comment periods found in Chapter 5.0 *Consultation and Coordination* of the PRMP/FEIS and summarized in the Public Involvement section of this document.

On September 30, 2005, the Notice of Availability for the Draft Resource Management Plan/Environmental Impact Statement was published in the *Federal Register*, starting the 90-day public review and comment period. The comment period was originally scheduled to end on December 29, 2005, but because of a mapping error in the document,

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 9 of 82

the BLM extended the comment period an additional 30 days, produced an errata sheet and a corrected map, and distributed them to the Ring of Fire mail list. Substantive comments were compiled, with the responses, in the Comment Analysis Report (Chapter 6 of the PRMP/FEIS). The BLM also completed the standard protest period of 30 days prior to approval of this ROD, as required by BLM planning regulations found in 43 CFR 1610.5-2. The protest period ended September 30, 2006.

# II. Results of the Protest Review and Governor's Consistency Review

## A. Protests

During the 30-day protest period, two protest letters were received and subsequently resolved by the BLM Director, whose decision is final for the U.S. Department of Interior (USDOI). This ROD serves as the final plan decision for the Ring of Fire as described, and the RMP becomes effective on the date it is signed. No further administrative remedies are available at this time for these plan decisions.

The protesting parties were:

- Alaska Coalition/American Rivers Association (joint protest letter)
- Lynn Canal Conservation, Inc.

The main points of protest included:

The Alaska Coalition/American Rivers
- The plan's adequacy in responding to substantive comments
- Not deferring final suitability of Wild and Scenic Rivers (WSR) until the conveyances of Federal lands are completed
- Inadequate range of alternatives for WSR
- Inadequate protection of free flow, water quality and outstandingly remarkable values of eligible/suitable rivers, and interim management of eligible rivers
- Lack of protection of wildness and resource qualities of public rivers
- Consideration of the cumulative impacts of the Pebble Mine
- Failure to provide sufficient interim management of the Haines area
- Failure to analyze available mountain goat data

Lynn Canal Conservation, Inc.
- Failure to provide a hard copy of the PRMP/FEIS for review in a timely manner
- Not carrying forward the recommendation for an Area of Critical Environmental Concern (ACEC) or Research Natural Area (RNA) in the Haines Block
- The decision to establish a Special Recreation Management Area (SRMA) instead of the recommended ACEC for the Haines Block
- Failure to consider the BLM's available mountain goat data in making decisions concerning the establishment of an ACEC/RNA for the Haines Block

- Failure to respond adequately to substantive comments

In response to the Alaska Coalition/American Rivers protest letter and the concern expressed over the treatment of the Wild and Scenic Rivers resource in the plan, the BLM will defer the suitability determination for the segments identified in the RMP as "Eligible." This change aligns the BLM's treatment of Wild and Scenic Rivers processing with the East Alaska RMP by deferring the suitability determination for the river segments until the land ownership within the planning area is stabilized. This suitability determination is expected to be completed in 2011. Deferring the determination will allow the BLM to make a more meaningful evaluation of the resources which were identified during the planning process and which supported the segments' eligibility determination.

In making this change, the BLM recognizes that it commits to manage the 14 eligible river segments, subject to valid existing rights, in a manner that maintains or enhances the values which supported the segments' eligibility. No action will be permitted which will diminish the identified Outstandingly Remarkable Values (ORVs) and the river segments' opportunity to be found suitable for inclusion in the Wild and Scenic River System. At a minimum, the BLM will provide protection of the values addressed in BLM Manual 8351.32 C Protective Management. The BLM will manage all lands within the planning area through the application of the National Environmental Policy Act (NEPA) process allowing the identification of potential impacts and the development of mitigating measures specific to the location. These measures will provide additional protection beyond that provided through the application of the Required Operating Procedures (ROPs), Stipulations, and Standard Lease Terms. The Approved Plan lists the ORVs and the tentative classification for each segment, as well as a description of how the BLM intends to manage the lands in the interim period to ensure the identified ORVs are not diminished.

In response to the protest letter filed by Lynn Canal Conservation, Inc. (LCC) the BLM will defer a final determination as to the establishment of an ACEC for the Haines Block until BLM re-evaluates the Importance Criteria found in BLM Manual 1613 as they apply to the resources associated with the Haines Block, including mountain goats. The NEPA process for the BLM's re-evaluation of the ACEC for the Haines Block will also govern the preparation of a Special Recreation Management Plan (SRMP) for the SRMA, which the BLM will begin developing in 2008. The NEPA process will provide an opportunity for the public to submit additional data, and a variety of management alternatives and corresponding protective measures for mountain goats and their habitat will be considered at that time, with input from the public, affected entities, and other interested parties.

In the interim period, the BLM will manage the lands using the existing guidelines for recreation management including the observance of the Monitoring and Control Area and the application of the Required Operating Procedures and Stipulations found in Appendix A of this document.

## B. Governor's Consistency Review

The Governor of the State of Alaska provided comments to the Draft RMP/EIS which were considered by the BLM. The mandatory Governor's Consistency Review of the PRMP/FEIS was completed on October 2, 2006, and concluded that it was consistent with the State of Alaska's planning efforts.

# III. Decision

A decision is hereby made to approve the attached Resource Management Plan for the Ring of Fire planning area. This plan was prepared under the regulations (43 CFR 1600) implementing the Federal Land Policy and Management Act (FLPMA) of 1976. An Environmental Impact Statement was prepared for this plan in accordance with NEPA.

## A. Notice of Modifications

As a result of protests on the PRMP/FEIS and continued internal review, BLM made two modifications, included in the Approved Plan:

- Determination of suitability for the 14 eligible Wild and Scenic River segments will be deferred until the land ownership in the planning area is better defined;

- The BLM will also defer a final determination as to the establishment of an ACEC within the Haines Block until such time that the BLM re-evaluates the Importance Criteria and the related aspects of the ACEC designation process as they apply to the resources associated with the Haines Block, including mountain goats.

All other aspects of the Approved Plan are identical to those set forth in the PRMP/FEIS in July 2006. Management decisions and guidance for public lands within the planning area and under the jurisdiction of the BLM's Anchorage Field Office are presented in the Approved Plan and summarized in this ROD in the Section VI, "Land Use Management Decisions."

## B. What the ROD/Approved Plan Will Provide

This ROD and the Approved Plan will provide overall direction for all resources found on BLM-managed lands within the boundary of the Ring of Fire planning area, as well as federally-managed sub-surface estate beneath national forest lands, national wildlife refuge lands, and private lands.

Decisions in the land use plan apply to all BLM-managed unselected lands (486,000 acres) and any selected lands (798,000 acres) whose selections would be relinquished or rejected. Acreages presented in the Approved Plan are approximate because the BLM continues to transfer title to lands within the planning area.

The Approved Plan establishes specific program objectives and quantifiable desired conditions. It specifies which lands within the planning area are determined suitable and made available for disposal.

The Approved Plan will provide the interim management direction for the eligible WSR segments based on the guidance found in BLM Manual 8351.32C.

## C. What the ROD/Approved Plan Will Not Provide

*Proposal Authorizations - This Approved Plan does not authorize any project, approve any application, or provide approval for any specific future action within the planning area. All applications, regardless of the proposal, will be subject to a NEPA process, including additional public review, the identification of potential impacts resulting from the proposed action, the development and application of mitigating measures, and the assignment of Required Operating Procedures, Stipulations, and Standard Lease Terms as appropriate.*

*The Approved Plan will not make the suitability determination for the Wild and Scenic River Segments identified in the Approved Plan as "Eligible" segments. This determination will be deferred until the Alaska Land Transfer Program conveyances in the planning area are completed.*

*The Approved Plan will not make a final determination as to potential establishment of an ACEC within the Haines Block. This determination will be deferred until the BLM re-evaluates the Importance Criteria and the related aspects of the ACEC designation process as they apply to the resources associated with the Haines Block.*

The Approved Plan does not contain decisions for leasing of federal mineral estate under U.S. Department of Agriculture (USDA) Forest Service lands, or USDOI National Wildlife Refuge lands.

Many decisions are not appropriate at this level of planning and are not included in the ROD. Examples of these decisions include:

- *Statutory requirements* - This plan will not change the BLM's obligation to comply with the applicable laws and regulations including, but not limited to the Clean Air Act, the Clean Water Act, the National Environmental Policy Act, the Federal Land Policy and Management Act, the Endangered Species Act, or any other Federal law.
- *National policy* - These decisions will not change the BLM's obligation to conform to current or future national policy.
- *Funding levels and allocations* - These are determined at the national level on a yearly basis and are beyond the control of the RMP.

# IV. Overview of the Alternatives, including the Environmentally Preferred Alternative

Four alternatives, including the No Action Alternative, were analyzed in detail in the Draft RMP/EIS in 2005 and the Proposed RMP/FEIS in 2006. The alternatives were developed to address the major planning issues and provide direction for the resources affected. All Alternatives recognize and incorporate the Alaska Land Health Standards developed with the assistance of the Alaska Resource Advisory Council in 2004 as the baseline standard for assessing the land health. All management under any of the four alternatives would comply with Federal and State laws and regulations, standards and policies. Each alternative represents a complete and reasonable set of objectives, actions and allocations that would guide future management of lands and resources in the planning area. The BLM considered additional alternatives raised during scoping and comment on the Draft RMP/EIS which were not carried forward into the final document. These were discussed in Chapter 2.2 of the PRMP/FEIS.

## A. Alternative Description

**Alternative A** is the continuation of the BLM's current management also called the No Action Alternative. This alternative would continue current management under guidance of the South-central Management Framework Plan (MFP) for lands covered by that plan. Direction found in current laws, regulations, and policy would also continue to be implemented, sometimes overriding the provisions of the Southcentral MFP. The current methods, mix and levels of multiple-use management would continue and resource values would receive attention at the present levels. No lands would be open to fluid or solid mineral leasing, including leasing for coal bed natural gas, and large tracts would remain closed to mineral entry and development due to the retention of ANCSA 17(d)(1) withdrawals. No special management areas would be designated within the planning area. Lands would remain unclassified for OHV use and visual resources. In general, most activities would be analyzed on a case-by-case basis through the application of the NEPA process and few activities would be limited or excluded, as long as they were consistent with State and Federal laws and BLM policy.

**Alternative B** highlights management that would facilitate resource development. Nearly all unselected lands within the planning area would be open to mineral leasing and development. All existing ANCSA 17(d)(1) withdrawals would be revoked, allowing for potential mineral exploration and development. BLM lands would be designated and managed as "Open" to OHV uses and the visual resources would be managed as VRM Class IV, the least restrictive class of management. Lands and resources would be protected through the NEPA process allowing for the development of site specific mitigation measures and the application of Required Operating Procedures and Stipulations, as described in Appendix D of the PRMP/FEIS.

**Alternative C** provides emphasis on actions and management which would protect or enhance the resource values. Oil and gas leasing and mineral exploration and development would be more constrained than in Alternatives B or D and portions of the

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 14 of 82

BLM-managed land within the planning area would be excluded from mineral leasing and location to protect the resources. One ACEC and two SRMAs would be established on lands that remain under long-term BLM management. The BLM would develop implementation level plans for these areas that would outline specific measures to protect or enhance resource values within these areas. All BLM-managed lands in the planning area would be designated as "Limited" for OHV use, allowing limitations to protect the habitat, soils, vegetation and the recreational experience. Development of the implementation plans for the SRMAs and the ACEC would further refine the limitations to OHV use to meet the objectives of the designation. ANCSA 17(d)(1) withdrawals would be maintained as an interim measure while the BLM pursues withdrawals or other suitable administrative designations to protect or maintain the resource values. Fourteen river segments would be determined Eligible for inclusion into the National Wild and Scenic Rivers System. The ACEC and two smaller parcels would be managed as VRM Class II, and the majority of the remaining BLM lands within the planning area would be managed as VRM Class III. As also described in Alternative B, the resources would be protected by the application of the NEPA process, the development of site-specific mitigating measures, and the application of ROPs and Stipulations as described in Appendix D of the PRMP/FEIS.

**Alternative D** provides a balance of protection, use and enhancement of resources. The majority of lands that are not selected, as well as those lands whose selections are relinquished or rejected, would be open to oil and gas leasing and mineral location and development, though several unique and sensitive areas would remain closed. The BLM would establish one ACEC and two SRMAs on lands that remain under long-term BLM management. Implementation level plans would be developed for these areas that would outline specific management measures to protect or enhance the resource values within the designated area. Three parcels–the Halibut Cove Forest Study Area, the Lake Carlanna Municipal Watershed, and the Neacola ACEC–would be managed as VRM Class II. All other lands would be managed as Class IV. All BLM-managed lands in the planning area would be classified as "Limited" for OHV use. This "Limited" designation would be the same as the State of Alaska's *Generally Allowed Uses on State Lands found in Appendix E of the Proposed RMP.* Implementation planning for the ACEC and the two SRMAs would be used to further refine the "Limited" OHV designation to meet the objectives of the designation. All ANCSA 17(d)(1) withdrawals would be revoked, allowing increased potential for mineral exploration and development. As with Alternatives B and C, resources would be protected through the NEPA process associated with application processing, including the development of site-specific mitigating measures and the application of the ROPs and Stipulations.

## B. The Environmentally Preferable Alternative

Alternative D is the agency Preferred Alternative and the Environmentally Preferable Alternative, when taking into consideration the human (social and economic) environment as well as the natural environment. The Council on Environmental Quality (CEQ) has defined the environmentally preferable alternative as the alternative that will

promote the national environmental policy as expressed in Section 101 of NEPA. This section lists six broad policy goals for all Federal plans, programs, and policies:

1. Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
2. Assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
3. Attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable or unintended consequences;
4. Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;
5. Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
6. Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

Based on these criteria, identification of the environmentally preferable alternative(s) involves balancing current and potential resource uses with the need to protect resources, as well as consideration of the human environment. Alternative B could be viewed as the least environmentally preferable alternative, as it offers the most intensive, active management for use of the area, which may negatively impact other resource values the most. However, this alternative would provide the most economic benefit to the economy in the short term. Alternative D would be less environmentally preferable than Alternative C, but more preferable than Alternatives A or B. Alternative C would be more protective of natural and biological values than Alternatives A, B, or D, but would provide for fewer or restricted uses. Alternative D would achieve a balance between sustainable economic benefits and resource protection.

## V. Management Considerations in Selecting the Approved Plan

The BLM is directed by the Federal Land Policy and Management Act of 1976 to manage lands for multiple uses, various purposes and values. Alternative D was developed to address the diverse resource uses in a fair manner and provide a practical and "workable" framework for management of the lands within the planning area.

The BLM is responsible for preparing a plan that is consistent with its legal mandates and reflects its collective professional judgment, while incorporating varying viewpoints and ideas. There has been both support and opposition to the components of Alternative D as the Proposed Alternative. The Approved Plan provides a balance between the reasonable measures necessary to protect the existing resource values and the continuing need for use of the public lands and resources found in the planning area. Approval of a plan which provided a balance of resource uses and the flexibility of management options to

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 16 of 82

meet the concerns for the resources and the socio-economic need was a major factor. Alternative D was selected because it provides management that will maintain and improve the quality of the resources, while considering the needs and demands for potential resource development and use. The BLM manages its resources by integrating the ecological, economic and social principals in a manner that safeguards the sustainability, diversity and productivity of the lands.

# VI. Land Use Management Decisions

Specific management decisions under the jurisdiction of the Anchorage Field Office are presented in the attached Resource Management Plan. Major decisions include:

**Rights-of-Way**
Establishing rights-of-way exclusion and avoidance areas for the Mountain Goat Monitoring and Control Area within the Haines Block SRMA.

**Specially Designated Areas**
Designation of two Special Recreation Management Areas (SRMAs): the Knik River (PRMP/FEIS Figure 2.3-5) and the Haines Block (PRMP/FEIS Figures 2.3-2 and 2.3-3), and retention of the existing Campbell Tract SRMA.

The BLM will develop Special Recreation Management Plans (implementation plans) for the Knik River and Haines Block. (The Knik River implementation plan will be deferred until land conveyance is complete; a plan will not be completed if BLM does not retain ownership of the Knik River SRMA). Public use cabins would be considered in these areas if they are consistent with the objectives described for the SRMAs. The objectives for these two SRMAs are listed below.

