# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRIUMVIRATE, LLC | ) Case No. 1:18-cv-00511 |
| Plaintiff, | ) |
| v. | ) DECLARATION OF |
| | ) STEPHANIE KUHNS |
| RYAN ZINKE, *et al.*, | ) |
| Federal Defendants. | ) |

I, Stephanie Kuhns, declare as follows:

1. I am the Outdoor Recreation Planner (ORP) for the Bureau of Land Management's (BLM) Anchorage Field Office (AFO). I have held this position since March, 2016. As the ORP, I am responsible for administering Special Recreation Permits (SRPs) on the BLM-managed lands overseen by the AFO. The land at issue in this case is within an area in which there is a "checkerboard" of land statuses, with many different parcels managed or owned by other federal, state, and private entities.

2. The mission of the BLM is to "sustain the health, diversity, and productivity of public lands for the use and enjoyment of present and future generations." As such, the BLM is required to take a "multiple use" approach, managing the public lands under its jurisdiction for a variety of purposes, including recreational activities. By managing with a multiple use approach, the BLM is able to maximize opportunities for Americans to access their public lands, thereby fulfilling its Congressional mandate and advancing the President's national priorities. In this particular instance, the issuance of SRPs increases job opportunities in Alaska and provides access to public lands for recreational opportunities while maintaining the health and integrity of the lands.

3. Triumvirate, LLC, Plaintiff in this litigation, was the first BLM-permitted operator in this area. Triumvirate approached the BLM in late 2011 to learn more about obtaining an SRP, and submitted an application package on or about January 21, 2012. The permit was issued on February 20, 2014 after the NEPA process had been finalized. As part of the NEPA process, an Environmental Assessment (EA) was prepared; Triumvirate agreed to defray BLM's costs due to the amount of time it would take BLM staff to complete the assessment.

4. Attached as exhibits to this declaration are conversations between the AFO and Plaintiff, including conversations with myself, my predecessor(s), and my colleagues. At the time of the EA Mr. Overcast, owner of Triumvirate, expressed dismay that the BLM was not going to limit the number of permits in the area, and stated that it would be unfair for him to pay for the initial study while other potential operators would not have to contribute to the cost of NEPA compliance.

5. The BLM agreed that Triumvirate was likely just the first of potentially many applicants to operate in the 428,000 acre area and, therefore agreed to pay one half of the sum of the cost recovery. The total cost to Triumvirate for NEPA compliance was less than $2300.

6. Shortly after Triumvirate applied for an SRP, Teton Gravity Research (TGR), a commercial filming company that produces extreme sports movies, applied for a land use permit with the BLM for the same location as Triumvirate.

7. TGR was awarded a permit for commercial filming in 2014. As this was not a recreational endeavor, it was permitted under a different system, incurred different fees, and required different stipulations and reporting methods.

8. Mr. Overcast again expressed dismay that TGR would be operating in the same area. He complained that his guests expect to be the first people to operate in the area and that permitting TGR would degrade their experience. Despite the reservations expressed by Mr. Overcast, both parties were permitted to operate in the same area with no conflict from 2015 through 2017.

9. In 2016, Silverton Mountain Guides (SMG) applied for an SRP to operate in the same area (428,000 acres). Using a Determination of NEPA Adequacy (DNA), the BLM determined that the previous EA sufficiently analyzed the potential environmental impacts and BLM issued the SRP. The BLM AFO wildlife biologist and subsistence specialist determined through an ANILCA Section 810 analysis that wildlife would not be adversely affected by the heli-ski operations. As of February 27, 2017, there were three operators utilizing the same 428,000 acres of land (two SRPs, one land use permit). Also in 2016, another heli-ski operator applied for a permit for use of the same area. However, this individual's operations were incompatible with the BLM and the application was denied.

10. In late 2017, Alaska Snowboard Guides (ASG) applied for an SRP to operate in the same area (428,000 acres). The land use permit issued to TGR was set to expire in 2017, and TGR communicated that it did not intend to renew the permit. BLM determined that the previous EA had sufficiently analyzed the potential impacts to the environment and, using a DNA, the BLM issued an SRP to ASG on January 28, 2018. The total number of operators thus remains at three.

11. Permit holders are held to the stipulations and general terms and conditions attached to their permits. In each permit there is a stipulation that states "The operators shall assure

that their operations meet Federal Aviation Administration (FAA) requirements to achieve safe air operations (routing, airspace separation and coordination with other operators)."

12. Applicants are initially granted a permit for a one-year period. After successfully abiding by the permit stipulations during the first year, permits may then be reauthorized for up to nine more years, allowing permit holders to operate for a total of ten years before needing to renew the permit. The permits held by Triumvirate and SMG were both reauthorized for ten-year periods. ASG is operating in its first year, and as such, is under a one-year permit. The operating season for these operations is late winter through mid-spring each year. Operations are limited by weather and amount of daylight, which increases rapidly during this timeframe.

13. Triumvirate's SRP application requested February 1 through April 30 annually for its dates of use. The period of use granted to Triumvirate was "February through April," and the number of helicopter landings is limited to 130 each season.