- **Knik River SRMA** (approximately 80,000 acres; date of land status extract 11/2007).
  Goals:
  i. Manage recreation to maintain a diversity of opportunities.
  ii. Provide opportunities for commercial recreation consistent with area objectives for recreation management.
  Preliminary Management Objectives:
  i. Manage the SRMA to maintain the existing recreation opportunities, including designated Recreation Opportunity Spectrum (ROS) classifications.
  ii. Maintain the area for designated Visual Resource Management (VRM) classifications.
  iii. Develop further guidance for management for Off-Highway Vehicle (OHV) use, either by opening, further limiting, or closing areas to OHV use.
  iv. Manage recreation opportunities to maintain the quality of user experience, minimize adverse impacts on fish and wildlife resources,

reduce refuse and unauthorized dumping, and minimize disturbance to adjacent communities.

v. Work collaboratively with other landowners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities.

- **Haines Block SRMA** (approximately 268,968 acres; date of land status extract 11/2007).

Goals:

i. Manage recreation to maintain a diversity of opportunities.

ii. Provide opportunities for commercial recreation consistent with the area objectives for recreation management.

Preliminary Management Objectives

i. Manage the SRMA to maintain a diversity of opportunities, including designated ROS classification.

ii. Maintain the area for designated VRM classification.

iii. Develop further guidance for management of OHV use.

iv. Manage commercial recreation activities to maintain the quality of user experience, avoid adverse effects on wildlife resources, and minimize disturbance to adjacent communities.

v. Work collaboratively with landowners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities.

- Designation of one Area of Critical Environmental Concern (ACEC) for the **Neacola** Mountains (approximately 230,162 acres; date of land status extract 11/2007) (PRMP/FEIS Figure 2.3-3). The Neacola Block will be managed using an implementation plan developed after the ROD is signed. Objectives for the Neacola Mountains ACEC are (found in Appendix F of the PRMP/FEIS are listed below:

Goals:

i. Create the Neacola Mountains ACEC to preserve identified values and outstanding natural scenery in an unspoiled setting.

ii. Manage the ACEC to maintain the visual resource and scenic values.

iii. Manage recreation to maintain the existing opportunities.

Preliminary Management Objectives:

i. Manage the ACEC to maintain the existing Recreational Opportunity Spectrum classifications.

ii. Maintain the area for existing (Class II) VRM classification.

iii. Develop further guidance for limitations to OHV use.

iv. Work collaboratively with landowners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities.

- Retention of the existing **Campbell Tract SRMA.** Management of this administrative site would continue to be guided by *A Management Plan for*

> *Public Use and Resource Management on the Bureau of Land Management Campbell Tract Facility* (BLM 1988), and any future amendments to this plan.

## Visual Resource Management

The BLM will manage lands within the planning area as VRM Class IV (PRMP/FEIS Figures 2.4-7 through 2.4-9) with the following exceptions, which will be managed as VRM Class II:

- Lake Carlanna Municipal Watershed in Ketchikan (PRMP/FEIS Figure 2.4-9)
- Halibut Cove Forest Study Area near Seldovia (PRMP/FEIS Figure 2.4-8)
- Neacola Mountains ACEC

## Off-Highway Vehicles

Off-Highway Vehicle (OHV) classification- Limited

The BLM will manage OHVs within the planning area as "Limited." Use will be limited to existing roads and trails consistent with the State of Alaska's *Generally Allowed Uses on State Lands* which, among other things, requires that OHVs stay on existing trails whenever possible (as described in the PRMP/FEIS Appendix E).

Limitations within the Haines Block (PRMP/FEIS Figures 2.3-2 and 2.3-4), the Knik River SRMA (PRMP/FEIS Figures 2.3-5), and the Neacola Mountains ACEC (PRMP Figure 2.3-3) will be further defined by the development of implementation plans to meet the objectives of the specific area. Implementation plans may include instituting seasonal closures, designating trail routes and/or opening the Knik River SRMA to expanded OHV use.

The Campbell Tract SRMA will remain "Closed" to OHV use.

## Land Ownership Adjustments

Classifying 8.78 acres located in Southeast Alaska as suitable for sale.

- Three parcels located in Cape Pole totaling 5.03 acres described as follows:
  - U.S. Survey 2615, Lot 2
  - U.S. Survey 2616, Lot 12
  - U.S. Survey 2616, Lot 14
- One parcel located in Ketchikan comprising the Southeast Aquaculture Association totaling 3.10 acres described as follows:
  - U.S. Survey 3835, Lot 106
- Four parcels located in Tenakee Springs totaling 0.65 acres described as follows:
  - U.S. Survey 1409, MSRs 1, 2, 3 and 4 located within Section 21, T. 47 S., R. 63 E., CRM

**Fire Management**
Placement of BLM-managed lands into Fire Management Categories as described in the Land Use Plan Amendment for Wildfire and Fuels Management for Alaska (BLM 2005).

**Withdrawal Management**
The BLM recommends the revocation of the existing ANCSA Section 17(d)(1) withdrawals within the planning area. This would result in the opening of those lands which are unencumbered by selections by the State or the Native corporations to mineral entry. Lands that are selected by the State or Native corporations will also have withdrawals lifted, but will remain closed to mineral entry or leasing because of the segregative effect of the selection. Other withdrawals within the planning area are not affected by this recommendation.

**No Surface Occupancy (NSO) and Minor Constraints on Mineral Development**
- Identification of areas for mineral leasing where NSO and where minor constraints are applied. The RMP establishes seasonal constraints to protect the habitat for migratory birds within the Palmer Hay Flats (PRMP/FEIS Figure 2.3-5). No oil and gas exploration activity or road building is allowed between March 15 to June 1, and from September 1 to October 31.
- To protect onshore habitat of marine mammals, wintering waterfowl, northern sea otters, and brown bear habitat, NSO will be required on BLM-managed lands within ¼ mile inland from mean high tide in the Cape Lieskof area of the Alaska Peninsula (PRMP/FEIS Figure 2.3-9).
- The Halibut Cove Forest Study Area (PRMP/FEIS Figure 2.3-1) and the Lake Carlanna Municipal Watershed (PRMP/FEIS Figure 2.3-2) will remain closed to mineral entry.

**Required Operating Procedures and Stipulations**
Adoption of Required Operating Procedures, Stipulations, and Standard Lease Terms developed during the planning process and described in the attached Appendix A.

**Wild and Scenic River Suitability Determination**
The BLM will defer the Wild and Scenic River suitability determination until the land ownership patterns within the planning area are better defined. The Approved Plan contains a listing of the 14 eligible river segments within the planning area. Included are the tentative classification of the Outstandingly Remarkable Value (ORV) and the guidelines for interim management of the segments to protect the ORVs identified. The BLM will apply the management measures associated with the tentative classification as described in BLM Manual 8351.

# VII. Mitigation Measures

Measures to avoid or minimize environmental impacts have been built into the Approved Plan where practicable. The application of the Required Operating Procedures, Stipulations, and Standard Lease Terms, identified in Appendix A, represent the minimum mitigating measures applied to activities proposed in the planning area. Each

proposed activity within the planning area is subject to a subsequent NEPA analysis and the development of site-specific mitigation in addition to the application of the ROPs and Stipulations as appropriate. This is also true in the development of the implementation plans for the SRMAs in the Knik River, the Haines Block, and the Neacola Mountains ACEC. Additional NEPA consideration, the subsequent identification of impacts, and the development of mitigating measures specific to the resources involved are part of the process of developing the implementation plans for management of these areas.

## VIII. Plan Monitoring

Monitoring is the repeated measurement of activities and conditions over time. Individual authorizations contain requirements for monitoring in the authorizing document. The BLM will use the data gathered through monitoring to evaluate the decisions made and determine if the management practices meet the objectives.

## IX. Public Involvement

In the development of the RMP, the BLM's primary objective was to gain greater understanding of the public's views through a series of meaningful public participation opportunities.

To achieve this goal, the BLM held seven public scoping meetings in six "hub" communities in the planning area (Juneau, Skagway, Haines, Anchorage, Wasilla and Kenai) to solicit comments to be used in the development of the Draft RMP/EIS. These meetings were to provide information on the process, identify issues, and gather comments concerning the management of resources within the planning area.

From this effort within the planning area the BLM identified three primary areas of focus; the Knik River, the Haines Block, and the Neacola Mountains. Each of these areas requires that BLM develop an additional planning document specific to the area. These implementation, or "activity" plans will be developed once the ROD is signed. A tentative schedule for the development of these plans is listed in the Approved Plan, Table 1. Each of these implementation plans require additional public involvement, the application of the regulatory guidance found in 43 CFR 1610 and the guidance found in the BLM 1601 Land Use Planning Handbook.

The public was able to submit comments via email, fax, U.S. mail, in person and in writing, or orally at the scoping meetings. In addition, while in the communities, the BLM met with local representatives of the U.S. Forest Service, National Park Service, and U.S. Fish and Wildlife Service, as well as community leaders and planners, to solicit comments. The scoping meetings consisted of open house sessions, followed by a presentation on the plan, and then a question-and-answer session.

Following the release of the Draft RMP/EIS in September 2005, the BLM held an additional series of public meetings during the standard 90-day comment period.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 21 of 82

Following the discovery of a mapping error in the presentation, the BLM extended the public comment period for an additional 30 days. During this 30-day extension, the BLM provided corrected maps to all the participants in the planning process. The BLM also contacted all ANCSA corporations and tribal entities in the planning area and consulted with two tribal entities: the Native Village of Eklutna and the Chilkat Indian Village (Klukwan). The State of Alaska provided an employee to work with BLM on the project as a member of the planning team.

During the project, periodic newsletters were sent to participants, and the BLM provided Internet schedules and updates. Public hearings were held in the same locations where BLM held project scoping and Draft RMP/EIS meetings, and utilized the same format of an open house followed by questions and answers, then opportunity for public testimony. This testimony was provided orally, in writing at the meeting, and in e-mails and letters. Detailed information on these efforts is included in both the Draft Ring of Fire RMP/EIS and the PRMP/FEIS in Chapter 5, *Consultation and Coordination.*

The BLM will continue to actively seek the views of the public using techniques such as news releases and mailings to request participation and inform the public of new and ongoing project proposals, site-specific planning, and opportunities and timeframes for comment. The BLM will also continue to coordinate, both formally and informally, with the various State, Federal, Tribal and local agencies interested and involved in the management of public lands in the Ring of Fire planning area.

# X. Implementation

Implementation of the Ring of Fire RMP will begin upon the signing of this Record of Decision and public notification via the Notice of Availability published in the *Federal Register.* RMP implementation will occur according to an implementation plan to be developed by the Anchorage Field Office after this ROD is signed. The implementation plan will serve as a link between the BLM's planning and budgeting processes and will assist the BLM in establishing priorities, timeframes, budget proposals and tracking the progress of RMP implementation.

The BLM recognizes that deferral of the Wild and Scenic River suitability determination will require additional environmental consideration, as defined in 43 CFR 1610.5-5. This will include developing a separate NEPA document to evaluate the suitability of individual river segments for inclusion into the National Wild and Scenic River System. The BLM expects to develop this document in 2011. In the interim period between signature of the document and completing the suitability determination, the BLM will manage the river segments in a manner consistent with the guidance found in BLM Manual 8351.32 Classification and Protective Management, C. Protective Management.

The BLM will defer a final determination on establishment of an ACEC/RNA in the Haines Block until such time that the BLM reevaluates the Importance Criteria and related aspects of the ACEC designation process as they apply to the area's resources, including mountain goats. The NEPA process conducted for this re-evaluation will be

tiered to the Ring of Fire PRMP/FEIS, and will offer the public an opportunity to comment and to submit additional supporting information that will assist the BLM in making a decision on whether to designate an ACEC/RNA. The NEPA process for the BLM's re-evaluation of the ACEC for the Haines Block will also govern the preparation of a Special Recreation Management Plan (SRMP) for the SRMA.

In the interim period, the BLM will manage the Haines Block using the existing guidelines for recreation management including the observance of the Monitoring and Control Area and the application of the ROPs and Stipulations found in Appendix A of this document.

# XI. Availability of the Plan

Copies of the Record of Decision and the Ring of Fire Resource Management Plan are available by request from the following locations: BLM Anchorage District Office, 6881 Elmore Road, Anchorage, Alaska 99507, (907) 267-1246, and on the Anchorage Field Office website at www.blm.gov/ak/st/en/fo/ado.html (online availability subject to change, based on court orders regarding access to Department of the Interior websites).

## XII. Field Manager Recommendation

Having considered a full range of alternatives, associated effects, and public input, I recommend adoption and implementation of the attached Ring of Fire Resource Management Plan.

_____     3/21/2008
Mike Zaidlicz                         Date
Anchorage Field Manager

## Approval

In consideration of the foregoing, I approve the Ring of Fire Resource Management Plan.

_____     3-21-2008
Thomas P. Lonnie                      Date
State Director, Alaska

# Ring of Fire Approved Plan

# I. INTRODUCTION

This Approved Plan replaces the Southcentral Management Framework Plan (MFP), approved in 1980, and is now the base land use plan for lands within the area described in the Proposed Ring of Fire Resource Management Plan/Final Environmental Impact Statement (PRMP/FEIS) (July 2006), administered by the Bureau of Land Management's (BLM) Anchorage Field Office (AFO). The Approved Plan adopts the management options described in Alternative "D" of the PRMP/FEIS, with adjustments as describe in the Notice of Modifications section of the Record of Decision (ROD).

## A. Purpose and Need

This Approved Plan summarizes the information found in the PRMP/FEIS and provides the AFO with a comprehensive framework for managing BLM lands within the Ring of Fire planning area. This RMP also provides a public document that specifies management policies and actions for BLM-managed lands. This RMP replaces the applicable portions of the South-central MFP and provides a plan which is consistent with evolving law, regulations, and policy. The Approved RMP also meets the Federal Land Policy and Management Act (FLPMA) Section 202 requirement for consistency with multiple use and sustained yield objectives.

## B. Consideration of Other BLM Policies, Plans, and Programs

In addition to complying with all applicable Federal laws, Executive Orders and regulations, this Approved RMP incorporates the following documents and their decisions unless or until amended or replaced. The BLM will continue to refer to and consider the information contained in these plans in its decision making and incorporate decisions from the planning documents as allowable and appropriate as it considers applications.

- A Management Plan for Public Use and Resource Management on Bureau of Land Management Campbell Tract Facility (BLM 1988)
- Alaska Interagency Wildland Fire Management Plan (Alaska Department of Natural Resources et al. 1998)
- Land Use Plan Amendment for Wildland Fire and Fuels Management - Environmental Assessment (BLM 2004) Decision Record (2005)
- BLM-Alaska Statewide Land Health Standards (USDOI-BLM 2004)
- The Required Operating Procedures, Stipulations, and Standard Lease Terms identified as Appendix D in the Ring of Fire PRMP/FEIS
- Master Memorandum of Understanding between the BLM and the Alaska Department of Fish and Game (August 8, 1983) and its Supplement (Aug 8, 1983) for the management of fish and game and fish and game habitat.
- Federal Land Policy and Management Act (FLPMA), Section 202(c)(9).
- The BLM will consider the planning documents developed by Federal, State, Tribal and local governments.

## C. Collaboration

Intergovernmental and inter-agency collaboration will be undertaken on a case-by-case basis as required and directed by the BLM's national policy. Tribal relationships will be maintained through the execution of agreements to coordinate Tribal involvement in the management of the lands and associated resources within the planning area. These agreements will be revisited periodically to ensure their applicability.

Other stakeholder relationships are driven by the public process including the public comment processes required by proposals being evaluated using the National Environmental Policy Act (NEPA), the Alaska Native Claims Settlement Act (ANCSA), the Statehood Act, the Alaska National Interest Lands Conservation Act (ANILCA) and other laws and directives. The BLM will continue to contact, coordinate and consult with parties having an interest in lands within the planning area as determined by a specific project, such as an implementation level plan. The coordination will be to provide the stakeholders with a meaningful opportunity to provide input and comment on the BLM's management of the public lands within the planning area.