14. TGR was initially granted a one-year land use permit in 2013. TGR was authorized to operate for a total of 15 days between March 23 and April 28, 2013. There was no limit to the number of landings. TGR did not operate in 2014. They did, however, apply for another permit for 2015. This permit was granted for a total of three years, allowing them to operate 15 days each season from March through May, in 2015, 2016, and 2017. Again, there was no maximum number of landings allowed, only a maximum number of days for operating over the season.

15. SMG provides its clients with helicopter and guided backcountry skiing and environmental education programs. The requested dates of use were November 1

through May 15 annually, and when the permit was authorized, the allowed dates of use were from the receipt of the permit until May 15, 2017. SMG's current permit limits total landings to 130 per season, consistent with the Triumvirate permit.

16. ASG applied for an SRP in 2017, and the permit was issued on January 28, 2018 for the 2018 season. ASG was authorized a maximum of 130 landings.

17. In an email dated December 12, 2017 I responded to an email from Mr. Overcast of Triumvirate and inquired of him his thoughts on permitting a third SRP in the same area. Mr. Overcast was opposed to adding another permit, but did not specify a reason for his opposition in this email.

18. In my experience as the ORP, I communicate with my counterparts in different agencies (state and federal). From my experience coordinating efforts with my peers in similar offices within the State of Alaska's Department of Natural Resources, I know that the State of Alaska's permitting process is very different from that of the BLM. As long as there are no ground disturbing activities and the operator does not have overnight activities, the operations fall under "generally allowable uses." Thus, heli-ski operations fall under generally allowable uses, and operate on any state-managed land on which their operations are acceptable.

19. An injunction in this case will cause harm to Alaskan and other consumers, the Alaskan economy, and to Plaintiff's competitors and their customers. My understanding of the heli-ski operations is that clients must schedule their trips months in advance, especially if they are traveling from out of state. An injunction harms those consumers while benefiting Plaintiff. Alaskan businesses suffer sharply decreased revenue in winter months, and an injunction would further harm the State's economy.

20. In support of Federal Defendants' response, Federal Defendants are providing a provisional Administrative Record. I hereby certify that to the best of my knowledge the materials are true and correct copies of the documents directly or indirectly considered by BLM in relation to the claims raised in this case.

Pursuant to the provisions of 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 12th day of March, 2018, in Anchorage, Alaska.

Stephanie L. Kuhns
Outdoor Recreation Planner

# EXHIBIT A



# Re: Permit suggest to speed up getting an authorization ASAP

1 message

**mike overcast** <span style="background:black">████████████</span>     Tue, Mar 12, 2013 at 6:51 AM
To: "Kowalczyk, Jeffrey" <jkowalcz@blm.gov>

Jeff,

Thank you for the update. When we discussed the permit process back in December, You were confident the full EA could be completed by March. Now your telling me not at all this winter? We have funded the co share for the cost recovery, to complete the EA. I have owned a number of companies that have required this kind of analysis and had much better luck with the process moving along and also had no recovery costs to my companies. What is the hold up? Why were the scoping Doc's not put out earlier to illicit response and time to address them. A simple Categorical exclusion, does not require the scoping and can be written next week, however, the primary area we are interested in, is within your ACEC. I do not understand why this area was chosen as the ACEC to begin with, as the more critical habitat for Sheep lies in the Northern area you are suggesting we use for a CE. It leads me to believe that the BLM understands very little about this area, because the sheep do not utilize the ACEC habitat. I know this because I have spent a considerable amount of time sheep hunting and scouting in the Tordrillos and Neacolas. There is too much snow for the sheep to exist in the winter. You will find the sheep further North, away from the coast and the heavy snow distribution areas. The geology and geography does not support prime sheep habitat as well.

I am very disappointed that you are not going to get this area under permit after we have ponied up the money to see that it gets completed in a timely way. I submitted my request back in July of 2012, and also the fact that you have no intentions as of yet to limit the amount of permits in the area. If this process were going to analyze and consider a low volume of use, I might feel better about the slow pace at which this work is being completed. I feel it is unfair that
i will pay for the study and every other operator can ride in later with a fraction of the costs.

Further, I was totally un aware, but informed through industry channels that you have permitted theTGR film company to operate within this area with no analysis at all. This makes no sense what so ever, as they are going to have much higher impact in the area then we would ever have. They are setting up remote camps, cacheing fuel, will have human waste, will be in the area for much longer intervals then our proposed occasional fly through. They will be hovering and filming from the helicopters and having a far greater impact overall then our style of operating.

We are also in competition for terrain. Our guests are interested in being the first people to heliski in these areas and this is why we have pursued this permit. Now I have learned that TGR will be in there for weeks to a month this spring before we get a shot at it. Why was I not informed of this in writing for the analysis that is required for their permit? Should commercial operators be treated differently then commercial film companies. I think not! My guests should be afforded the same opportunity they have.

Commercial Air taxi operators have been using this area as well. Are they under permit? Will they be under permit to assist TGR?There is difference in Turbine Planes and Turbine helicopters. I sense we are not being treated in a fair fashion and on equal ground with other commercial pursuits. If your saying you need more time for analysis, to do adequate environmental work to support the EA, fine. However, that should apply to all interests as well.