## D. Maintaining the Plan

Land use plan decisions and supporting information can be maintained to reflect minor changes in data, but maintenance is limited to refining, documenting, and/or clarifying previously approved decisions. Some examples of maintenance actions include:

- Correcting minor data, typographical, mapping, or tabular data errors
- Refining baseline information as a result of new inventory data

The BLM expects that new information gathered from field inventories and assessments, research, other agency studies, and other sources will update baseline data and/or support new management techniques, Required Operating Procedures, and scientific principles. Where monitoring shows land use plan actions or Required Operating Procedures are not effective, modifications or assumptions and impacts disclosed in the analysis remain valid and broadscale goals and objectives are not changed.

Plan maintenance will be documented in supporting records. Plan maintenance does not require formal public involvement, interagency coordination, or the NEPA analysis required for making new land use plan decisions.

## E. Changing the Plan

The Approved Plan may be changed, should conditions warrant, through a plan amendment or plan revision process. A plan amendment may become necessary if major changes are needed or to consider a proposal or action that is not in conformance with the plan. The results of monitoring, evaluation of new data, or policy changes and changing public needs might also provide the impetus for an amendment. Generally, an amendment is issue-specific. If several areas of the plan become outdated or otherwise obsolete, a plan revision may become necessary. Plan amendments and revisions are accomplished with public input and the appropriate level of environmental analysis.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 27 of 82

## F. Plan Implementation

The following represents a prioritized schedule for the development of implementation plans within the Ring of Fire planning area. These implementation, or "activity" plans will be developed once the ROD is signed. The implementation of these decisions is contingent on the availability of staff and funding.

These actions require additional site-specific analysis, and an additional planning document specific to the area. This list must be considered tentative because it may be affected by future project priorities, funding, non-discretionary workloads, and public participation.

**Table 1. Implementation Planning Schedule**

| Implementation Plan | Scheduled Year | Comments |
|---|---|---|
| Haines Block SRMA | 2008 | Commercial recreation management |
| Neacola Mountains ACEC | 2011 | Recognition of scenic values |
| Knik River SRMA | Deferred | This implementation plan will be deferred until land conveyance is complete; a plan will not be completed if BLM does not retain ownership of the Knik River SRMA. |

## G. Plan Evaluation

BLM has an obligation to provide evaluations of its planning documents every five years to determine the effectiveness of the Approved Plan. Following is a general schedule for the evaluation of the Ring of Fire RMP:

- September 2013
- September 2018
- September 2023
- September 2028

# II. MANAGEMENT DECISIONS

This section of the Approved Plan presents the goals, land use allocations, and management actions established for public lands managed by the BLM's Anchorage Field Office. Not all types of decisions were identified for each program. Most of the identified goals are long range in nature and will not be achieved immediately, but rather are assumed to require a period of 20 to 50 years to achieve.

This section is organized alphabetically by program area.

## A. Air Resources

### A-1: Goal
Protect and enhance the quality of air resources within the planning area. The BLM will also consider, and if practical, minimize the effects of smoke from wildfire and prescribed burns to human health, communities, recreation, and tourism.

### A-2: Management Action
1. The BLM will stipulate that all direct and authorized actions within the planning area will comply with Federal and State air quality laws and regulations.
2. All permittees will be required to mitigate any activity that may result in air pollution.
The BLM will implement interagency wildland fire smoke mitigation measures adopted by the Wildland Fire Coordinating Group and consider public health and safety in all fire management activities.

## B. Cultural Resources

### B-1: Goal
Preserve key cultural properties listed on the National Register of Historic Places.

### B-2: Management Action
1. Manage all cultural properties within BLM-managed lands in the planning area for their scientific use (preserved until their research potential is realized).
2. Manage actions which may impact cultural resources in compliance with the National Historic Preservation Act (NHPA) Sections 106 and 110.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 29 of 82

## C. Fisheries

### C-1: Goal
Maintain and protect fish habitat on public lands and provide for the habitat needs of the fish resources necessary to maintain or restore such populations and to ensure the continued public use, economic and subsistence use of such resources.

### C-2: Objective
Fish habitat will be managed to meet the goals of the State of Alaska Department of Fish and Game (ADF&G) management plans, consistent with the MOU between the BLM and ADF&G (Appendix K of the PRMP/FEIS) and the current decisions related to Title VIII of ANILCA.

### C-3: Management Action
1. Support the continued monitoring and assessment of riparian areas in order to develop a baseline used to support maintenance and restoration projects.
2. Consider all other resource uses and cooperate with other Federal agencies and the State in identifying the need for relocation, closure, or maintenance of OHV trails in order to avoid key fish habitat features.
3. Identify waters on BLM lands that support anadromous fish for inclusion into the ADF&G anadromous waters catalogue.
4. Identify Federal submerged lands on BLM-managed lands within the Ring of Fire planning area for Federal subsistence priority uses.

## D. Floodplains

### D-1: Goal
Reduce the loss of life and property and the disruption of societal and economic pursuits caused by flooding. Sustain, restore or enhance the natural resources, ecosystems or other functions of the floodplain.

### D-2: Management Action
The BLM will address floodplain and watershed flow management on a case-by-case basis using BLM Manual Section 7260 as guidance.

## E. Forestry

### E-1: Goal
Provide personal use and subsistence wood products for local consumption and allow opportunities for commercial harvests. Sustain the natural range and variation in plant composition and structure as well as the high value of the natural resources. Commercial resources will be maintained or enhanced.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 30 of 82

### E-2: Management Action

1. In areas where Healthy Forest Restoration Act authorities are used, identify old growth stands or describe the process for identifying old growth stands in the land use plan based on the composition characteristic of the forest type.

2. Identify potential commercial harvest areas and high interest personal use areas. If these areas are found within the proposed Area of Critical Environmental Concern (ACEC) or Special Recreation Management Areas (SRMA), management will be consistent with the objectives of the proposed ACEC or SRMA.

3. Forestry management practice will be conducted in a manner consistent with the guidelines found in the Required Operating Procedures, Stipulations, and Standard Lease Terms (Appendix A).

## F. Grazing (Livestock and Reindeer)

### F-1: Goal

Provide seasonal grazing opportunities for casual day use grazing, or for saddle and pack livestock consistent with terrain characteristics and protection of the soil, vegetation and watershed.

### F-2: Management Action

Grazing on BLM-managed lands will be conducted in a manner consistent with the guidelines found in the ROPs and/or Stipulations found in Appendix A. Where not compatible with vulnerable wildlife populations, habitat, vegetation, or areas of high erosion and slope instability, grazing would be prohibited.

## G. Hazardous Materials

### G-1: Goal

Ensure that all activities occurring on BLM-managed lands within the planning area comply with Federal and State hazardous materials standards and that all Federal and State mandates, laws, regulations, Executive Orders and policies are met.

### G-2: Management Action

1. Adverse effects resulting from past hazardous materials management on BLM-managed lands within the planning area will be mitigated subject to the availability of funds.

2. The BLM will prevent creation of new hazardous material sites through the implementation of best management practices for all permits, leases, Right-of-Way, and mining claims and will include pollution prevention measures in all of its authorizations.

3. The BLM will coordinate and consult with the appropriate regulatory agencies for all cleanup plans and will notify and coordinate hazardous materials activities with specific Native Corporations on Native selected lands.

## H. Iditarod National Historic Trail (INHT)

### H-1: Goal
Manage the INHT under the terms of the Iditarod National Historic Trail Comprehensive Management Plan.

### H-2: Management Action
1. The BLM will continue to issue permits and use authorizations for commercial activities, and competitive recreation events.
2. The BLM will maintain trail associated recreation facilities on public lands.
3. Any lands donated to the INHT will be managed according to the comprehensive INHT Management Plan.

## I. Lands and Realty

### I-1: Goal
1. Support the BLM Alaska policy to survey and convey lands to the State of Alaska, the ANCSA Native Corporations and to Native Allottees.
2. Provide a balance between land use (Right-of-Way, permits, leases and sales) and resource protection which best serves the public at large.
3. Provide support to other BLM programs to protect and enhance resources.

### I-2: Management Action

#### I-2a: Land Disposal
Lands withdrawn from public land laws or selected by the State or Native selection will not be analyzed for disposal, though they may be conveyed.

#### I-2b: Entitlement and Settlement
The BLM will assist in the conveyance of lands pursuant to the legislative mandates including ANCSA, the Alaska Statehood Act and the Native Allotment Act (1906).

#### I-2c: Sales
The BLM will dispose of the eight parcels classified as suitable for sale in the planning document described as follows:
- Three parcels located in Cape Pole totaling 5.03 acres described as follows:
  - U.S. Survey 2615, Lot 2
  - U.S. Survey 2616, Lot 12
  - U.S. Survey 2616, Lot 14
- One parcel located in Ketchikan comprising the Southeast Aquaculture Association totaling 3.10 acres described as follows:
  - U.S. Survey 3835, Lot 106
- Four parcels located in Tenakee Springs totaling 0.65 acres described as follows:
  - U.S. Survey 1409, MSRs 1, 2, 3 and 4 located within Section 21, T. 47 S., R. 63 E., CRM

Lands meeting the following criteria would be analyzed and classified in subsequent planning efforts and could be disposed of through FLPMA Section 203 (43CFR 2710):

- A tract that was acquired for a specific purpose and is no longer required for that or any other Federal purpose;
- A tract whose disposal would serve an important public objective including but not limited to, community expansion and economic development that cannot be achieved prudently or feasibly on other public lands and that out weigh other public objectives and values including but not limited to recreation and scenic values which would be maintained in Federal ownership;
- A tract that because of its location or other characteristics is difficult and uneconomic to manage as a part of the public lands and is not suitable for management by another Federal department or agency.

### I-2d: Recreation and Public Purpose Act (R&PP)

Lands that are identified for disposal using this authority and are selected by either the State or by an ANCSA corporation will be fully adjudicated prior to the BLM entertaining the sale. In addition the following conditions must exist:

- Lands must be readily accessible to a qualified applicant;
- The qualified applicant must have a defined purpose for the lands and secure funding to develop the lands;
- R&PP sale will not be implemented on another agency's lands without the approval of that agency;
- Lands within a proposed SRMA or ACEC will not be considered as available for disposal under the R&PP authority.
- Proposals for sanitary land fill use will always be sold provided they meet the requirements of R&PP and the title documents contain a clause prohibiting reversion of the lands to the Federal government.

### I-2e: Act of August 1, 1956 Public Land Order 1613

The BLM will continue to convey PLO 1613 lots, typically found along highway Right-of-Ways to qualified applicants.

### I-2f: Airport and Airway Improvement Act of September 3, 1982

The BLM will continue to process conveyance requests by the Federal Aviation Administration for airport conveyances.

### I-2g: Exchanges

The BLM will strive to process mutually beneficial public interest land exchanges authorized by FLPMA, ANCSA and ANILCA. Exchanges will not be actively sought until State and Native entitlements are fulfilled.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 33 of 82

### I-2h: Acquisitions

The BLM would acquire private lands from willing owners through purchase or exchange provided the lands are located in areas identified for long-term Federal management and retention, in order to further the programs of the Secretary, including access, to meet specific plan objectives. Emphasis areas for considering acquisition to further SRMA and Conservation System Unit (CSU) objectives include:

- The Neacola Mountains ACEC
- The Haines Block SRMA
- The Knik River SRMA
- The portions of the Iditarod National Historic Trail located within the planning area

### I-2i: Land Use Authorizations

State and Native selections affect land use authorizations. These guidelines are common to all authorizations considered within the planning area.

- State-selected lands: Prior to issuing authorizations on State-selected lands, the BLM will receive the concurrence of the State pursuant to Section 906(k) of ANILCA. If the selection is "top filed" using ANILCA Section 906(e) a letter of concurrence is not required.
- Native-selected lands: Prior to issuing an authorization the views of the concerned Native Corporation will be obtained and considered.
- Monies received for most use authorizations are placed in an escrow account and dispersed when the title to the lands is transferred.
- The BLM will apply the Required Operating Procedures and Stipulations to each authorization, as appropriate.

### I-2j: FLPMA Leases

All FLPMA leases issued will be at fair market value. No cabins or permanent structures used for private recreation will be authorized. Proposals for commercial use cabins will meet the following criteria:

- Proximity to other private lands or existing authorized structures
- Proximity to existing transportation routes or systems
- Documentation of customary lifestyle and need

### I-2k: FLPMA Permits

The BLM may issue land use permits if it is determined that the use conforms to agency plans, policies and programs, local regulations, and other requirements, and will not cause appreciable damage or disturbance to the public lands, their resources or improvements.

- Trapping shelters would be authorized using permits (maximum 3-year duration) which may be renewable at the discretion of the BLM.
- Shelters, tent platforms and other temporary facilities and equipment used for permitted hunting and fishing are allowed on BLM lands pursuant to Section 1316 of ANILCA. Upon written request these facilities will be removed by the permit holder.
- Guide shelters will only be authorized in conjunction with Special Recreation Permits (SRPs) issued under the authority of FLPMA. Criteria used for commercial use cabins as listed above will apply.

### I-2l: FLPMA Easements
Each easement will be subject to case-by-case evaluation per 43 CFR 2920.7 and would contain terms and conditions mitigating impacts and protecting the environment and public health and safety.

#### 1. 17(b) Easements
The BLM will continue to manage 17(b) easements reserved in patents and interim conveyances to ANCSA corporations. The BLM will transfer administration of 17(b) easements to the National Park Service and the U.S. Forest Service when those easements access Conservation System Unit (CSU) lands or when the easements are wholly within the boundaries of the CSU. The BLM will continue to identify, sign, monitor and map, and realign 17(b) easements with priority based on:

- Easements accessing lands permanently managed by the BLM or important to BLM programs
- Easements receiving high public use
- Easements required to implement an activity plan
- Easements where the land owner supports the activity allowed by the easement
- Easements where signing and education would mitigate damage to the easement or to BLM-managed lands

#### 2. Conservation Easements
The BLM will continue to manage conservation easements for the specific purposes for which the easement was acquired.

### I-2m: Withdrawal Review
The BLM recommends the revocation of the ANCSA Section 17(d)(1) withdrawals within the planning area.

The BLM will maintain current withdrawals unless the agency for which the lands were withdrawn requests revocation of the withdrawal. The following table summarizes existing withdrawals within the planning area.

## Table 2.  Existing Withdrawals within the Ring of Fire Planning Area

| Withdrawal Type | Acres Withdrawn | Department | Segregative Effect |
|---|---|---|---|
| **Military Withdrawals** | 60,000 | Department of Defense | Executive Order 8102 withdrew the lands from "settlement, location, sale, entry, and all forms of appropriation." BLM is the Secretary of the Interior's (Secretary) authorized delegate and retains jurisdiction of mineral and vegetative resources on the installations, although BLM's authority is limited. |
| **Light House Reserves** | 29,000 | U.S. Coast Guard | Closed to settlement, location, sale, entry or other disposition |
| **Air Navigation Sites** | 3,300 | BLM and Federal Aviation Administration | Closed to settlement, location, sale, entry or other disposition, including State Selection |
| **Administrative Sites\*** | 25,000 | BLM, USGS, U.S. Coast Guard, USFWS, NOAA | Closed to public land laws including State Selection and mining laws |
| **Recreation Withdrawals** | 1,000 | BLM, Department of Defense | BLM withdrawals are closed to all forms of appropriation, including mining, but not to the mineral leasing laws. DOD withdrawals are closed to all forms of appropriation including mineral location and entry but not to mineral leasing, nor to the disposal of materials under the Act of July 31, 1947. |
| **Alaska Rail Road Withdrawals** | 1,400 | Alaska Rail Road Corporation | Closed to public land laws including State selection, the mining laws and mineral leasing laws |
| **Power Site Classifications, Power Site Reserves, and Power Projects** | 2,000 | BLM, Alaska Energy Authority and FERC | BLM withdrawals are closed to public land laws, including State Selection, but not to ANCSA selection; open to mineral location (subject to 43CFR3731); and open to mineral leasing.  Power Project Withdrawals are closed to public land laws and open to mineral location subject to 43 CFR 3731, in the application state.  Upon issuance of a preliminary permit or license by FERC, they are closed to mineral location. Mineral leasing remains open. |

\*Includes the Campbell Tract Facility (730 acres)

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 36 of 82

### I-2n: Rights-of-Way

The BLM may issue rights-of-way for a variety of uses including but not limited to: roads, water pipelines, electric lines and communication sites under the authority of Title V of FLPMA. Oil and Gas pipelines are issued using the Mineral Leasing Act (1920). Stipulations developed during the proposal's evaluation will include:

- Restoration, revegetation and curtailment of erosion along the right-of-way route;
- Compliance with air and water quality standards;
- Control or prevention of damage to the environment, public and private property and hazards to public health and safety;
- Protection of subsistence resources and the user's access to those resources.
- Protection of the natural resources associated with public lands.
- Utilization of right-of-ways in common with respect to engineering and technological compatibility will be promoted.
- Coordination with the State and Local governments, tribal entities and interested groups and individuals takes place to the fullest extent possible.
- The Mountain Goat Monitoring and Control Area is identified as a Right-of-Way Avoidance area.