This letter should serve as my formal appeal to issuing TGR a permit in the ACEC, if we are not afforded the same treatment. Please forward me all plans they have submitted and correspondence I am afforded under FOIA.

Best Regards,
Mike Overcast
On Mar 11, 2013, at 3:05 PM, "Kowalczyk, Jeffrey" <jkowalcz@blm.gov> wrote:

Mike:

Today, I discussed with our office Environmental Coordinator, Molly Cobbs, your preferred use dates of March and April in the Neacola's and the status of completing our environmental analysis for your proposed action. As a result, I'd like to make a suggestion to consider when it comes to getting you an authorization on BLM lands as soon as possible this winter.

If you operate this winter only in the north block of BLM lands in the Neacola Mountains (see attached map), which would be outside the designated Neacola Mountain's Area of Critical Environmental Concern (ACEC) in the south block, we can issue a permit as early as next week using a Category Exclusion (CX) through our NEPA process and we would not be required to perform public scoping.

Recall BLM is required to complete a full Environmental Assessment (EA) through our NEPA process, with associated public scoping, for activities occurring within Special Areas (e.g. Neacola Mtns. ACEC). To date, we're still working on public scoping with no short-term definitive date of completion, including time to address any protests or appeals.

To summarize, for activities on BLM lands in the north block only this winter would get you a permit as early as next week. If agreeable to this suggestion, our office would also continue working on the EA for activities associated with the ACEC, which of course would be completed well before next winter.

Please give me a call at your earliest convenience to discuss if you'd like me to pursue this option as soon as possible this week.

**Jeff Kowalczyk**
Outdoor Recreation Planner
Anchorage Field Office
4700 BLM Road
Anchorage, AK 99507
(907) 267-1459
FAX (907) 267-1267



On Tue, Mar 5, 2013 at 9:21 AM, mike overcast <​​​​​​​​​​​​​​​​> wrote:
Jeff,
Thanks for the update. How did the comment period go? I look forward to working on BLM lands.

Best,
Mike
On Mar 4, 2013, at 12:46 PM, "Kowalczyk, Jeffrey" <jkowalcz@blm.gov> wrote:

> We're currently working on completing the NEPA. I can't give you an exact

completion date at this moment. We have a few final NEPA tasks we're required to complete.

**Jeff Kowalczyk**
Outdoor Recreation Planner
Anchorage Field Office
4700 BLM Road
Anchorage, AK 99507
(907) 267-1459
FAX (907) 267-1267


doi seal color

On Mon, Mar 4, 2013 at 5:32 AM, mike overcast <mikeovercast@me.com> wrote:
> Hello Jeff,
> Please give me an update on the permit process. We discussed that you should be close to a ROD here before long.
>
> Mike

<Overcast Neacolas sites 031113.jpg>

# EXHIBIT B

Record of Telephone Conversation 12/15/2017

On Friday afternoon, 12/15/2017, I talked with Mike Overcast representing Triumvirate LLC on the telephone from my office on the subject of a pending SRP application submitted by Alaska Snowboard Guides to operate heliski operations on BLM lands in the Neacola Mountains ACEC.

Overcast was very vocal in expressing his great concern over the potential permitting of an additional operator in the Neacolas citing aircraft and passenger safety, and degradation of the quality of his client's experience.

From a safety point of view, Overcast accused BLM of "stacking helicopter companies up" and that three helicopter operations in the Neacolas was a "huge deal to us". Overcast expressed that only 10% of the terrain in the Neacola Mountains was "useable" and that BLM was "making a mistake authorizing an additional permit". Overcast repeatedly stated that the BLM lands in the Neacola Mountains were too small and concentrated for three permittees to safely operate.

Overcast also disputed the existing EA, stating that the current EA, "which I paid for", was inadequate and that an EIS level of NEPA was necessary to permit three operators in the Neacolas. Overcast further stated that a ROS should be prepared for the Neacolas. He stated that he was talking with his "NEPA Attorneys" and that he planned to file an appeal and request a stay if a new SRP heliski permit is issued by BLM in the Neacola Mountains.

Overcast stated that he could get "industry backing from US Heli" on his claims of increased safety issues if three helicopter operations were permitted and was also talking with "Lisa" and seeking "Congressional level support" for his complaints.

Overcast expressed concerns that an additional heliski operator would "degrade the experience for his guests by leaving tracks in the snow" and that his clients expected clean un-tracked slopes.

Overcast stated that he had not been consulted about a new pending SRP application in the Neacolas. He stated that he was "just getting things going" in his business and that he had 13 competitors statewide.

In the course of the conversation I reminded Overcast that BLM had assumed one-half of the cost recovery burden for the preparation of the original EA based upon Overcast's specific complaints that he didn't want to fund his competitors. I further reminded him that the basis for BLM sharing the cost recovery was the realization from both entities that additional heliski operators were likely to seek SRPs for future entry into the Neacola Mountains.

I concluded the call with an offer to Overcast from the Field Manager Bonnie Million to give her a call to discuss his concerns. To my knowledge he did not follow up on this offer.

*Douglas Ballou*