## J.  Minerals - Fluid Leasable

### J-1: Goal

Maintain or enhance opportunity for mineral exploration and development while maintaining other resource values. Public lands and the Federal mineral estate will be made available for orderly and efficient exploration, development, and production unless withdrawal or other administrative action is justified in the national interest. In addition to oil and gas, geothermal resources would be available for leasing in areas open to oil and gas leasing. Areas closed to oil and gas leasing are also closed to geothermal leasing.

#### J-1a: Allocations

- Land encumbered with selections by the ANCSA Corporations and the State is segregated from mineral leasing and not available for leasing.
- All leases will be subject to Required Operating Procedures, Stipulations and Standard Lease Terms as described in Appendix D of the PRMP/FEIS.
- Make 486,000 acres of unencumbered lands available for mineral leasing
- Make the 740,000 acres of selected lands available for mineral leasing upon the relinquishment or rejection of the selection.

#### J-1b: Exceptions to leasing:

Lake Carlanna Municipal Watershed (1,835 acres) and the Halibut Cove Forest Study Area (120 acres) have additional withdrawals which segregate them from mineral exploration and development.

#### J-1c: Areas open to mineral leasing subject to minor constraints

To protect habitat for migratory birds within the Palmer Hay Flats, no oil and gas exploration activity or road building is allowed from March 15 to June 1 and from September 1 to October 31.

**J-1d: Areas open to leasing with Major constraints:**
To protect onshore habitat of marine mammals, wintering waterfowl, northern sea otters, and brown bear habitat, No Surface Occupancy is allowed on lands within ¼ mile upland of the mean high tide line in the Cape Lieskof area of the Alaska Peninsula.

## K. Minerals - Solid Leasable

All BLM-managed lands within the planning are open to coal exploration and study under 43 CFR 3400.2. Interest in exploration or leasing will be handled on a case-by-case basis. Should coal operations be developed on Federal lands, an agreement must occur between the BLM and the State and the Office of Surface Mining (30 CFR 745).

### K-1: Goal
Public lands and the Federal mineral estate will be made available for orderly and efficient exploration, development and production of solid leasable minerals including coal and oil shale as well as non-energy leasable minerals (e.g. potassium, sodium, phosphate) unless withdrawal or other administrative action is justified in the national interest.

### K-2: Management Actions
Commercially available deposits of solid leasable minerals are unlikely to appear on BLM-managed lands within the planning area. If deposits are discovered, subsequent exploration will be analyzed on a case-by-case basis.

**K-2a:** Lands within the planning area will be made available after the withdrawals precluding mineral development are revoked.

## L. Minerals - Locatable and Saleable

### L-1: Goal
Manage the lands within the planning to provide opportunities for mineral exploration and development in a manner that prevents undue and unnecessary degradation resulting from the development of locatable and saleable minerals.

### L-2: Allocations
Approximately 486,000 acres of unselected lands would be available for mineral entry. Selected lands would become available upon the relinquishment or rejection of the selection.

### L-3: Management Actions
**L-3a:** All mining of locatable minerals will be subject to the surface management regulations found in 43 CFR 3809.

**L-3b:** Surface occupancy will be limited to uses incident to the mining operation per 43 CFR 3715.

**L-3c:** Bonding of the operation may be required according to BLM policy.

**L-3d:** Specific measures to minimize surface effects and to rehabilitate the area found in the Required Operating Procedures and Stipulations will apply as appropriate.

**L-3e:** All mining operations will file a Plan of Operations which must be approved prior to mining operations beginning.

## M. Off-Highway Vehicles

### M-1: Goal

The BLM will ensure protection of the natural resources from the effects of OHV use, provide OHV access consistent with the provisions of ANILCA Section 811 and manage OHV access for resource development through the application of the ROPs and Stips as appropriate.

### M-2: Management Actions

**M-2a:** Lands within the planning area are classified and managed as "limited" to OHV use. This classification is aligned with the State's *Generally Allowed Uses on State Land* as described in Appendix E of the PRMP/FEIS. OHV use will be limited to existing roads and trails whenever possible.

**M-2b:** No lands within the planning area are classified and managed as "open" to OHV use.

**M-2c:** With the exception of Campbell Tract, no lands within the planning area are classified and managed as "closed" to OHV use.

**M-2d:** Trail inventory and assessment work necessary to identify existing trails and assess trail density and resource effects will continue. Information gathered will be used to support implementation planning and prioritize trail maintenance needs.

**M-2e:** The BLM will further define the "limited" OHV classification of the Haines and Knik River SRMAs and the Neacola Mountains ACEC, as implementation plans for these areas are developed. The result of these planning efforts may result in change in the classification or additional restrictions/openings within the subject area. The BLM will ensure consistency with ANILCA 811 in its implementation planning by:
- Drawing the distinction between recreational and subsistence use.
- Allowance in subsistence use areas classified as "limited" to provide:
  - Travel off existing roads or trails for game retrieval
  - Uses of classes of vehicle otherwise restricted to recreational use
  - Lifting of seasonal restrictions during subsistence harvest seasons

**M-2f: Monitoring -** Inventory and assessment work will continue. The information will be used as baseline data for future decision making and to define the trails within the SRMAs being

developed in the Haines Block and Knik River areas and the Neacola Mountains ACEC. Emphasis will be on trails with the highest use ratios, potential for damage to the resource values and those which pose conflicts between users.

# N. Paleontology

### N-1: Goal

Protect and preserve important Paleontological resources within the planning area.

### N-2: Management Actions

Actions that may impact paleontological resources will comply with NEPA, FLPMA, the Antiquities Act, the Federal Cave Resources Protection Act and the Required Operating Procedures, Stipulations, and Standard Lease Terms (Appendix A), intended to mitigate adverse effects to the resource.

# O. Recreation

### O-1: Goal

Manage recreation to maintain a diversity of recreational opportunities. Opportunities for commercial recreation will be provided consistent with area objectives for recreation management.

### O-2: Allocations

Retain the existing Campbell Tract SRMA. Management of this administrative site would continue to be guided by *A Management Plan for Public Use and Resource Management on the Bureau of Land Management Campbell Tract Facility* (BLM 1988), and any future amendments to this plan.

Create Special Recreation Management Areas and the associated Special Recreation Management Plans for the Haines Block and the Knik River.

**Knik River SRMA** (approximately 80,000 acres; date of land status extract 11/2007)
  Goals:
  - Manage recreation to maintain a diversity of opportunities.
  - Provide opportunities for commercial recreation consistent with area objectives for recreation management.

  Preliminary Management Objectives:
  - Manage the SRMA to maintain the existing recreation opportunities, including designated Recreation Opportunity Spectrum (ROS) classifications.
  - Maintain the area for designated Visual Resource Management (VRM) classifications.
  - Develop further guidance for management for OHV use, either by opening, further limiting, or closing areas to OHV use.
  - Manage recreation opportunities to maintain the quality of user experience, minimize adverse impacts on fish and wildlife resources, reduce refuse and unauthorized dumping, and minimize disturbance to adjacent communities.
  - Work collaboratively with other land owners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities.

**Haines Block SRMA** (approximately 263,968 acres; date of land status extract 11/2007)

Goals:
- Manage recreation to maintain a diversity of opportunities.
- Provide opportunities for commercial recreation consistent with the area objectives for recreation management.

Preliminary Management Objectives
- Manage the SRMA to maintain a diversity of opportunities, including designated ROS classification.
- Maintain the area for designated VRM classification.
- Develop further guidance for management of OHV use.
- Manage commercial recreation activities to maintain the quality of user experience, avoid adverse effects on wildlife resources, and minimize disturbance to adjacent communities.
- Work collaboratively with landowners in the area, recreation users, and adjacent communities to develop management strategies and define enforcement responsibilities.

### O-3: Management Actions

**O-3a: Public cabins-** The BLM will consider existing structures such as unauthorized cabins claimed by the BLM for public use cabins prior to construction of new cabins.

**O-3b:** Permit compliance monitoring will include the following depending on available funding:
- Visitor use of both dispersed and developed sites
- Monitoring of commercial use activities to determine permit compliance
- Assessment of visitor and resident recreation experience and benefit

## P. Renewable Energy

### P-1: Goal

Some potential exists for the development of solar, wind or biomass facilities on BLM-managed lands within the planning area. The BLM will consider applications to permit or lease for development, subject to the constraints for leasing and permitting on a case-by-case basis.

### P-2: Management Actions

**P-2a:** Manage permitting and leasing in accordance with the "Land Use Authorization" section of Lands and Realty.

**P-2b:** Analyze proposals on a case-by-case basis. Opportunities for development will be consistent with the goals for the other resources identified in the planning area.

## Q. Soils

### Q-1: Goal

Manage and maintain soils to promote healthy, sustainable and fully functioning ecosystems that support a wide range of public values and resources.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 41 of 82

### Q-2: Management Actions

**Q-2a:** Consider the soils types during the analysis of proposals and mitigate as necessary.

**Q-2b:** Assign ROPs and Stipulations as appropriate on a case-by-case basis to project proposals to mitigate impacts of compacting of soils, erosion, and slumping of the soils.

## R. Subsistence

### R-1: Goals

Conserve healthy populations of subsistence resources through management and protection of habitat and Federal subsistence harvest permitting regulations. Provide reasonable access to subsistence resources.

## S. Vegetation

### S-1: Goal

The BLM will take action to minimize impacts on vegetation, and to promote healthy, sustainable, fully functioning ecosystems by maintaining plant communities that support a wide range of public values and uses. Management will be conducted to prevent the spread of invasive plant species including noxious weeds.

### S-2: Management Actions

Authorized activities will comply with the numerous protective measures for vegetation identified in the Required Operating Procedures, Stipulations, and Standard Lease Terms found in Appendix A of this document.

## T. Visual Resources

### T-1: Goal

Manage visual resources consistent with the multiple use objectives for VRM classes and the classifications.

### T-2: Management Actions

**T-2a:** Manage the Lake Carlanna Municipal Watershed and the Halibut Cove Forest Study Area as VRM Class II.

**T-2b:** Manage the Neacola Mountains ACEC as VRM Class II.

**T-2c:** Manage all other BLM-managed lands within the planning area as VRM Class IV.

## Table 3. Visual Resources Class Objectives

| Class I |
|---|
| Preserve the existing character of the landscape; provide for natural change; does not preclude management activity; change to the characteristic landscape should be low and not attract attention. |

| Class II |
|---|
| Preserve the existing character of the landscape; change to the characteristic landscape should not be evident or attract attention of the casual observer and repeat the basis elements of form, line color and texture found in the predominant natural features of the characteristic landscape. |

| Class III |
|---|
| Partially retain the existing character of the landscape; changes should be moderate and may attract attention but not dominate the view of the observer or detract from the existing landscape. |

| Class IV |
|---|
| Class IV objective provides for management activities that would make major modifications to the existing character of the landscape; change may be very high and while reflecting the basic elements of the landscape, but may dominate the view. |

# U. Water Resources

### U-1 Goal:
Promote healthy ecosystems and ensure that the activities occurring on BLM lands within the planning area comply with the Federal and State water quality standards.

### U-2: Management Actions
**U-2a:** Through management of the water resource and protection of the aquatic habitat, the BLM will support the health objectives of the fisheries program and the recreation program by protecting the water resource.
**U-2b:** Require that permittees perform mitigation for all activities that may result in accelerated soil erosion.

# V. Wetlands/Riparian

### V-1 Goal:
Minimize destruction, loss or degradation of wetlands and riparian areas. Preserve and enhance natural and beneficial values. Desired ecological conditions and attainment guidelines are outlined in the BLM-Alaska Statewide Land Health Standards (2004).

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 43 of 82

## W. Wildland Fire and Fuels

**W-1 Goal:**
Prioritize and protect human life and property. Retain key ecological components intact and functioning within their historic range. Provide appropriate levels of fire protection with available firefighting resources. Use wildland fire and fuel treatments to meet land use and resource needs.

Lands within the planning area are protected by the State of Alaska's Division of Forestry (DOF) under the provisions of the Reciprocal Fire Protection Agreement (1322-LAA-99-0012) between the BLM and DOF.

**W-2: Management Actions**
   **W-2a:** Apply the management prescriptions found in the 2005 BLM-Alaska Land Use Plan Amendment for Wildfire and Fuels Management.

## X. Wildlife

**X-1: Goals**
- Manage wildlife habitat to meet BLM's Alaska Statewide Land Health Standards and the goals of the State of Alaska's Department of Fish and Game consistent with the Master Memorandum of Understanding (Appendix K of the PRMP/FEIS);
- Maintain or enhance wildlife habitat to sustain or increase populations;
- Perpetuate diversity and abundance of waterfowl by managing wetlands and other habitat and provide suitable habitat for birds of prey through conservation of essential habitat;
- Provide for the continued opportunity for subsistence uses on public lands in compliance with Title VIII of ANILCA.
- Manage to ensure actions are consistent with the requirements of Federal Threatened and Endangered Species Mandates.

**X-2: Management Actions**
   Within budgetary constraints the BLM will, in cooperation with the State of Alaska Department of Fish and Game:
- Conduct habitat assessments for game species with priorities assigned to areas suggested by the Federal Subsistence Game Board;
- Establish and monitor breeding bird survey transects, in conjunction with the protocols established by the interagency Partners in Flight initiatives;
- Through the NEPA process, ensure that the authorized activities within the planning area are consistent with the conservation needs of BLM Alaska's special status species and that actions do not contribute to the listing of any species.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 44 of 82

## Y. Wild and Scenic Rivers

The BLM will manage the river segments within the planning which have been determined to be eligible for inclusion in the Wild and Scenic Rivers System to protect the identified Outstandingly Remarkable Values pursuant to the guidance found for interim management in BLM Manual 8351.32 Classification and Protective Management.

The BLM will defer the Wild and Scenic River suitability determination until the land ownership patterns within the planning area are better defined. Following is a listing of the 14 eligible river segments within the planning area. Included are the tentative classification of the Outstandingly Remarkable Value (ORV) and the guidelines for interim management of the segments to protect the ORVs identified. The BLM will apply the management measures associated with the tentative classification as described in BLM Manual 8351.

In certain circumstances, segments have existing appropriations, specifically power site classifications and withdrawal orders for power projects, which precede the eligibility determination for the segment. In these cases, the BLM will recognize the appropriation and adjust the management of the segment to incorporate the order.

Where the tentative classification is determined to be "and/or," the BLM will apply the more protective guidance to insure that the ORVs are not diminished by the proposed activity. The BLM will conduct a NEPA evaluation as it processes applications for use. This process incorporates the identification of potential impacts of the proposal and the development of mitigation measures specific to the proposal. The BLM will apply the ROPs and Stipulations as appropriate to each authorization granted. At a minimum, the BLM will recognize and provide protection or enhancement of the free-flowing nature and the ORV of the river segment, regardless of the tentative classification of the river segment, and immediately implement the interim management measures described here.

### *Alaska Peninsula/Aleutian Island Chain Region*
Barbara Creek and Reindeer Creek near Port Heiden are both tentatively classified as Wild and the ORV is listed as wildlife. Portions of Barbara Creek are within the nesting area of a unique Beringian subspecies population of the marbled godwit. Community access to the area is primarily by OHV. The BLM will manage these segments through the application of the NEPA process, recognizing the godwit population. OHV use will be managed under a "Limited" classification consistent with the State's Generally Allowable Uses. Additional road and trail construction will be governed by the guidance found in BLM Manual 8351.5 A Wild River Areas. ROPs and Stipulations will be applied to authorized activities as appropriate.

### *Kodiak Region*
Elbow Creek is tentatively classified as Recreational. The ORV is listed as ecological function based on the area's large variety of wildlife and habitat. The segment has a history of subsistence use. The BLM will manage the segment for continued subsistence use and apply the ROPs and Stipulations as appropriate to all authorizations granted. OHV classification will

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 45 of 82

continue as "Limited" and incorporate as a management guideline the State's Generally Allowable Uses.

*Southcentral Region*

The South Fork of Eagle River's ORV is the wildland-urban interface and the segment is tentatively classified as Recreational. This segment is within the boundary of Chugach State Park and is currently managed for park purposes under the Cooperative Recreation Management Agreement Between the Bureau of Land Management and the Alaska Department of Natural Resources, Division of Parks (1972). In the interim, the BLM will continue to have the lands managed by the State using this agreement as the authority. The State uses the authority of Alaska Statute 41.21.120 to manage the lands for park purposes.

The Chilligan River is the only Eligible segment within the planning boundary that is not selected by an ANCSA corporation or the State of Alaska. The Chilligan River's ORVs are listed as scenery and wildlife and the river segment is  tentatively classified as Wild and/or Scenic. OHV will be managed as "Limited" and incorporate the State's Generally Allowable Uses as management guidance. The BLM will manage this segment to ensure that the ORVs of wildlife and scenery are not diminished by applying the NEPA process to all requests for authorization. This process will take the resources which are present into account and develop mitigation for potential impacts to them. The BLM will apply the ROPs and Stipulations as appropriate as a minimum protective measure.

The Iniskin River has wildlife as its ORV and is tentatively classified as Wild. In the interim, the BLM will manage the segment using the guidance found in BLM Manual 8351.5 A. Wild River Areas. OHVs will be managed as "Limited" consistent with the State's Generally Allowed Uses. Applications will be subject to a NEPA evaluation allowing the identification of potential impacts and the development of mitigating measures. The BLM will apply ROPs and Stipulations to authorizations as appropriate.

The Ursus Cove Complex has ORVs of wildlife and ecological function and is tentatively classified as Wild. The BLM will manage these lands in accordance with BLM Manual 8351.5 A Wild River Areas. OHVs will be managed as "Limited" consistent with the State's Generally Allowable uses. Applications will be subject to a NEPA evaluation allowing the identification of potential impacts and the development of mitigating measures. The BLM will apply ROPs and Stipulations to authorizations as appropriate.

The Kirschner Lake Complex was found Eligible for its scenic primitive setting and its recreational opportunities, and is tentatively classified as Wild and/or Scenic. The BLM will manage this river segment using the guidance found in BLM Manual 8351.5 A Wild River Areas. OHVs will be managed as "Limited" consistent with the State's Generally Allowable uses. Applications will be subject to a NEPA evaluation allowing the identification of potential impacts and the development of mitigating measures. The BLM will apply ROPs and Stipulations to authorizations as appropriate.

The MacArthur River has a listed ORV for ecological function and for wildlife and a tentative classification as a Recreational river. The BLM will manage these lands in accordance with

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 46 of 82

BLM Manual 8351.5 C <u>Recreational River Areas</u>. The BLM will manage the river segment to protect the ORVs through application of the NEPA process. OHVs will be managed as "Limited" consistent with the State's Generally Allowable uses. Applications will be subject to a NEPA evaluation allowing the identification of potential impacts and the development of mitigating measures. The BLM will apply ROPs and Stipulations to authorizations as appropriate.

*Southeast Region*
The Chilkat River has been transferred to the State of Alaska as part of the continued transfer of title to the State and the ANCSA corporations. The BLM currently has no land ownership or management responsibility for this river segment.

The Tsirku River was originally determined Eligible for its scenery, wildlife and geology, with a tentative classification as a Wild and/or Recreational river. The BLM has transferred all lands the Tsirku River travels through, except those within Trespass File AA-086385 located in T. 30 S., R. 55 E., Copper River Meridian. These lands, generally adjacent to Mineral Survey 1564, will be conveyed to the State upon resolution of the trespass case. OHV use will be managed as "Limited" consistent with the State of Alaska's Generally Allowable Uses as a management guideline. In the interim, the BLM will work with the selecting entity (the State) to manage trespass and manage the lands through the NEPA process which allows for the identification of potential impacts to the resources and the ORVs and the development of mitigating measures to offset the impacts. The BLM will apply ROPs and Stipulations as appropriate.

The Chilkoot River contains ORVs for ecological function and scenery and is tentatively classified as a Wild and/or Scenic river. The BLM issued a Recordable Disclaimer of Interest (RDI) for submerged lands located in T., 29 S., R.57 and 58 E., Copper River Meridian, on February 1, 2006. This limits the BLM's management interest to the lands upland of the river to the 200-foot contour line, which was previously within Power Site Classification (PSC) 439 and the river segment that flows through State-selected lands in T. 27 S., Rs. 56 and 57 E., CRM. OHV use will be managed as "Limited." The BLM will incorporate the State of Alaska's Generally Allowable Uses as a management guideline. In the interim, the BLM will manage the segment and surrounding lands using the NEPA process to identify and mitigate potential impacts which might reduce the segment's potential to be found suitable for inclusion in the National Wild and Scenic River System. The BLM will apply ROPs and Stipulations to authorizations as appropriate.

The Chilkoot Lake Power Site Withdrawal was found Eligible with the identified ORV of wildlife. The segment is tentatively classified as Recreational. The BLM issued a Recordable Disclaimer of Interest (RDI) for submerged lands located in T., 29 S., R.57 and 58 E., Copper River Meridian, on Feburary1, 2006. This limits the BLM's management authority to the lands extending from ordinary high water for the river and lake, upland to the 200-foot contour line. These lands were previously withdrawn by Power Site Withdrawal (PSC 439). In the interim, the BLM will manage the area to protect the identified ORV. This area is located within the boundary of the proposed Haines Block Special Recreation Management Area (SRMA). A Special Recreation Management Plan (SRMP) will be developed with additional public participation. Authorizations within the area will be coordinated with the State. OHV will be

managed as "Limited" and incorporate the State's Generally Allowable Uses for OHV as a management guideline.

The Tahini River lists wildlife as the ORV and a tentative classification as Wild and/or Recreational. This segment flows through lands selected by the State. The BLM will continue to seek concurrence prior to approving any project. The lands are also encumbered by Proclamation 810, a 60-foot-wide reservation for the international boundary. The BLM will include these lands and consider the wildlife ORV in its development of the SRMP for the Haines Block. This SRMP will be developed with additional public participation. Authorizations within the area will be coordinated with the State. OHV will be managed as "Limited" and incorporate the State's Generally Allowable Uses for OHV as a management guideline.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 48 of 82

# Appendix A: Required Operating Procedures, Stipulations, and Standard Lease Terms

# TABLE OF CONTENTS

**Page**

1.0    INTRODUCTION.................................................................................................A-1

    1.1    Required Operating Procedures.................................................................. A-1
    1.2    Oil and Gas Leasing Stipulations ...............................................................A-1
    1.3    Exceptions, Modifications, and Waivers......................................................A-1
    1.4    Standard Lease Terms ...............................................................................A-2

2.0    REQUIRED OPERATING PROCEDURES...................................................A-3

    2.1    Soils............................................................................................................A-3
    2.2    Fish and Wildlife Habitat.............................................................................A-4
    2.3    Riparian Areas and Water Resources........................................................A-5
    2.4    Wetlands ....................................................................................................A-7
    2.5    Vegetation .................................................................................................A-7
    2.6    Cultural and Paleontological Resources ....................................................A-8
    2.7    Visual Resources .......................................................................................A-9
    2.8    Hazardous Materials and Waste Handling................................................A-10

3.0    OIL AND GAS LEASING STIPULATIONS.................................................A-12

4.0    STANDARD LEASE TERMS (BLM FORM 3100-11)..................................A-14

    4.1    Section 1. Rentals....................................................................................A-14
    4.2    Section 2. Royalties..................................................................................A-14
    4.3    Section 3. Bonds ......................................................................................A-15
    4.4    Section 4. Diligence, rate of development, unitization, and drainage...................A-15
    4.5    Section 5. Documents, evidence, and inspection.....................................A-15
    4.6    Section 6. Conduct of operations .............................................................A-15
    4.7    Section 7. Mining operations ....................................................................A-16
    4.8    Section 8. Extraction of helium.................................................................A-16
    4.9    Section 9. Damages to property................................................................A-16
    4.10    Section 10. Protection of diverse interests and equal opportunity .........................A-16
    4.11    Section 11. Transfer of lease interests and relinquishment of lease.....................A-17
    4.12    Section 12. Delivery of premises...............................................................A-17
    4.13    Section 13. Proceedings in case of default ..............................................A-17
    4.14    Section 14. Heirs and successors-in-interest...........................................A-17

## LIST OF FIGURES

Figure A-1    Anadromous Fish Streams Map of the Aleutian Chain
Figure A-2    Anadromous Fish Streams Map of Alaska Peninsula and Kodiak Island
Figure A-3    Anadromous Fish Stream Map of the Southcentral Region
Figure A-4    Anadromous Fish Stream Map of the Southeast Region
Figure A-5    Trumpeter Swan Distribution Map of the Southcentral Region
Figure A-6    Trumpeter Swan Distribution Map of the Southeast Region
Figure A-7    Moose Winter Range Map of the Southcentral Region
Figure A-8    Moose Winter Range Map of the Southeast Region
Figure A-9    Bald Eagle Nest Map of Alaska Peninsula and Kodiak Island
Figure A-10    Bald Eagle Nest Map of the Southcentral Region
Figure A-11    Bald Eagle Nest Map of the Southeast Region
Figure A-12    Dall Sheep Area Map of the Southcentral Region
Figure A-13    Mountain Goat Area Map of the Southeast Region
Figure A-14    Caribou Calving Area Map of the Southcentral Region

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 50 of 82

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| ADEC | Alaska Department of Environmental Conservation |
| ADF&G | Alaska Department of Fish and Game |
| AO | Authorized Officer |
| BLM | Bureau of Land Management |
| CFR | Code of Federal Regulation |
| CHA | critical habitat area |
| ESA | Endangered Species Act |
| FEIS | Final Environmental Impact Statement |
| FLPMA | Federal Land Policy and Management Act |
| ft | foot/feet |
| FWH | Fish and Wildlife Habitat |
| NHPA | National Historic Preservation Act |
| NPDES | National Pollution Discharge Elimination System |
| OHV | off-highway vehicle |
| PRMP | Proposed Resource Management Plan |
| ROP | required operating procedures |
| ROW | right-of-way |
| T&E | threatened and endangered |
| U.S. | United States |
| U.S.C. | United States Code |
| USEPA | U.S. Environmental Protection Agency |
| VRM | Visual Resource Management |

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 51 of 82

# 1.0 INTRODUCTION

These required operating procedures (ROPs) and oil and gas leasing stipulations were developed through the Ring of Fire planning process. To be necessary and effective, ROPs and stipulations are based on sound science, current land patterns and uses, resource protection requirements, and are consistent with the requirements of the land use plan, regulations, and laws.

## 1.1 Required Operating Procedures

ROPs are requirements, procedures, management practices, or design features that the Bureau of Land Management (BLM) adopts as operational requirements. They would apply to the action alternatives (Alternatives B, C, and D). ROPs would apply to all permitted activities, including Federal Land Management Policy Act (FLPMA) leases and permits, special recreation permits (SRPs), oil and gas operations, mining plans of operation, and right-of-way (ROW) authorizations. All vegetation management practices would be conducted consistent with these guidelines. Obviously, not all ROPs would apply to all permitted activities. ROPs have been developed to ensure that objectives identified within the Alaska Land Health Standards are met in carrying out permitted activities and management practices.

## 1.2 Oil and Gas Leasing Stipulations

Stipulations are specific to oil and gas exploration, development, and production. They constitute significant restrictions on the conduct of operations under a lease. For example, a stipulation that does not allow permanent facilities within one-fourth of a mile of a bird nest could result in a well being located far enough from the (lessee's) optimum site to prevent an oil reservoir from being fully developed. Such restrictions must be attached to the lease. As part of a lease contract, lease stipulations are specific to the lessee. All oil and gas activity permits subsequently issued to a lessee would comply with the lease stipulations appropriate to the activity under review.

The Authorized Officer (AO) may add additional conditions of approval as determined necessary through further National Environmental Policy Act analysis as developed through consultation with other federal and state regulatory and resource agencies.

## 1.3 Exceptions, Modifications, and Waivers

Surface stipulations could be excepted, modified, or waived by the AO. An exception exempts the holder of the land use authorization document from the stipulation on a one-time basis. A modification changes the language or provisions of a surface stipulation, either temporarily or permanently. A waiver permanently exempts the surface stipulation.

An environmental analysis document prepared for oil and gas development (e.g., Applications for Permit to Drill or sundry notices) would also address proposals to exempt, modify, or waive a surface stipulation. To exempt, modify, or waive a stipulation, the environmental analysis document would need to show that: 1) the circumstances or relative resource values in the area had changed following issuance of the lease; or 2) less restrictive requirements could be developed to protect the resource of concern; or 3) operations could be conducted without causing unacceptable impacts; or 4) the resource value of concern does not occur within the

lease area. The environmental analysis document would also determine the need for an RMP amendment.

## 1.4  Standard Lease Terms

The Standard Lease Terms are contained in Form 3100-11 (see Section 4), Offer to Lease for Oil and Gas, United States (U.S.) Department of the Interior, BLM, October 1992 or later addition (BLM 1992). Form 3100-11 is standard nationwide and is applied to every lease issued by the BLM. The Standard Lease Terms provide the lessee the right to use the leased land as needed to explore for, drill for, extract, remove, and dispose of oil and gas deposits located under the leased lands. Operations must be conducted in a manner that minimizes adverse impacts to the land, air, water, cultural, biological, and visual elements of the environment, as well as other land uses or users. Federal environmental protection laws such as the Clean Water Act, Endangered Species Act (ESA), and National Historic Preservation Act (NHPA), will be applied to all lands and operations and are included in the Standard Lease Terms. If threatened or endangered (T&E) species; objects of historic, cultural, or scientific value; or substantial unanticipated environmental effects are encountered during construction, all work affecting the resource will stop and the land management agency will be contacted.

Standard Lease Terms provide for reasonable measures to minimize adverse impacts to surface resources. These include, but are not limited to, modifications to the siting or design of facilities, timing of operations, and specifications of interim and final reclamation measures. At a minimum, measures shall be deemed consistent with lease rights granted provided that they do not: require relocation of proposed operations by more than 200 meters; require that operations be sited off the leasehold; or prohibit new surface disturbing operations for a period in excess of 60 days in any lease year (43 Code of Federal Regulations [CFR] part 3101.I-2).

# 2.0 REQUIRED OPERATING PROCEDURES

## 2.1 Soils

### 2.1.1 Objective

Stabilizing disturbed soil as soon as possible minimizes soil erosion. Where permitted operations result in surface disturbance, land is returned as closely as possible to its pre-disturbed condition (Soils 1 through 12).

### 2.1.2 Requirements

| Soils 1 | Ditch roadways on the uphill side and install culverts or low water crossings at suitable intervals. Spacing of drainage devices will be dependent on road gradient and soil erodibility. |
|---------|---|
| Soils 2 | Design roads for minimal disruption of natural drainage patterns. |
| Soils 3 | Roads shall avoid areas with unstable or fragile soils. |
| Soils 4 | Place water bars across reclaimed roads having grades in excess of two percent. Spacing will be dependent on road gradient and soil erodibility. |
| Soils 5 | Save all organic material for future use in an area separate from overburden. |
| Soils 6 | Stockpile and save all overburden for respreading over tailings. |
| Soils 7 | Shape and stabilize all overburden piles to prevent erosion. |
| Soils 8 | Final shape of respread tailing and overburden will approximate the shape of the surrounding terrain. |
| Soils 9 | Recontour and revegetate roads, well pads, and other disturbed areas as per an approved reclamation plan or Plan of Operations. Revegetation will occur through seeding of native seed or by providing for soil conditions that allow the site to revegetate naturally; whichever provides the most effective means of reestablishing ground cover and minimizing erosion. Scarify the final land surface to provide seed traps and erosion control. |
| Soils 10 | Seed and plant with native species. Where native species are not available in sufficient quantities or where they are incapable of maintaining or achieving the objective, or where non-native species are essential to the functional integrity of the site, non-native vegetation may be used with specific approval from the AO. |
| Soils 11 | Respread vegetation removed during pipeline installation to provide protection, nutrient recycling, and seed source. |
| Soils 12 | Operators will prevent and control noxious weed infestations. Noxious weeds in Alaska are listed under Alaska Statute 11 Alaska Administrative Code 34.020. |

### 2.1.3 Objective

Minimize soil disturbance and compaction associated with overland moves, forestry operations, and seismic exploration (Soils 13 through 15).

### 2.1.4 Requirements

| Soils 13 | Whenever possible, overland moves that are part of permitted operations will occur when frost and snow cover is sufficient to minimize soil disturbance and compaction. For proposed operations during snow-free months, permittee will work with the AO on specifying vehicle types and methods to minimize vegetation and soil disturbance, such as use of air or watercraft, utilizing existing roads or trails, or use of low ground pressure vehicles. |
|----------|---|
| Soils 14 | Bulldozing of tundra mat and vegetation is prohibited unless project objectives call for scarification of the site to improve sprouting or seeding success. In situations where pipeline or electric line requires burial, use equipment designed specifically for trenching that minimizes disturbance of vegetation mat. |
| Soils 15 | Off-highway vehicle (OHV) use associated with permitted activities will comply with trail limitations in the area. The use of OHVs associated with permitted activities will be allowed under appropriate stipulations as approved by the AO. |

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 54 of 82

## 2.2 Fish and Wildlife Habitat

### 2.2.1 Objective

Maintain and protect fish and wildlife habitat (FWH) on public lands, and provide the habitat needs of fish and wildlife resources necessary to maintain or restore such populations (FWH 1 through 14).

### 2.2.2 Requirements

| | |
|---|---|
| FWH 1 | Utilize existing roads and trails whenever possible. |
| FWH 2 | No road crossings are permitted in crucial spawning habitat unless no feasible alternative exists and it can be demonstrated that no adverse effects will occur. |
| FWH 3 | Avoid stream crossings. When a stream must be crossed, make the crossing as close as possible to a 90 degree angle to the stream. Make stream crossings at stable sections in the stream channel. |
| FWH 4 | Bridges and culverts will be large enough, or will be positioned, to 1) avoid altering the direction and velocity of stream flow, and 2) avoid interfering with migrating, rearing, or spawning activities of fish and wildlife. Bridges and culverts should span the entire non-vegetated stream channel. |
| FWH 5 | Recontour and revegetate disturbed stream banks, or take other protective measures to prevent soil erosion into adjacent waters. |
| FWH 6 | Roads, well pads, and other oil and gas facilities will not be allowed within 500 feet (ft) of fish-bearing rivers and lakes unless the lessee can demonstrate (through a site-specific analysis that considers species of fish present, slope, vegetation, and other conditions) that the impacts to fish habitat are minimal (Figures D-1 through D-3). |
| FWH 7 | Exploratory oil and gas drilling is prohibited in fish-bearing rivers and streams (as determined by the active floodplain) and fish-bearing lakes except where the lessee can demonstrate on a site-specific basis that impacts would be minimal or it is determined that there is no feasible or prudent alternative (Figures D-1 through D-3). |
| FWH 8 | Travel up and down streambeds is prohibited. |
| FWH 9 | Water intakes will be screened and designed to prevent fish intake. |
| FWH 10 | Timber sales will provide buffers to prevent disturbance of fish habitat and possible sedimentation into streams. Buffer widths will be dependent on harvest method, season of harvest, equipment used, slope, vegetation, and soil type. Winter operations will be encouraged in order to minimize impacts to riparian areas. |
| FWH 11 | Prescribed burn ignition patterns will allow for stream buffers. Lighting at stream edge will be avoided. |
| FWH 12 | Overhead powerline construction will be avoided in primary trumpeter swan breeding habitat (Figures D-5 and D-6). |
| FWH 13 | Recreational developments, permits, or leases on lakes or lakeshores with historically active trumpeter swan nest sites or staging areas will not be allowed (Figures D-5 and D-6). |
| FWH 14 | When possible, operations that require vegetation removal will avoid the migratory bird nesting period of April 15 to July 15. If no feasible alternatives exist, an assessment will be conducted to determine bird species present, significance of potential impacts, and possible mitigation measures. |

### 2.2.3 Objective

Heavy concentrations of activities in sensitive wildlife and plant habitats will be avoided (FWH 15 and 16).

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 55 of 82

## 2.2.4 Requirements

| FWH 15 | Within one-fourth of a mile of bald eagle nests (Figures D-9 through D-11), the following uses will not be permitted from April 1 to August 31: a) surface disturbing activities; or b) FLPMA leases or permits. Aircraft associated with permitted activities will maintain an altitude of 1,000 ft within one-half mile of documented eagle nests. Exemptions to this ROP may be granted for mining operations where no feasible alternative exists and where mitigation measures can be identified to minimize impacts. Appropriate buffers around other raptor nests will be determined based on site-specific analysis. Stipulations regarding oil and gas exploration, development, and production are described in the Oil and Gas Leasing Stipulations section beginning on page 12. |
|---|---|
| FWH 16 | In critical Dall sheep and mountain goat habitat (Figures D-12 and D-13), helicopters used in support of permitted activities will maintain one-half mile of horizontal and 1,500 ft vertical distance from goats and sheep. Heli-ski landing or skiing is not permitted in Dall sheep or goat critical ranges, as identified based on Alaska Department of Fish & Game (ADF&G) maps and refined by monitoring. |

## 2.2.5 Objective

Fish and wildlife resources and habitat will be managed to ensure compliance with the ESA and to ensure progress towards recovery of listed T&E species (FWH 20).

## 2.2.6 Requirements

| FWH 20 | The planning area may now or hereafter contain plants or animals (or their habitats) identified as T&E or special status species. BLM may recommend modifications to proposals to further its conservation and management objective to avoid any BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activities that are likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat area (CHA). BLM will not approve any ground-disturbing activities that may affect any such species or CHA until BLM completes its obligations under applicable requirements of the ESA, 16 United States Code (U.S.C.) 1531 et seq., including completion of any required procedures for conference or consultation. |
|---|---|

# 2.3 Riparian Areas and Water Resources

## 2.3.1 Objective

New structures will be located away from riparian or wetland areas if they conflict with achieving or maintaining riparian or wetland function. Existing structures are used so as not to conflict with riparian or wetland functions, or they are relocated or modified when incompatible (Water 1 and 2).

## 2.3.2 Requirements

| Water 1 | The design and location of permanent oil and gas facilities within 500 ft of fish-bearing waterbodies or within 100 ft of non fish-bearing waterbodies will only be approved on a case-by-case basis if the lessee can demonstrate that impacts to fish, water quality, and aquatic and riparian habitats are minimal. |
|---|---|
| Water 2 | New road construction within floodplains will be avoided. Where necessary, roads will cross riparian areas perpendicular to the main channel. |

## 2.3.3 Objective

Minimize disturbance to riparian areas and facilitate rehabilitation of riparian areas (Water 3 through 8).

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 56 of 82

## 2.3.4 Requirements

| Water 3 | Streams will be diverted around mining operations using an appropriately-sized bypass channel. |
|---|---|
| Water 4 | All process waters and any groundwater seeping into the operating area will be diverted into the settling pond system for treatment prior to reentering the natural water system. |
| Water 5 | Settling ponds will be cleaned out and maintained at appropriate intervals to comply with water quality standards. Fine sediment captured in settling ponds will be protected from washout and left in a stable condition at the end of each mining season to prevent unnecessary and undue degradation to the environment during periods of non-operation. |
| Water 6 | Riparian areas located between a mined ore deposit and a water course will not be disturbed to serve as a buffer strip to protect integrity of stream banks, provide water temperature control, and provide filtration of sediment from surface runoff. All roads, bunkhouses, offices, equipment storage, and maintenance facilities will be sited in upland areas if possible. Overburden will be placed on the uplands if possible or on the upland side of the mine pit. Application of this ROP is not intended to preclude activities, which by nature, must occur within riparian areas, such as placer mining. |
| Water 7 | Projects will be designed to protect water quality and comply with state and federal water quality standards. |
| Water 8 | Streams that have been altered by channeling, diversion, or damming will be restored to a condition that will allow for proper functioning condition. Active streams will be returned to the natural water course or a new channel will be created at its lowest energy state (valley bottom) that approximates the old natural channel in shape, gradient, and meander frequency using a stable channel design. The new channel will be designed consistent with the capabilities of the reclaimed site. |

## 2.3.5 Objective

Provide for maintenance of proper functioning condition in riparian areas and protection of water quality by minimizing impacts of other permitted activities and vegetation treatments (Water 10 through 16).

## 2.3.6 Requirements

| Water 10 | Structural and vegetative treatments in riparian and wetland areas will be compatible with the capability of the site, including the system's hydrologic regime, and will contribute to the maintenance or restoration of proper functioning condition. |
|---|---|
| Water 11 | Refueling of equipment will not be conducted in riparian areas or within 500 ft of the active floodplain of any fish-bearing waterbody or within 100 ft from non-fish bearing waterbodies. The AO may allow storage and operations at areas closer than the stated distance if properly designed to account for local hydrologic conditions. |
| Water 12 | Water withdrawal from lakes may be authorized on a site-specific basis depending on size, water volume, depth, fish population, and species diversification. |
| Water 13 | If operations occur in winter, crossing of waterway courses will be made using a low-angle approach. Snow and ice bridges will be removed, breached, or slotted before spring break-up. Ramps and bridges will be substantially free of soil and debris. |
| Water 14 | All permitted operations will be conducted in such a manner as to not block any stream or drainage system, and to comply with state and federal water quality standards. Application of this ROP is not intended to preclude activities, which by nature, must occur within riparian areas, such as hydropower dams or placer mining. |
| Water 15 | Human use will be managed to meet and maintain water quality standards and avoid management problems and water quality impacts. Specific management practices will include education, construction of toilet facilities where appropriate, and encouragement in the use of portable toilet systems. |
| Water 16 | Use of aerial fire retardant near lakes, wetlands, streams, rivers, sources of human water consumption, and areas adjacent to water sources will be avoided to protect fish habitat and water quality. If feasible, use of water rather than retardant is preferred in these areas. |

## 2.3.7 Objective

Minimize disturbance to riparian areas from development of mineral material sites (Water 17 through 24).

## 2.3.8 Requirements

| | |
|---|---|
| Water 17 | When responding to a request for a material sale or identifying a source for materials on public lands, the highest priority shall be given to using existing upland material sources. Using materials from wetlands, lakes, and active or inactive floodplains will be avoided unless no feasible public upland alternative exists. Sales or permits for gravel extraction will not be permitted in known fish spawning or rearing areas. |
| Water 18 | Where possible, braided or split stream types will be selected for material extraction. Meandering, sinuous, and straight steam channel types should be avoided. |
| Water 19 | Generally, the largest river feasible should be selected for a gravel operation in a given area. Larger rivers have higher volumes of gravel and a wider floodplain more forgiving to in-channel disturbance. The proportionately smaller disturbance in large river systems will reduce the overall effect of gravel removal. |
| Water 20 | Mining gravel from active channels will be avoided to reduce detrimental effects on water quality, aquatic habitat, and biota. |
| Water 21 | When possible, avoid vegetated habitats. |
| Water 22 | When scraping gravel in active or inactive floodplains, maintain buffers that will constrain active channels to their original locations and configurations. |
| Water 23 | Material pits will be designed with high shorelines, water depth diversity, and islands. |
| Water 24 | If mining in vegetated areas, all overburden, vegetative slash, and debris will be saved for use during site reclamation to facilitate vegetative recovery. This material should be piled or broadcast so that it will not be washed away. |

# 2.4 Wetlands

## 2.4.1 Requirements

Involve the following land management practices to avoid or minimize adverse impacts upon the hydrological, habitat, subsistence, and recreational values of public wetlands (Wetlands 1 through 3):

| | |
|---|---|
| Wetlands 1 | Activities in wetlands will comply with federal and state permit requirements for alteration of wetlands. |
| Wetlands 2 | Utilize winter access whenever possible and avoid road or trail construction in wetlands. |
| Wetlands 3 | In snow-free months, if wetlands cannot be avoided, low ground pressure vehicles will be used wherever possible. |

# 2.5 Vegetation

## 2.5.1 Objective

Treatments to alter the vegetative composition of a site, such as prescribed burning, seeding, or planting, will be based on the potential of the site and will (Veg 1 through 7):

a) retain or promote infiltration, permeability, and soil moisture storage;

b) contribute to nutrient cycling and energy flow;

c) protect water quality;

d) help prevent the introduction and spread of noxious weeds;

e) contribute to the diversity of plant communities and plant community composition and structure;

f) maintain proper functioning condition; and

g) support the conservation of T&E, special status species, and species of local importance.

A-7

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 58 of 82

## 2.5.2 Requirements

| Veg 1 | Vegetation treatments will be designed to achieve desired conditions clearly described in individual burn plans or timber sales. Desired conditions will be based on the ecological capability of a given site and will be expressed as cover types or seral stages within cover types, based on management objectives. |
|---|---|
| Veg2 | Vegetation treatments will be designed to prevent introduction of noxious weeds. Prescribed burn plans will contain a segment on known occurrence of noxious weeds within planned burning areas and strategies for post-burn monitoring or treatment. |
| Veg 3 | Machinery used in timber sales will be inspected for noxious weed seeds. |
| Veg 4 | Burn plans for large burns will prescribe conditions that result in a mosaic of burned or unburned areas within the burn unit. Smaller burns may not require a mosaic, dependent on objectives. |
| Veg 5 | Timber sales will rely, to the extent possible, on natural regeneration through proper site preparation. |
| Veg 6 | Permitted livestock grazing will be conducted in a manner that maintains long-term productivity of vegetation. Animals will not be picketed in riparian areas. In areas of low grass production, operators will pack in weed-free hay or concentrated feed. |
| Veg 7 | Currently there is known habitat in the planning area for special status plant species. However, no specific population locations are known. If specific populations or individual special status species are located, measures will be taken to protect these populations or individuals through site-specific buffers or management prescriptions. |

## 2.5.3 Objective

Minimize vegetation disturbance from permitted activities (Veg 8 through 14).

## 2.5.4 Requirements

| Veg 8 | Conduct ground operations during frozen conditions when possible (12 inches frost or 6 inches average snow cover). |
|---|---|
| Veg 9 | Bulldozing of tundra mat or vegetation is prohibited unless there is no feasible alternative (lode mining), as approved by the AO. If trenching is required, utilize equipment that minimizes trench width. |
| Veg 10 | Location of winter trails will be designed to minimize breakage or compaction of vegetation. |
| Veg 11 | When ground operations are required in snow-free months, select routes that utilize naturally hardened sites and avoid the need for trail braiding. |
| Veg 12 | Use of tracked or OHV in fire suppression or management activities will be conducted in a manner that does not cause erosion, damage to riparian areas, degradation of water quality or fish habitat, or contribution to stream channel sedimentation. |
| Veg 13 | Permanent oil and gas facilities will be designed and located to minimize the development footprint. |
| Veg 14 | Rehabilitate firelines and bulldozer lines by spreading original soil and vegetation on the disturbed ground. In extreme cases where seeding or plugging may be necessary, use native vegetation and seeds. A rehabilitation plan should be developed by suppression forces working with Anchorage Field Office wildlife biologists and botanists. |

# 2.6 Cultural and Paleontological Resources

## 2.6.1 Objective

Management practices will consider protection and conservation of known cultural resources, including historical and prehistoric sites (Cultural 1 through 3).

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 59 of 82

## 2.6.2 Requirements

| Cultural 1 | For oil and gas activities, cultural resource protection is covered under the standard lease terms. |
|---|---|
| Cultural 2 | For other non-oil and gas permitted activities, cultural resource protection, and conservation will be consistent with: 1) Sections 106, 110, and 101d of the National Historic Preservation Act (NHPA), 2) procedures under BLM's 1997 Programmatic Agreement for Section 106 compliance, and 3) BLM's 1998 Implementing Protocol in Alaska between BLM and the Alaska State Historic Preservation Officer. |
| Cultural 3 | If necessary, mitigation measures will be implemented according to a mitigation plan approved by the AO. Such plans are usually prepared by the land use applicant's contract archaeologist according to BLM specifications. Mitigation plans will be reviewed as part of Section 106 consultation for National Register of Historic Places eligible or listed properties. The extent and nature of recommended mitigation will be commensurate with the significance of the cultural resource involved and the anticipated extent of the damage. Reasonable costs for mitigation will be borne by the land use applicant. Mitigation will be cost-effective and realistic. |

## 2.6.3 Objective

Avoid damage to significant paleontological resources where possible, and mitigate unavoidable damage (Cultural 4 and 5).

## 2.6.4 Requirements

| Cultural 4 | For all actions, evaluate the impacts of proposed actions to known resources and avoid damage to already-identified significant paleontological resources by avoidance. |
|---|---|
| Cultural 5 | If avoidance is not possible, perform scientific examination of the to-be-impacted significant resources followed by appropriate mitigation, which may include the professional collection and analysis of significant specimens by scientists. |

## 2.7   Visual Resources

### 2.7.1 Objective

Manage oil and gas, mining, and other permitted activities to meet the Visual Resource Management (VRM) class objectives I through IV:

**Class I** – Preserve the existing character of the landscape; change to the characteristic landscape should be very low and not attract attention.

**Class II** – Preserve the existing character of the landscape; change to the characteristic landscape may be seen, but should be low and not attract the attention of the casual observer.

**Class III** – Partially retain the existing character of the landscape; change to the characteristic landscape should be moderate and may attract attention, but not dominate the view of the casual observer.

**Class IV** – Provides for action that would make major modifications to the existing character of the landscape; change to the characteristic landscape can be high, dominate the view, and be the major focus of the viewer.

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 60 of 82

## 2.7.2 Requirements

The following land management practices will be applied to achieve VRM class objectives I through IV.

| VRM 1 | To the extent practicable, all permanent facilities will be located away from roadsides, rivers, or trails, thereby using distance to reduce the facility's visual impact. |
|-------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| VRM 2 | Access roads and permanent facilities will be designed to meet the visual resource objective using such methods as minimizing vegetation clearing and using landforms to screen roads and facilities. |
| VRM 3 | Permanent facilities will be screened behind trees or landforms if feasible so they will blend with the natural surroundings. |
| VRM 4 | The modification or disturbance of landforms and vegetative cover will be minimized. |
| VRM 5 | Permanent facilities shall be designed so their shapes, sizes, and colors harmonize with the scale and character of the surrounding landscape. |
| VRM 6 | In open, exposed landscapes, development will be located in the opposite direction from the primary scenic views, if feasible. |

# 2.8 Hazardous Materials and Waste Handling

## 2.8.1 Objective

Protect the health and safety of permittees, lessees, miners, oil field workers, and the general public by avoiding the disposal of solid waste and garbage near areas of human activity (Haz 1).

## 2.8.2 Requirement

| Haz 1 | Areas of operation will be left clean of all debris. |
|-------|-------------------------------------------------------|

## 2.8.3 Objective

Minimize impacts on the environment from non-hazardous waste generation (Haz 2 through 6).

## 2.8.4 Requirements

| Haz 2 | All feasible precautions will be taken to avoid attracting wildlife to food and garbage. |
|-------|------------------------------------------------------------------------------------------|
| Haz 3 | Current requirements prohibit the burial of putrescible waste. All putrescible waste will be incinerated, backhauled, or composted in a manner approved by the AO. All solid waste, including incinerator ash, will be disposed of in an approved waste-disposal facility in accordance with United States Environmental Protection Agency (USEPA) and Alaska Department of Environmental Conservation (ADEC) regulations and procedures. |
| Haz 4 | For oil and gas operations, all pumpable solid, liquid, and sludge waste will be disposed by injection in accordance with USEPA, ADEC, and the Alaska Oil and Gas Conservation Commission regulations and procedures. The AO may permit alternate disposal if the lessee demonstrates that subsurface disposal is not feasible or prudent and the alternative method will not result in adverse environmental effects. |
| Haz 5 | For oil and gas operations, produced water will be disposed of into injection wells as approved by the Alaska Oil and Gas Conservation Commission under USEPA regulations and the Underground Injection Control program. The AO may permit alternate disposal methods if the lessee demonstrates that subsurface disposal is not feasible or prudent and the alternative method will not result in adverse environmental effects. |
| Haz 6 | No disposal of domestic wastewater is allowed into bodies of fresh, estuarine, and marine water, including wetlands, unless authorized by the National Pollution Discharge Elimination System (NPDES) or state permit. |

## 2.8.5 Objective

Minimize the impacts to fish, wildlife, and the environment from hazardous materials, oil spills, and other chemical spills (Haz 7 through 15).

## 2.8.6 Requirements

| | |
|---|---|
| Haz 7 | For oil and gas operations and mining plans of operation, a Hazardous Materials Emergency Contingency Plan will be prepared and implemented before transportation, storage, or use of fuel or hazardous substances. The plan will include a set of procedures to ensure prompt response, notification, and cleanup in the event of a hazardous substance spill or threat of a release. The plan will include a list of resources available for response (e.g., heavy-equipment operators, spill-cleanup materials, or companies), and names and phone numbers of federal and state contacts. |
| Haz 8 | A plan of operations will include a disclosure of the components in any hydraulic fracturing materials to be used, the volume and depths at which such materials are expected to be used, and the volume capacity of the vessels to be used to store such materials. |
| Haz 9 | For oil and gas operations and mining plans of operation, the operator will maintain Material Safety Data Sheet information on all hazardous substances used by the operator. |
| Haz 10 | Before initiating any oil and gas or related activity or operation, including field research and surveys and/or seismic operations, lessees/permittees will develop a comprehensive spill prevention and response contingency plan per 40 CFR 112. |
| Haz 11 | For oil and gas operations, mining operations, and other leases and permits, sufficient oil-spill cleanup materials (absorbents, containment devices, etc.) will be stored at all fueling points and vehicle-maintenance areas and will be carried by field crews on all overland moves, seismic work trains, and similar overland moves by heavy equipment. |
| Haz 12 | Fuel and other petroleum products will be stored at a location approved by the AO and within an impermeable lined and diked area capable of containing 110 percent of the stored volume or within approved alternate storage containers. |
| Haz 13 | Fuel storage will not occur closer than 100 ft from any river, lake, stream, or wetland unless approved by the AO. |
| Haz 14 | Liner material will be compatible with the stored product and will be capable of remaining impermeable during typical weather extremes expected throughout the storage period. |
| Haz 15 | All fuel containers, including barrels and propane tanks, will be marked with the responsible party's name, product type, and year filled and purchased. |

## 2.8.7 Objective

Minimize impacts on fish, wildlife, and the environment from contaminants associated with the exploratory drilling process (Haz 16).

## 2.8.8 Requirements

| | |
|---|---|
| Haz 16 | Surface discharge of reserve-pit fluids and produced water is prohibited unless authorized by applicable NPDES and ADEC, and approved by the AO. |

Case 3.18-cv-00091-HRH    Document 1-7    Filed 03/05/18    Page 62 of 82

# 3.0 OIL AND GAS LEASING STIPULATIONS

**Table 1. Oil and Gas Leasing Stipulations**

| Objective | Stipulation | Areas Where Stipulations Apply | Exception, Modification, Waiver |
|---|---|---|---|
| Minimize disturbance to nesting trumpeter swans and their habitat (Figures D-5 and D-6). | **Stip-1:** Closed to drilling (exploration or development), pipeline construction, road construction, or location of permanent facilities May 1 to August 31. Allows off-season exploration activities or pipeline construction. | Area within one-fourth of a mile of trumpeter swan nesting or staging ponds, marshes, or lakes. | **Exception:** U.S. Fish and Wildlife five-year census data will be used to accurately identify nest sites that are used repeatedly. Upon site-specific review and monitoring, the AO may grant exceptions based on non-occupancy of specific nests. **Modification:** Season may be adjusted based on documented season of occupancy of specific nest sites. **Waiver:** None if nests are present in the lease area. |
| Maintain high value moose habitat and minimize disturbance in areas of winter concentration (Figures D-7 and D-8). | **Stip-2:** Closed to drilling (exploration or development), pipeline construction, and road construction activities October 15 to March 31. Open during this period to production activities. Open in off-season to all activities, subject to other stipulated areas. | Moose winter range. | **Exception:** Upon review and monitoring, the AO may grant exceptions based on actual moose use of site-specific area. Exceptions granted for work-over rigs on a case-by-case basis based on duration of activity and actual moose occupancy of the area. **Modification:** Season may be adjusted depending on climatic conditions, severity of winter, and documented occupancy of the area. **Waiver:** None if moose winter range is present in the lease area. |
| Protect active bald eagle nests (Figures D-9 through D-11). | **Stip-3:** Closed to drilling (exploration or development), pipeline construction, road construction, or location of permanent facilities April 1 to August 31. Allows off-season exploration activities or pipeline construction. | One-fourth of a mile buffer from historically active bald eagle nests. | **Exception:** Where data exists, the AO may grant exceptions based on review of eagle nest monitoring data. Nests unoccupied for three consecutive years may be considered for exception. **Modification:** Season may be adjusted based on actual nest occupancy. **Waiver:** None if bald eagle nests are present in area. |
| Minimize disturbance to calving caribou (Figure D-14). | **Stip-4:** No exploration or development activities May 1 to June 15. Production activities may occur (no workover rigs). | Caribou calving areas. | **Exception:** The AO may grant exception if a review indicates that calving caribou no longer occupy specific areas. Exceptions may be granted for work-over rigs on a case by case basis, depending on duration of activity and actual caribou occupancy of the area. **Modification:** Season may be extended or reduced based on actual occupancy of the area. Monitoring provided by annual ADF&G aerial counts. **Waiver:** This stipulation may be waived if caribou migratory patterns change and the areas are no longer used for calving. |

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 63 of 82

### Table 1 (continued). Oil and Gas Leasing Stipulations

| Objective | Stipulation | Areas Where Stipulations Apply | Exception, Modification, Waiver |
|---|---|---|---|
| Minimize soil erosion. | **Stip-5:** Surface disturbing proposals involving construction on slopes greater than 25 percent would include an approved erosion control strategy, topsoil segregation/ restoration plan, be properly surveyed and designed by a certified engineer, and approved by BLM prior to construction and maintenance. | All slopes greater than 25 percent within the planning area. | **Exception:** If after an environmental analysis the AO determines that it would cause undue or unnecessary degradation to pursue other placement alternatives, occupancy in the No Surface Occupancy area may be authorized. **Modification:** May be granted if a more detailed analysis (Order I soil survey) finds that surface disturbance could occur without accelerated erosion. **Waivers:** None. |
| Minimize impact on the human environment. | **Stip-6:** The operator will construct drill pads at least 500 ft and compressor stations at least 1,500 ft from occupied structures. | | **Exception:** The AO may grant an exception if the operator obtains the consent of the owner of the structure. **Modification:** None. **Waivers:** None. |
| Protect T&E, special status species, and their habitats. | **Stip-7:** The lease area may now or hereafter contain plants, animals, or their habitats determined to be threatened, endangered, or other special status species. BLM may recommend modifications to exploration and development proposals to further its conservation and management objective to avoid BLM-approved activity that will contribute to a need to list such a species or their habitat. BLM may require modifications to or disapprove proposed activity that is likely to result in jeopardy to the continued existence of a proposed or listed threatened or endangered species or result in the destruction or adverse modification of a designated or proposed critical habitat. BLM will not approve any ground-disturbing activity that may affect any such species or critical habitat until it completes its obligations under applicable requirements of the Endangered Species Act as amended, 16 U.S.C. § 1531 et seq., including completion of any required procedure for conference or consultation. | All BLM-managed lands. | **Exception:** None. **Modification:** None. **Waiver:** None. |
| Protect migratory, breeding, and brooding birds in the Palmer Hay Flats. | **Stip-8:** Closed to drilling (exploration or development), pipeline construction, road construction, or location of permanent facilities March 15 to October 31. | All BLM-managed lands within the Palmer Hay Flats. | **Exception:** AO may grant an exception if the birds are no longer in the area or if the lessee can demonstrate the primary bird habitat will not be impacted. **Modification:** Season may be adjusted based on documented season of occupancy. **Waiver:** None, if nests are present in the lease area. |

Case 3:18-cv-00091-HRH Document 1-7 Filed 03/05/18 Page 64 of 82

# 4.0  STANDARD LEASE TERMS (BLM FORM 3100-11)

## 4.1  Rentals

Rentals shall be paid to proper office of lessor in advance of each lease year. Annual rental rates per acre or fraction thereof are:

a) Noncompetitive lease, $1.50 for the first 5 years; thereafter $2.00;

b) Competitive lease, $1.50, for the first 5 years; thereafter $2.00;

c) Other, see attachment, or as specified in regulations at the time this lease is issued.

If this lease or a portion thereof is committed to an approved cooperative or unit plan, which includes a well capable of producing leased resources, and the plan contains a provision for allocation of production, royalties shall be paid on the production allocated to this lease. However, annual rentals shall continue to be due at the rate specified in (a), (b), or (c) for those lands not within a participating area.

Failure to pay annual rental, if due, on or before the anniversary date of this lease (or next official working day if office is closed) shall automatically terminate this lease by operation of law. Rentals may be waived, reduced, or suspended by the Secretary upon a sufficient showing by lessee.

## 4.2  Royalties

Royalties shall be paid to proper office of lessor. Royalties shall be computed in accordance with regulations on production removed or sold. Royalty rates are:

a) Noncompetitive lease, 12 1/2 percent;

b) Competitive lease, 12 1/2 percent;

c) Other, see attachment; or as specified in regulations at the time this lease is issued.

Lessor reserves the right to specify whether royalty is to be paid in value or in kind, and the right to establish reasonable minimum values on products after giving lessee notice and an opportunity to be heard. When paid in value, royalties shall be due and payable on the last day of the month following the month in which production occurred. When paid in kind, production shall be delivered, unless otherwise agreed to by lessor, in merchantable condition on the premises where produced without cost to lessor. Lessee shall not be required to hold such production in storage beyond the last day of the month following the month in which production occurred, nor shall lessee be held liable for loss or destruction of royalty oil or other products in storage from causes beyond the reasonable control of lessee.

Minimum royalty in lieu of rental of not less than the rental which otherwise would be required for that lease year shall be payable at the end of each lease year beginning on or after a discovery in paying quantities. This minimum royalty may be waived, suspended, or reduced, and the above royalty rates may be reduced, for all or portions of this lease if the Secretary determines that such action is necessary to encourage the greatest ultimate recovery of the leased resources, or is otherwise justified.

An interest charge shall be assessed on late royalty payments or underpayments in accordance with the Federal Oil and Gas Royalty Management Act of 1982 (30 U.S.C. 1701). Lessee shall be liable for royalty payments on oil and gas lost or wasted from a lease site when such loss or waste is due to negligence on the part of the operator, or due to the failure to comply with any rule, regulation, order, or citation issued under Federal Oil and Gas Royalty Management Act or the leasing authority.

## 4.3 Bonds

A bond shall be filed and maintained for lease operations as required under regulations.

## 4.4 Diligence, rate of development, unitization, and drainage

Lessee shall exercise reasonable diligence in developing and producing, and shall prevent unnecessary damage to, loss of, or waste of leased resources. Lessor reserves the right to specify rates of development and production in the public interest and to require lessee to subscribe to a cooperative or unit plan, within 30 days of notice, if seemed necessary for proper development and operation of area, field, or pool embracing these leased lands. Lessee shall drill and produce wells necessary to protect leased lands from drainage or pay compensatory royalty for drainage in amount determined by lessor.

## 4.5 Documents, evidence, and inspection

Lessee shall file with proper office of lessor, not later than 30 days after effective date thereof, any contract or evidence of other arrangement for sale or disposal of production. At such times and in such form as lessor may prescribe, lessee shall furnish detailed statements showing amounts and quality of all products removed and sold, proceeds therefrom, and amount used for production purposes or unavoidably lost. Lessee may be required to provide plats and schematic diagrams showing development work and improvements and reports with respect to parties in interest, expenditures, and depreciation costs. In the form prescribed by lessor, lessee shall keep a daily drilling record, a log, information on well surveys and tests, and a record of subsurface investigations and furnish copies to lessor when required. Lessee shall keep open at all reasonable times for inspection by any authorized officer of lessor, the leased premises and all wells, improvements, machinery, and fixtures thereon, and all books, accounts, maps, and records relative to operations, surveys, or investigations on or in the leased lands. Lessee shall maintain copies of all contracts, sales agreements, accounting records, and documentation such as billings, invoices, or similar documentation that supports costs claimed as manufacturing, preparation, and/or transportation costs. All such records shall be maintained in lessee's accounting offices for future audit by lessor. Lessee shall maintain required records for six years after they are generated or, if an audit or investigation is underway, until released of the obligation to maintain such records by lessor.

During existence of this lease, information obtained under this section shall be closed to inspection by the public in accordance with the Freedom of Information Act (5 U.S.C. 552).

## 4.6 Conduct of operations

Lessee shall conduct operations in a manner that minimizes adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users. Lessee shall take reasonable measures deemed necessary by lessor to accomplish the intent of

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 66 of 82

this section. To the extent consistent with lease rights granted, such measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures. Lessor reserves the right to continue existing uses and to authorize future uses upon or in the leased lands, including the approval of easements or ROWs. Such uses shall be conditioned so as to prevent unnecessary or unreasonable interference with rights of lessee.

Prior to disturbing the surface of the leased lands, lessee shall contact lessor to be apprised of procedures to be followed and modifications or reclamation measures that may be necessary. Areas to be disturbed may require inventories or special studies to determine the extent of impacts to other resources. Lessee may be required to complete minor inventories or short-term special studies under guidelines provided by lessor. If in the conduct of operations, threatened or endangered species, objects of historic or scientific interest, or substantial unanticipated environmental effects are observed, lessee shall immediately contact lessor. Lessee shall cease any operations that would result in the destruction of such species or objects.

## 4.7 Mining operations

To the extent that impacts from mining operations would be substantially different or greater than those associated with normal drilling operations, lessor reserves the right to deny approval of such operations.

## 4.8 Extraction of helium

Lessor reserves the option of extracting or having extracted helium from gas production in a manner specified and by means provided by lessor at no expense or loss to lessee or owner of the gas. Lessee shall include in any contract of sale of gas the provisions of this section.

## 4.9 Damages to property

Lessee shall pay lessor for damage to lessor's improvements, and shall save and hold lessor harmless from all claims for damage or harm to persons or property as a result of lease operations.

## 4.10 Protection of diverse interests and equal opportunity

Lessee shall: pay when due all taxes legally assessed and levied under laws of the State or the U.S.; accord all employees complete freedom of purchase; pay all wages at least twice each month in lawful money of the U.S.; maintain a safe working environment in accordance with standard industry practices; and take measures necessary to protect the health and safety of the public.

Lessor reserves the right to ensure that production is sold at reasonable prices; and to prevent monopoly. If lessee operates a pipeline, or owns controlling interest in a pipeline or a company operating a pipeline, which may be operated accessible to oil derived from these leased lands, lessee shall comply with Section 28 of the Mineral Leasing Act of 1920.

Lessee shall comply with Executive Order 11246 of September 24, 1965, as amended, and regulations and relevant orders of the Secretary of Labor issued pursuant thereto. Neither lessee, nor lessee's subcontractors shall maintain segregated facilities.

## 4.11 Transfer of lease interests and relinquishment of lease

As required by regulations, lessee shall file with lessor any assignment or other transfer of an interest in this lease. Lessee may relinquish this lease or any legal subdivision by filing in the proper office a written relinquishment, which shall be effective as of the date of filing subject to the continued obligation of the lessee and surety to pay all accrued rentals and royalties.

## 4.12 Delivery of premises

At such time as all or portions of this lease are returned to lessor, lessee shall place affected wells in condition for suspension or abandonment, reclaim the land as specified by lessor and, within a reasonable period of time, remove equipment and improvements not deemed necessary by lessor for preservation of producible wells.

## 4.13 Proceedings in case of default

If lessee fails to comply with any provisions of this lease, and the noncompliance continues for 30 days after written notice thereof, this lease shall be subject to cancellation unless or until the leasehold contains a well capable of production of oil or gas in paying quantities, or the lease is committed to an approved cooperative or unit plan or communitization agreement which contains a well capable of production of unitized substances in paying quantities. This provision shall not be construed to prevent the exercise by lessor of any other legal and equitable remedy, including waiver of the default. Any such remedy or waiver shall not prevent later cancellation for the same default occurring at any other time. Lessee shall be subject to applicable provisions and penalties of Federal Oil and Gas Royalty Management Act (30 U.S.C. 1701).

## 4.14 Heirs and successors-in-interest

Each obligation of this lease shall extend to and be binding upon, and every benefit hereof shall inure to the heirs, executors, administrators, successors, beneficiaries, or assignees of the respective parties hereto.



A - WESTERN ALEUTIANS

Attu Island
Attu

Agattu Island

Bering Sea

Great Sitkin Island

Adak Station

Atka

Semisopochnoi Island

Tanaga Island

Atka Island

Kiska Island

Rat Islands

Kanaga Island

Adak Island

Buldir

Pacific Ocean

B - EASTERN ALEUTIANS

Atka

Amlia Island

Seguam Island

Bering Sea

Unalaska Island

Unimak Island

Bechevin Bay

Cold Bay

False Pass

King Cove

Islands of the Four Mountains

Dutch Harbor/Unalaska

Unimak Pass

Nikolski

Great Sitkin Island

Data sources: ADNR, ADFG, BLM

Pacific Ocean

INDEX MAP

N

Alaska

Canada

Ring of Fire Planning Area

A

B

▼ Ring of Fire Planning Area, Alaska

Anadromous Fish Streams Map
of the Aleutian Chain

Anadromous Fish Streams

BLM Administered Lands
☐ Bureau of Land Management
☐ Native Corporation Lands Selected
☐ State Lands Selected
○ Towns & Villages

35   17.5   0        35
▬▬▬▬▬▬▬▬▬ Miles

| Job No. | Drawing by: | |
| 26219496 | PLB | |
| Date: | File: | Figure A-1 |
| July 2005 | Figure D-1-, Aleutian Chain.mxd | |

State of Alaska, Department of Fish and Game
**Figure A-1. Anadromous Fish Streams Map of the Aleutian Chain**



**Figure A-2. Anadromous Fish Streams Map of Alaska Peninsula and Kodiak Island**

State of Alaska, Department of Fish and Game

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 70 of 82



**Legend:**
- Anadromous Fish Streams
- **BLM Administered Lands**
  - Bureau of Land Management
  - Native Selected
  - State Selected
- BLM Ring of Fire Boundary
- Towns & Villages

**INDEX MAP**

Alaska | Canada

Ring of Fire Planning Area

Data sources: ADNR, ADFG, BLM

Ring of Fire Planning Area, Alaska

Anadromous Fish Stream Map of the Southcentral Region

| Job No. 26219496 | Drawing by: PLB | |
|---|---|---|
| Date: July 2005 | File: Figure D-3 - Southcentral.mxd | Figure A-3 |

Prince William Sound

Gulf of Alaska

Cook Inlet

Palmer · Anchorage · Hope · Whittier · Kenai · Soldotna · Seward · Homer

35   17.5   0   35
Miles

State of Alaska, Department of Fish and Game
**Figure A-3. Anadromous Fish Stream Map of the Southcentral Region**



**INDEX MAP**

Alaska  Canada

Ring of Fire
Planning Area

ALASKA

CANADA

Skagway

Haines

Juneau

Hoonah

Petersburg

Sika

Wrangell

*Pacific Ocean*

Ketchikan

Metlakatla

— Anadromous Fish Streams
**BLM Administered Lands**
■ Bureau of Land Management
■ Native Selected
■ State Selected
— BLM Ring of Fire Boundary
● Towns & Villages

Data sources: ADNR, ADFG, BLM

**Ring of Fire Planning Area, Alaska**

Anadromous Fish Stream Map
of the Southeast Region

| Job No: 2271496 | Drawing by: PLB | |
|---|---|---|
| Date: July 2005 | File: Figure # - Southeast.mxd | Figure A-4 |

35  17.5  0          35
                     Miles

State of Alaska, Department of Fish and Game
**Figure A-4.  Anadromous  Fish Stream Map of the Southeast Region**



**Legend:**

Known Nesting Distribution
· General Distribution
**BLM Administered Lands**
- Bureau of Land Management
- Native Selected
- State Selected
— BLM Ring of Fire Boundary
● Towns & Villages

Data sources: ADNR, BLM

INDEX MAP

Alaska    Canada

Ring of Fire
Planning Area

Ring of Fire Planning Area, Alaska

Trumpeter Swan Distribution Map
of the Southcentral Region

| Job No. 26219496 | Drawing by: PLB | |
| Date July 2005 | File: Figure D-5 - Southcentral.mxd | Figure A-5 |

Bureau of Land Management
**Figure A-5. Trumpeter Swan Distribution Map of the Southcentral Region**



**Figure A-6. Trumpeter Swan Distribution Map of the Southeast Region**

Bureau of Land Management

Case 3:18-cv-00091-HRH   Document 1-7   Filed 03/05/18   Page 74 of 82



**Legend:**
- Moose Winter Range
- **BLM Administered Lands**
  - Bureau of Land Management
  - Native Selected
  - State Selected
- BLM Ring of Fire Boundary
- Towns & Villages

INDEX MAP

Alaska    Canada

Ring of Fire
Planning Area

Data sources: ADNR, BLM

Ring of Fire Planning Area, Alaska

Moose Winter Range Map
of the Southcentral Region

| Job No. 26219496 | Drawing by: PLB | |
| Date: July 2005 | File: Figure D-7 - Southcentral.mxd | Figure A-7 |

35   17.5   0          35
                    Miles

Bureau of Land Management
**Figure A-7. Moose Winter Range Map of the Southcentral Region**



**Figure A-8. Moose Winter Range Map of the Southeast Region**

Legend:
- Moose Winter Range
- **BLM Administered Lands**
  - Bureau of Land Management
  - Native Selected
  - State Selected
- BLM Ring of Fire Boundary
- Towns & Villages

Data sources: ADNR, BLM

Ring of Fire Planning Area, Alaska

Moose Winter Range Map
of the Southeast Region

| Job No. 20219496 | Drawing by PLB | |
|---|---|---|
| Date: July 2005 | File: Figure D-8 - Southeast.mxd | Figure A-8 |

35  17.5  0  35
Miles

INDEX MAP

Ring of Fire
Planning Area

Bureau of Land Management



**Legend:**
- ⊹ Bald Eagle Nests (historically active)
- **BLM Administered Lands**
- ▢ Bureau of Land Management
- ▢ Native Selected
- ▢ State Selected
- — BLM Ring of Fire Boundary
- Towns & Villages

*Cook Inlet*

*Bristol Bay*

Egegik

Port Heiden

Chignik Lake · Chignik

Perryville

Sand Point · Shumagin Islands

Kaguyak · Karluk · Old Harbor · Akhiok · Womens Bay · Chiniak · Ouzinkie · Kodiak

Data sources: ADNR, BLM, NOAA

45   22.5   0   45
Miles

**INDEX MAP**

Alaska    Canada

Ring of Fire Planning Area

**Ring of Fire Planning Area, Alaska**

Bald Eagle Nest Map of Alaska Peninsula and Kodiak Island

| Job No. 26219496 | Drawing by: PLB | |
| Date: July 2005 | File: Figure D-9 - Alaska Peninsula.mxd | **Figure A-9** |

National Oceanic and Atmospheric Administration

**Figure A-9. Bald Eagle Nest Map of Alaska Peninsula and Kodiak Island**



**Legend:**

+ Bald Eagle Nests (historically active)

**BLM Administered Lands**
- Bureau of Land Management
- Native Selected
- State Selected
— BLM Ring of Fire Boundary
- Towns & Villages

INDEX MAP

Ring of Fire Planning Area

Ring of Fire Planning Area, Alaska

Bald Eagle Nest Map
of the Southcentral Region

| Job No. 26219496 | Drawing by: PLB | |
|---|---|---|
| Date: July 2005 | File: Figure D-10 - Southcentral.mxd | Figure A-10 |

Data sources: ADNR, BLM, NOAA

National Oceanic and Atmospheric Administration

**Figure A-10. Bald Eagle Nest Map of the Southcentral Region**



INDEX MAP

ALASKA

CANADA

Ring of Fire
Planning Area

+ Bald Eagle Nests (historically active)
**BLM Administered Lands**
Bureau of Land Management
Native Selected
State Selected
○ Towns & Villages

Data sources: ADNR, BLM, NOAA

Ring of Fire Planning Area, Alaska

Bald Eagle Nest Map
of the Southeast Region

| Job No.<br>26219496 | Drawing by:<br>PLB | Figure A-11 |
|---|---|---|
| Date<br>July 2005 | File:<br>Figure A-11 - Southeast.mxd | |

35  17.5  0        35
━━━━━━━━━━━ Miles

National Oceanic and Atmospheric Administration
**Figure A-11.  Bald  Eagle Nest Map of the Southeast Region**



**Legend:**
- Dall Sheep Area
- **BLM Administered Lands**
  - Bureau of Land Management
  - Native Selected
  - State Selected
- — BLM Ring of Fire Boundary
- ● Towns & Villages

Prince William Sound

Gulf of Alaska

Cook Inlet

Data sources: ADNR, BLM

**INDEX MAP**
N
W E
S

Alaska    Canada

Ring of Fire Planning Area

**Ring of Fire Planning Area, Alaska**

Dall Sheep Area Map
of the Southcentral Region

| Job No.<br>26219496 | Drawing by:<br>PLB | |
| Date:<br>July 2005 | File:<br>Figure D-12 - Southcentral.mxd | Figure A-12 |

35   17.5   0   35
Miles

Bureau of Land Management
**Figure A-12. Dall Sheep Area Map of the Southcentral Region**



Bureau of Land Management
**Figure A-13. Mountain Goat Area Map of the Southeast Region**



Caribou calving areas
**BLM Administered Lands**
Bureau of Land Management
Native Selected
State Selected
— BLM Ring of Fire Boundary
Towns & Villages

INDEX MAP

N
W—E
S

Alaska | Canada

Ring of Fire
Planning Area

Data sources: ADNR, BLM

35  17.5  0      35
Miles

Prince William Sound

Gulf of Alaska

Cook Inlet

Palmer
Anchorage
Hope
Whittier
Kenai
Soldotna
Seward
Homer

Ring of Fire Planning Area, Alaska

Caribou Calving Area Map
of the Southcentral Region

| Job No. | Drawing by: | |
| --- | --- | --- |
| 26219496 | PLB | |
| Date: | File: | Figure A-14 |
| July 2005 | Figure D-14 - Southcentral.mxd | |

Bureau of Land Management
**Figure A-14. Caribou Calving Area Map of the Southcentral Region**