WO            IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF ALASKA


TRIUMVIRATE, LLC, d/b/a TORDRILLO     )
MOUNTAIN LODGE, MICHAEL               )
OVERCAST, and STEVEN HALL,            )
                                      )
                    Plaintiffs,       )
                                      )
        vs.                           )
                                      )
DAVID BERNHARDT, Acting Secretary     )
of the Interior, et al.,              )
                                      )
                    Defendants.       )     No. 3:18-cv-0091-HRH
_____ )


                    O R D E R

                Motions for Judicial Notice;
              Cross-motions for Summary Judgment

        Plaintiffs move for summary judgment.[1]  This motion is opposed and defendants

cross-move for summary judgment.[2]  Defendants' cross-motion is opposed.[3]  Plaintiffs also

move for the court to take judicial notice of six newspaper articles.[4]  The motions for judicial

notice are opposed.[5]  Oral argument was requested and has been heard.

_____

        [1]Docket No. 58.

        [2]Docket No. 65.

        [3]Docket No. 66.

        [4]Docket No. 59 and 76.

        [5]Docket Nos. 61 and 77.

                            -1-

<u>Facts</u>

Plaintiffs are Triumvirate, LLC d/b/a Tordrillo Mountain Lodge, Michael Overcast, and Steven Hall. Overcast is Triumvirate's general manager and Hall works for Triumvirate as a heli-ski guide.

Defendants are David Bernhardt, in his capacity as the Acting Secretary of the Interior; the U.S. Department of Interior; the U.S. Bureau of Land Management, an agency of the U.S. Department of Interior; and Brian Steed, Deputy Director of the U.S. Bureau of Land Management, exercising authority as the Director.

In 2012, Triumvirate submitted an application to BLM for a special recreation permit that would allow it to conduct commercial heli-skiing on lands managed by BLM in the Tordrillo and Neacola Mountains.[6] This region includes the Neacola Mountains Area of Critical Environmental Concern (ACEC), an area designated as such because of its scenic value.

After Triumvirate submitted its application, BLM conducted an environmental assessment[7] (EA) because a portion of the lands involved carried the ACEC designation. Triumvirate paid for half of the cost of doing the EA.[8] In the EA, BLM considered whether Triumvirate's proposed operations would impact wildlife resources, in particular, Dall sheep,

---

[6]Admin. Rec. at 27.

[7]Admin. Rec. at 808-829.

[8]Admin. Rec. at 161.

whether noise from the helicopters would impact other visitors, and whether it would impact the visual values of the Neacola ACEC.[9]  The EA considered two alternatives, either deny or grant the permit application.[10]  In the EA, BLM determined that Triumvirate's proposed operations were consistent with the Ring of Fire Resource Management Plan.[11]  BLM also concluded that any visual impacts if the permit were granted would be temporary and transient and that any impact on Dall sheep could be mitigated by permit conditions.[12]

While the EA was being completed, Overcast wrote to BLM complaining about a permit that had been issued to Teton Gravity Research (TGR), a film company.[13]  TGR had been issued a "Land Use Permit for commercial filming purposes to film professional skiers on helicopter-supported ski descents in the south block of BLM-managed lands in the Neacola Mountains Area of Critical Environmental Concern. . . ."[14]  Overcast wrote that

> [w]e are . . . in competition for terrain.  Our guests are interested in being the first people to heliski in these areas and this is why we have pursued this permit.  Now I have learned that TGR will be in there for weeks to a month this spring before we get a shot

---

[9]Admin. Rec. at 813-814.

[10]Admin. Rec. at 814.

[11]Admin. Rec. at 811-812.

[12]Admin. Rec. at 819-821.

[13]Admin. Rec. at 161.

[14]Admin. Rec. at 248.

at it.  Why was I not informed of this in writing for the analysis that is required for their permit?[15]

On February 20, 2014, BLM issued a Record of Decision (ROD)[16] and a Finding of No Significant Impact (FONSI) on Triumvirate's request for a special recreation permit.[17] In the FONSI, BLM noted that the EA "disclose[d] the potential for both beneficial effects and adverse effects."[18]  The adverse effects included noise generated by helicopters and fixed-wing airplanes and the "potential to disturb sheep populations at a vulnerable time of year. . . ."[19]  Beneficial effects included providing "additional recreational opportunities in a remote area. . . ."[20]  In the ROD, BLM found that "[a]uthorizing the requested SRP will provide a unique recreational experience in a remote and primitive setting, consistent with the RMP/ROD goals for the Neacola Mountains ACEC . . . without compromising other resource values, specifically, the visual resources or wilderness characteristics. . . ."[21]

_____

[15]Admin. Rec. at 161.

[16]Admin. Rec. at 800-803.

[17]Admin. Rec. at 804-807.

[18]Admin. Rec. at 805.

[19]Admin. Rec. at 805.

[20]Admin. Rec. at 805.

[21]Admin. Rec. at 801.

Triumvirate's one-year special recreation permit was issued on February 20, 2014.[22] Triumvirate's permit was later extended for ten years.

In 2016, Silverton Mountain Guides applied for a special recreation permit for heli-skiing in the Tordrillo and Neacola Mountains.[23]  In connection with the Silverton application, BLM prepared a Determination of NEPA Adequacy (DNA) worksheet.[24]  In the DNA, BLM concluded that

> the ranges of alternatives presented in the 2013 Environmental Assessment for Triumvirate LLC Heli-skiing are appropriate and sufficient in respect to the current Proposed Action.  There are no new issues or concerns that would prompt development or consideration of additional alternatives.  The issues identified for analysis in the 2013 EA remain unchanged.  There are no new issues around which to develop additional alternatives for the current Proposed Action.[25]

BLM considered the "direct, indirect, and cumulative effects" Silverton's operations might have and concluded that these effects were similar to those considered in the Triumvirate EA "but less than what have been previously analyzed . . . (for Triumvirate Heli-skiing) because though the operations are nearly the same, Silverton Mountain Guides will have one less

---

[22]Admin. Rec. at 832.

[23]Admin. Rec at 1047.

[24]Admin. Rec. at 1051-1055.

[25]Admin. Rec. at 1054.

helicopter and no airplanes, whereas Triumvirate has two helicopters and one airplane."[26] Based on the DNA, BLM issued a special recreation permit to Silverton in February 2017.

In April of 2017, Overcast contacted BLM to inquire if Silverton had a permit to operate in the Neacolas.[27] BLM advised that "Silverton Mountain Guides is permitted to operate on BLM-managed lands in the Neacolas. There are a total of three permits we have in that area: yours, Teton Gravity Research, and now Silverton."[28] On April 25, 2017, April Rabuck, an assistant field manager in the Anchorage BLM office, noted in an email to other BLM employees that

> [t]he issue seems to be three fold. The first operator, [Triumvirate], is concerned that the area is at capacity and is too crowded for another operator. They are upset that they did not have input on the NEPA for Silverton Mountain Guides (second operator). Finally, when BLM authorized the second SRP holder we stipulated that Silverton Mountain Guides must contact and coordinate with [Triumvirate] (per [Triumvirate] this has not occurred).
>
> We continue to have conversations with these operators about SRP's being a non-exclusive use and are exploring ways to improve communication. To asses[s] impact on the resources for these activities AFO has a compliance trip scheduled this week. . . .[29]

---

[26]Admin. Rec. at 1054.

[27]Admin. Rec. at 1103.

[28]Admin. Rec. at 1103.

[29]Admin. Rec. at 1187.

In July 2017, Overcast had a conversation with BLM regarding permits in the Neacolas.[30] Overcast informed BLM that Silverton had not communicated with Triumvirate as to when and where it was flying.[31] Overcast "encourage[d] the BLM to increase . . . dialogue with already permitted operators when . . . consider[ing] adding a new permit to the area and "suggest[ed]" that BLM "put a moratorium on permits until a capacity study has been completed."[32] BLM informed Overcast that it "was looking at a capacity study, but" that it was "around the middle of the priority list."[33]

In September 2017, Alaska Snowboard Guides (ASG) submitted an application for a special recreation permit "to conduct heliskiing/snowboarding, touring, and fishing in the Neacolas."[34] On December 11, 2017, Overcast advised BLM that he had heard a rumor that ASG had been issued a permit or was going to be issued a permit.[35] BLM responded that there was a third applicant and asked Overcast what his "thoughts and concerns" were "with adding a third operator[.]"[36] BLM indicated that it "was worried we may be reaching

---

[30]Admin. Rec. at 1263.

[31]Admin. Rec. at 1263.

[32]Admin. Rec. at 1263.

[33]Admin. Rec. at 1263.

[34]Admin. Rec. at 1272.

[35]Admin. Rec. at 1282.

[36]Admin. Rec. at 1283.

capacity for the area[.]"[37]  Overcast called BLM on December 15, 2017.[38]  During that conversation,

> Overcast was very vocal in expressing his great concern over the potential permitting of an additional operator in the Neacolas citing aircraft and passenger safety, and degradation of the quality of his client[s'] experience.
>
> From a safety point of view, Overcast accused BLM of "stacking helicopter companies up" and that three helicopter operations in the Neacolas was a "huge deal to us."  Overcast expressed that only 10% of the terrain in the Neacola Mountains was "usable" and that BLM was "making a mistake authorizing an additional permit".  Overcast repeatedly stated that the BLM lands in the Neacola Mountains were too small and concentrated for three permittees to safely operate.
>
> * * *
>
> Overcast expressed concerns that an additional heliski operator would "degrade the experience for his guests by leaving tracks in the snow" and that his clients expect clean un-tracked slopes.
>
> Overcast stated that he had not been consulted about a new pending SRP application in the Neacolas.  He stated that he was "just getting things going" in his business and that he had 13 competitors statewide.[[39]]

On December 18, 2017, Overcast provided a written response via email, in which he wrote:

---

[37]Admin. Rec. at 1283.

[38]Admin. Rec. at 1290.

[39]Admin. Rec. at 1290.

I am adamantly opposed to[] further permitting in the Neacolas. Especially, where we operate. There is a long history of problems associated with shared areas of federal lands with helicopter skiing. This is why I was so concerned that the BLM has permitted Silverton without any input from the current Permittee. Adding yet another would compound the issues and really compromise public safety. We are a member of Heli US. This trade organization focuses on best practices with the industry. If needed, I will engage the organization and get their input on shared use areas. They would agree that any additional use by other companies would not be recommended. Please keep me informed.[40]

On December 22, 2017, Overcast emailed BLM to inquire whether ASG had been issued a permit.[41] Overcast stated that "[w]e have industry concerns that need address[ing]. Silverton[']s permit was written without public input and acknowledgment of other outfitters. Is this really happening again?"[42] BLM responded that

ASG has not yet received their permit, but the Anchorage Field Office has decided to permit them. They will base their operations off Ron Eagley's property. TGR will no longer be operating in the Neacolas.

As the Neacolas are public lands, it is important for people to access them - in a safe manner. Due to the relatively small size of the area and the compressed operating season, the field office team feels that three operators is near the limit of what can occur safely. Should any other operators apply for use of public lands

---

[40]Admin. Rec. at 1283.

[41]Admin. Rec. at 1293.

[42]Admin. Rec. at 1293.

in this area in the future, the application will either be denied or go out for extensive public review.[43]

On January 28, 2018, BLM prepared a DNA for the ASG permit application.[44] In the DNA, BLM determined that

> the ranges of alternatives presented in the 2013 Environmental Assessment for Triumvirate LLC Heli-skiing are appropriate and sufficient in respect to the current Proposed Action. There are no new issues or concerns that would prompt development or consideration of additional alternatives. The issues identified for analysis in the 2013 EA remain unchanged. There are no new issues around which to develop additional alternatives for the current Proposed Action.[45]

BLM found that the direct, indirect, and cumulative effects of ASG proposed operations "will be nearly similar to those that have been previously analyzed (for Triumvirate Heli-skiing), as both Triumvirate and Alaska Snowboard Guides will have two helicopters and one airplane."[46] BLM noted that

> [t]he original Environmental Assessment went through public comment and the new activity is nearly identical to any activity previously analyzed by AFO. No further public comment was pursued for the new activity. However, the Outdoor Recreation Planner did reach out to the two previously permitted guides for their opinions on the possibility of a new operator entering the same area. The original operator (Triumvirate) was vehemently opposed to allowing another operator, while the most recently

---

[43]Admin. Rec. at 1293.

[44]Admin. Rec. at 1393-1397.

[45]Admin. Rec. at 1396.

[46]Admin. Rec. at 1396.

permitted operator (Silverton) was not opposed to the addition of a third operator.[47]

On January 29, 2018, BLM issued a Record of Decision approving a special recreation permit, effective February 1, 2018, to ASG.[48] BLM explained that "[b]ased on review of the DNA worksheet," it had "determined that the proposed action involves no significant impact to the human environment and no further analysis is required."[49]

On March 5, 2018, Triumvirate commenced this action to challenge BLM's issuance of a special recreation permit to ASG. In their amended complaint, plaintiffs assert APA claims, alleging that defendants violated the National Environmental Policy Act (NEPA) and the Federal Land Policy and Management Act (FLPMA). In Count I, Overcast and Hall allege that "[t]he BLM violated NEPA by not preparing an environmental assessment or EIS prior to issuing the permit to ASG."[50] In Count II, Overcast and Hall allege that "[t]he BLM violated its non-discretionary obligation under NEPA to take the requisite 'hard look' at the safety and hazard consequences of issuing the permit to ASG."[51] In Count III, Overcast and Hall allege that BLM violated NEPA in issuing the ASG permit by "fail[ing] to analyze the

---

[47]Admin. Rec. at 1396.

[48]Admin. Rec. at 1389-1391.

[49]Admin. Rec. at 1389.

[50]Corrected First Amended Complaint for Judicial Review of Agency Action at 33, ¶ 136, Docket No. 53.

[51]Id. at 35, ¶ 143.

additional direct, indirect, and cumulative environmental impacts resulting from noise, additional aircraft, and aircraft activity on wildlife, including Dall sheep."[52]  In Count IV, Overcast and Hall allege that BLM violated the "heart" of NEPA by failing "to consider alternatives prior to issuing the permit to ASG. . . ."[53]  In Count V, Overcast and Hall allege that BLM violated NEPA regulations because it failed to give Overcast and Triumvirate written notice of the ASG permit application.[54]  In Count VI, plaintiffs allege that BLM violated FLPMA by failing "to ensure that its actions conform to the" Ring of Fire RMP.[55] In Count VII, plaintiffs allege that BLM violated the regulation that governs the issuance of special recreation permits "by failing to consider impacts of the ASG permit on public safety, operating and safety conflicts caused by issuing the ASG permit, resource protection, the public interest, or whether the requested permit would conform with laws and land use plans, including NEPA, FLPMA, and the Ring of Fire RMP."[56]  For relief on all their claims, plaintiffs request a declaration that the defendants violated NEPA, FLPMA, and NEPA and FLPMA regulations and that the January 29, 2018 ROD approving the issuance of the ASG permit be vacated.

---

[52]Id. at 35, ¶ 148.

[53]Id. at 36, ¶ 154.

[54]Id. at 38, ¶ 164.

[55]Id. at 39, ¶ 172.

[56]Id. at 40, ¶ 177.

Plaintiffs now move for summary judgment on their claims. Defendants cross-move for summary judgment, seeking the dismissal of all of plaintiffs' claims.

## Discussion

The court's review of BLM's January 29, 2018 decision to issue a special recreation permit to ASG is governed by the Administrative Procedures Act. The court may "set aside agency actions, findings, or conclusions under the APA that are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Ctr. for Biological Diversity v. Zinke, 900 F.3d 1053, 1067 (9th Cir. 2018) (quoting Japanese Vill., LLC v. Fed. Transit Admin., 843 F.3d 445, 453 (9th Cir. 2016)). "In reviewing whether an agency decision is arbitrary or capricious," the court "'ensure[s] that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" Id. (quoting Greater Yellowstone Coalition, Inc. v. Servheen, 665 F.3d 1015, 1023 (9th Cir. 2011)).

> "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Id. (quoting Greater Yellowstone Coalition, 665 F.3d at 1023).

"The district court 'is not required to resolve any facts in a review of an administrative proceeding'; rather, 'the function of the district court is to determine whether or not as a

matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" Animal Legal Defense Fund v. U.S. Dep't of Agric., 223 F. Supp. 3d 1008, 1015 (C.D. Cal. 2016) (quoting Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985)).  "As a result, summary judgment is an appropriate vehicle for deciding APA cases." Id.

As an initial matter, defendants argue that Overcast and Hall lack constitutional standing to bring their NEPA claims.  "The 'irreducible constitutional minimum of standing' consists of three elements: the plaintiff must have (1) suffered an injury in fact; (2) that was caused by the defendant's challenged conduct; and (3) that would be redressed by the remedy the plaintiff seeks." Desert Water Agency v. U.S. Dep't of the Interior, 849 F.3d 1250, 1253 (9th Cir. 2017) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Defendants argue that Overcast and Hall have not shown that they suffered an injury in fact, "the '[f]irst and foremost' of standing's three elements." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (quoting Steel Co. v. Citizens for Better Environment, 523 U.S. 83, 103 (1998)).

"A plaintiff establishes injury in fact, if he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Van Patten v. Vertical Fitness Group, LLC, 847 F.3d 1037, 1042 (9th Cir. 2017) (quoting Spokeo, Inc., 136 S. Ct. at 1547).  The "injury must have actually occurred or must occur imminently; hypothetical, speculative or other possible future

injuries do not count in the standings calculus." <u>Schmier v. U.S. Court of Appeals for Ninth Circuit</u>, 279 F.3d 817, 821 (9th Cir. 2002) (citation omitted).

"A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought." <u>Wash. Envt'l Council v. Bellon</u>, 732 F.3d 1131, 1139 (9th Cir. 2013). "The plaintiff also bears the burden of proof to establish standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" <u>Id.</u> (quoting <u>Lujan</u>, 504 U.S. at 561). "While '[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice,' in responding to a summary judgment motion, 'the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.'" <u>Id.</u> (quoting <u>Lujan</u>, 504 U.S. at 561).

First, Overcast and Hall allege health and safety injuries. Overcast and Hall allege that the decision to issue a permit to ASG injured them "because it results in more helicopters assessing the same limited terrain" and because it "increases the risk of a potentially catastrophic accident between two helicopters from different operators."[57] Overcast and Hall further allege that permitting ASG to operate in the same terrain "increases the risk that [they] will be injured or killed by an avalanche or catastrophic helicopter accident."[58]

---

[57]Corrected First Amended Complaint for Judicial Review of Agency Action at 30, ¶ 118, Docket No. 53.

[58]<u>Id.</u> at 31, ¶ 122.

Overcast and Hall offer competent evidence to support their allegations in the form of

declarations.  Overcast avers that

> [p]ermitting multiple helicopter ski operators to use the same
> terrain materially increases the risks of helicopter skiing.  It
> creates safety hazards that do not exist if the terrain is limited to
> one helicopter ski operator.  As explained above, the amount of
> terrain that is suitable and available on a given day is restricted
> by topography, avalanche risks, and prudent operating standards.
> If multiple operators are stacked on the same terrain, they
> compete for the limited terrain that is suitable and available that
> day.  That creates an incentive for one operator to access it
> before the other operator to provide the guests with untracked
> snow.  That incentive works against efforts to minimize ava-
> lanche risks.  It is difficult to build in geographic buffers among
> multiple operators if all may access the same limited terrain.
> Stacking operators in the same terrain creates the risk that one
> group may inadvertently ski onto terrain above a group from
> another operator, potentially causing an avalanche.  There have
> been several close calls in the Valdez area due to this.  Permit-
> ting multiple operators in the same area increases the risk of
> catastrophic mid-air accident between helicopters from different
> operators.[59]

Overcast further avers that

> [t]he BLM decision to authorize Alaska Snowboard Guides to
> fly and ski in the same terrain as me increases the risks to me of
> loss of life and catastrophic accidents[.]  I am harmed because
> the BLM is forcing me to lower the safety standards under

---

[59]Declaration of Plaintiff Michael Overcast (dated May 7, 2018) at 7, ¶ 20, Exhibit 15,
Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.
Overcast repeats these averments in a supplemental declaration dated November 15, 2018.
Exhibit 1, Plaintiffs' Reply [etc.], Docket No. 66.

which I use the physical environment in the Tordrillo and Neacola Mountains."[60]

Hall avers that he has

> personal experience with helicopter skiing where more than one operator is authorized to use the same terrain in the Chugach/Valdez area in Alaska. In my opinion, it is dangerous to authorize more than one operator to use the same terrain because it creates riskier conditions, increases the risk of an avalanche caused by one group skiing upslope of another, and increases the risk of a catastrophic mid-air collision between helicopters. In the Chugach/Valdez area, I personally observed near miss mid-air collisions due to multiple aircraft operating in the same terrain. [I] [a]lso observed other operators landing & skiing above other ski groups, resulting in near miss avalanche encounters.[61]

Hall further avers that the BLM decision to issue a permit to ASG injured him "because it increase[s] the risk to me of avalanches and catastrophic helicopter accidents in the rugged physical environment of the Neacola and Tordrillo Mountains where I fly and ski."[62]  Hall also avers that

> [t]he BLM decision to authorize Alaska Snowboard Guides to fly and ski in the same terrain where I guide increases the risks to me of loss of life and catastrophic accidents[.]  I am harmed because the BLM is forcing me to lower the safety standards

---

[60]Overcast Declaration (dated May 7, 2018) at 16, ¶ 41, Exhibit 15, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.

[61]Declaration of Plaintiff Steven Hall (dated May 8, 2018) at 5, ¶ 15, Exhibit 16, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.

[62]Id. at 8-9, ¶ 26(c).

under which I use the physical environment in the Tordrillo and
Neacola Mountains.[63]

Defendants argue that Overcast's and Hall's averments are nothing more than speculation about future injury, which is insufficient. "A plaintiff threatened with future injury has standing to sue 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" In re Zappos.com, Inc., 888 F.3d 1020, 1024 (9th Cir. 2018) (quoting Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014)). However, as the court has previously found, Overcast's declaration "plainly shows that the increased risks are not trivial and that the January 29, 2018 decision creates a credible threat of harm to human health and safety."[64] Hall's affidavit also plainly shows that his claim of future injury is credible and not merely speculative.

Defendants next argue Overcast's and Hall's averments about an increased risk of avalanches are insufficient because any increased risk of avalanche would be a self-inflicted injury. Defendants suggest that Overcast and Hall could simply avoid skiing in an area if ASG was using the area and thus not suffer any harm. "The 'self-inflicted injury' doctrine provides that plaintiffs 'cannot manufacture standing merely by inflicting harm on themselves based on their fear of hypothetical future harm that is not certainly impending.'" Nat'l Educ. Assoc. v. DeVos, 345 F. Supp. 3d 1127, 1150 n.42 (N.D. Cal. 2018) (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 416 (2013)). The court is not persuaded by this

---

[63]Id. at 10, ¶ 29.

[64]Order re Motion to Dismiss at 13, Docket No. 43.

-18-

argument.  As Overcast avers, it is not always possible to avoid an area  in which another operator's clients are already skiing.[65]

Secondly, Overcast and Hall contend that their recreational interests have been injured by the BLM decision to issue ASG a special recreation permit. "[T]he Supreme Court [has] determined standing existed based on affidavits . . . stating 'use [of] the affected area' and that the affiants were 'persons for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity.'"  <u>Oregon Wild, v. Constance Cummins</u>, 239 F. Supp. 3d 1247, 1259 (D. Or. 2017) (quoting <u>Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.</u>, 528 U.S. 167, 183 (2000)).  Overcast's and Hall's declarations meet this standard because they have averred that they fly and ski in the same area that ASG was permitted to operate in and that they plan to do so in 2019; that on four occasions they had to leave an area they planned to ski because ASG was using it; and that ASG's presence has created additional hazards for them when they are flying and skiing in the Tordrillo and Neacola Mountains.[66]  Moreover, as Overcast and Hall point out, the court has already

---

[65]Overcast Declaration (dated May 7, 2018) at 7, ¶ 20, Exhibit 15, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.

[66]Overcast Declaration (dated May 7, 2018) 13-16, at ¶¶ 37(e)-(g) 40, Exhibit 15, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53; Hall Declaration (dated May 8, 2018) at 7-10, ¶¶ 25, 26(e), 28; Exhibit 16, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.

determined that their "declarations adequately show that they have suffered an injury in fact" to their recreational "interests that was caused by the BLM's ASG permitting decision."[67]

Finally, Overcast asserts a procedural injury. He avers that he was injured "because the BLM did not respond to or address the concerns about safety, public hazards, user conflicts, impacts on the recreational resource, and impacts to the environment that I identified when I contacted the BLM about" the ASG permit.[68] Defendants argue that Overcast cannot rely on a procedural interest to establish standing if he has no other concrete interest that has been harmed as a result of defendants' conduct. See Wilderness Soc., Inc. v. Rey, 622 F.3d 1251, 1260 (9th Cir. 2010) (a "procedural injury, standing on its own, cannot serve as an injury-in-fact"). But, as discussed above, Overcast has shown an injury-in-fact to his health and safety interests and his recreational interests.

But even if Overcast and Hall have constitutional standing, which they do, defendants argue that they have failed to show that they have prudential standing. "'Because NEPA does not provide for a private right of action, plaintiffs challenging an agency action based on NEPA must do so under the'" APA. Nuclear Information and Resource Service v. Nuclear Regulatory Com'n., 457 F.3d 941, 950 (9th Cir. 2006) (quoting Ashley Creek Phosphate Co. v. Norton, 420 F.3d 934, 937 (9th Cir. 2005)). "To meet the statutory requirements for standing under the APA, a plaintiff 'must establish (1) that there has been

---

[67]Order re Motion for Leave to File an Amended Complaint at 11, Docket No. 51.

[68]Overcast Declaration (dated May 7, 2018) at 15, ¶ 37j, Exhibit 15, Corrected First Amended Complaint for Judicial Review of Agency Action, Docket No. 53.

a final agency action adversely affecting [it], and (2) that, as a result, it suffers legal wrong or that its injury falls within the "zone of interests" of the statutory provision the plaintiff claims was violated.'" Id. (quoting Churchill County v. Babbitt, 150 F.3d 1072, 1078 (9th Cir. 1998) (quoting Lujan, 497 U.S. at 882–83). "It is well settled that the zone of interests protected by NEPA is environmental." Id. "'If a harm does not have a sufficiently close connection to the physical environment, NEPA does not apply.'" Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agric., 415 F.3d 1078, 1103 (9th Cir. 2005) (quoting Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 778 (1983)).

Defendants argue that Overcast's and Hall's health and safety claims fall outside of NEPA's zone of interests because there is no evidence that either helicopter collisions or avalanches will cause harm to the environment. As for Overcast's and Hall's recreational interests, defendants argue that their subjective fears and self-inflicted recreational injuries lack a nexus to the environment. Defendants insist that Overcast's and Hall's recreational interests are economic interests in disguise and thus are insufficient to establish prudential standing. See Calif. Forestry Ass'n v. Thomas, 936 F. Supp. 13, 22 (D.D.C. 1996) (citation omitted) ("plaintiffs' attempt to articulate concern for the health of the forest is in fact no more than an economic injury in disguise" and is insufficient to establish standing).

As Overcast and Hall point out, the court has already determined that their recreational interests "are plainly within NEPA's zone of interests."[69] Thus, there is no need for the court to determine whether their health and safety interests fall within NEPA's zone of interests as well. In short, Overcast and Hall have prudential standing.

Turning then to the merits of the NEPA claims, "NEPA 'is a procedural statute that requires . . . Federal agencies to assess the environmental consequences of their actions before those actions are undertaken.'" Great Basin Resource Watch v. BLM, 844 F.3d 1095, 1101 (9th Cir. 2016) (quoting Klamath–Siskiyou Wildlands Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004)). "NEPA 'does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" San Diego Navy Broadway Complex Coalition v. U.S. Dep't of Defense, 817 F.3d 653, 659 (9th Cir. 2016) (quoting Tri–Valley CAREs v. U.S. Dep't of Energy, 671 F.3d 1113, 1123 (9th Cir. 2012)).

There is no dispute that ASG's application for a special recreation permit was a "proposed action" that triggered NEPA review. In their first NEPA claim, Overcast and Hall argue that BLM failed to comply with NEPA as to that proposed action. "[F]ederal agencies can comply with NEPA in one of three ways. First, an agency may always prepare an" environmental impact statement (EIS). Wildlands v. U.S. Forest Srvc., 791 F. Supp. 2d 979, 984 (D. Or. 2011) (citing 40 C.F.R. § 1501.3). "Second, to determine whether an EIS is

---

[69]Order re Motion for Leave to File Amended Complaint at 15, Docket No. 51.

required, an agency may prepare an" environmental assessment (EA). Id. (citing 40 C.F.R.

§§ 1501.4(b), 1508.9). "An EA is a concise public document that briefly describes the

proposal, examines alternatives, considers environmental impacts, and provides a list of

individuals and agencies consulted." Id. (citing 40 C.F.R. § 1508.9). "'If the agency

concludes there is no significant effect associated with the proposed project, it may issue a

FONSI in lieu of preparing an EIS.'" Id. (quoting Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.,

451 F.3d 1005, 1009 (9th Cir. 2006)). "Third, the agency need not prepare an EA or an EIS

if the agency determines that the proposed action falls within a 'categorical exclusion' or

'CE.'" Id. (citing 40 C.F.R. §§ 1501.4(a)(2), 1501.4(b)).

There is no dispute that BLM did not prepare either an EA or EIS for the ASG permit.

There is also no dispute that BLM did not determine that the proposed action fell within a

CE. Rather, BLM decided that it had already met its NEPA obligations to evaluate the

environmental impacts associated with the ASG permit application by relying on the 2013

Triumvirate EA. BLM made that decision based on the DNA that was prepared. BLM

regulations provide that "[w]hen available, the Responsible Official should use existing

NEPA analyses for assessing the impacts of a proposed action and any alternatives." 43

C.F.R. § 46.120(a). The regulations further provide that

> [a]n existing environmental analysis prepared pursuant to NEPA
> and the Council on Environmental Quality [CEQ] regulations
> may be used in its entirety if the Responsible Official deter-
> mines, with appropriate supporting documentation, that it
> adequately assesses the environmental effects of the proposed
> action and reasonable alternatives. The supporting record must

include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

43 C.F.R. § 46.120(c). The BLM NEPA Handbook provides that the following questions must all be answered in the affirmative for no additional analysis to be necessary:

- Is the new proposed action a feature of, or essentially similar to, an alternative analyzed in the existing NEPA document(s)? Is the project within the same analysis area, or if the project location is different, are the geographic and resource conditions sufficiently similar to those analyzed in the existing NEPA document(s)? If there are differences, can you explain why they are not substantial?

- Is the range of alternatives analyzed in the existing NEPA document(s) appropriate with respect to the new proposed action, given current environmental concerns, interests, and resource values?

- Is the existing analysis valid in light of any new information or circumstances (such as rangeland health standard assessments, recent endangered species listings, updated BLM-sensitive species)? Can you reasonably conclude that new information and new circumstances would not substantially change the analysis of the new proposed action?

- Are the direct, indirect, and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analyzed in the existing NEPA document?

BLM National Environmental Policy Act Handbook, H-1790-1 (2008) at 23. If the answer to any of the questions is "no", then "a new EA or EIS must be prepared. . . ." Id.

Defendants argue that BLM reasonably concluded that the Triumvirate EA "fully cover[ed] the proposed action and constitutes BLM's compliance with the requirements of NEPA."[70] Defendants emphasize that the Triumvirate EA evaluated the impacts of a commercial heli-skiing operation involving two helicopters and a single plane, with a maximum number of 130 landings per year, a client to guide ratio of 5:1, and a prohibition against fuel caching, equipment storage, or gear storage on BLM land.[71] Because ASG proposed an operation that was nearly identical, defendants argue that it was reasonable for BLM to rely on the Triumvirate EA when deciding whether to issue the ASG permit. Defendants acknowledge that BLM may rely on an existing NEPA document only if there are no "new circumstances, new information or changes in the action or its impacts" that result in "significantly different environmental effects." 43 C.F.R. § 46.120(c). But, defendants insist that the DNA worksheet for the ASG permit shows that BLM reasonably concluded that the impacts of the ASG permit were likely to be identical to those that were analyzed in the Triumvirate EA because the operations being proposed by ASG were almost identical to those that were proposed by Triumvirate.

Defendants argue that not every changed circumstance requires the production of a new NEPA document. Defendants argue that changed circumstances only require a new NEPA document if those circumstances would result in "significantly different environmen-

[70]Admin. Rec. at 1397.

[71]Admin. Rec. at 814-815.

tal effects." 43 C.F.R. § 46.120(c) (emphasis added).  Defendants argue that it was reasonable for BLM to conclude that the ASG permit would not result in significantly different environmental effects given that its proposed operations were nearly identical to those proposed by Triumvirate, and BLM had determined the environmental effects identified in connection with Triumvirate's proposed operations did not meet "the definition of significance. . . ."[72]

Defendants argue that the issue is not whether the later-in-time action is identical to that analyzed in the earlier EA but whether the greater intensity of the later-in-time action, or changed circumstances in the area, are likely to result in significantly different environmental effects.  Defendants argue that the Triumvirate EA considered this issue.  In the Triumvirate EA, BLM noted that

> "[i]ncreased interest from commercial recreation providers, commercial filming companies, and aircraft transportation services may result in increased noise and observed aircraft by other aircraft in the area.  Although there has been a slight increase in such commercial recreation opportunities in this area, there is no substantial cumulative impact to the existing quality recreation experience due to the area's expanse where visitors can spread out and avoid . . . the sights and sounds of other users.  Therefore, cumulative impacts to recreation and visual resources as a result of this permit authorization would be limited.[[73]]

---

[72]Admin. Rec. at 807.

[73]Admin. Rec. at 820.

BLM improperly relied on the DNA to reach its decision to issue a permit to ASG. The Triumvirate EA considered the effects and impacts of only one heli-ski operator making 130 landings per season. The Triumvirate EA did not consider the impacts of three heli-ski operators making 390 landings per season. The effects of three commercial heli-ski operators in the same area are fundamentally different from the effects of one commercial heli-ski operator. But, the DNA does not reflect any consideration of this. Rather, in the DNA, BLM found that the direct, indirect, and cumulative effects of ASG's proposed operations "will be nearly similar to those that have been previously analyzed (for Triumvirate Heli-skiing), as both Triumvirate and Alaska Snowboard Guides will have two helicopters and one airplane."[74] This finding ignores the fact that when the Triumvirate EA was completed, there was only one heli-ski operator in the Neacolas, but with the addition of ASG, there would be three. There were changed circumstances which BLM failed to consider. It is not a matter of BLM having considered the changed circumstances and deciding that the changed circumstances would not result in significantly different environmental effects. It is that BLM did not consider the changed circumstances at all.

The example from BLM's NEPA Handbook that plaintiffs' counsel referred to at oral argument illustrates the problem with BLM's reliance on the DNA in this case. In that example, "[a]n applicant requests a special recreation permit for a 4-wheel vehicle race on an established route, which is analyzed in an EA, selected in a decision document, and

---

[74]Admin. Rec. at 1396.

implemented." BLM National Environmental Policy Act Handbook, H-1790-1 (2008) at 22.

"Later, another applicant requests a special recreation permit for a motorcycle race on the same route." Id. The Handbook suggests that this is a situation "in which an existing environmental analysis might be relied upon in its entirety." Id. In this example, the 4-wheel vehicle race and the motorcycle race were not taking place at the same time. Rather, one race had been permitted and held and then a second applicant sought a permit for a race in the same area to be held at a different time. In such a situation, it would be entirely reasonable that the EA that was completed for the first race could be relied upon in its entirety when considering the second race.

But that was not the situation here. In the DNA, BLM treated ASG's application as though it was dealing with the equivalent of the foregoing example, which it was not. In addressing the BLM NEPA Handbook queries in the DNA, BLM answered the fourth query as follows:

> Are the direct, indirect and cumulative effects that would result from implementation of the new proposed action similar (both quantitatively and qualitatively) to those analzyed in the existing NEPA document?
>
> Yes. The effects will be nearly similar to those that have been previously analyzed (for Triumvirate Heli-skiing), as both Triumvirate and Alaska Snowboard Guides will have two helicopters and one airplane.[75]

---

[75]Admin. Rec. at 1396.

This affirmative answer fails to recognize that ASG's operations and those of the two previously authorized permit holders overlap. They are not sequential. ASG is not taking the place of Triumvirate. Rather, Triumvirate and ASG (as well as Silverton) are operating at the same time in the same area. In order to take a hard look at the environmental impacts of ASG's permit application, as NEPA requires, BLM had to consider the environmental impacts of adding a third heli-ski operator to the same area in which Triumvirate and Silverton were already operating. This BLM failed to do in its DNA and thus its decision to issue a special recreation permit to ASG, based on the DNA, was arbitrary and capricious.[76]

## Conclusion

Plaintiffs' motions for the court to take judicial notice are denied as the court did not rely on any of the newspaper articles.

Plaintiffs' motion for summary judgment is granted and defendants' cross-motion is denied. Plaintiffs are entitled to a declaration that the defendants violated NEPA. Because of this violation, the January 29, 2018 ROD approving the issuance of the ASG permit is vacated. This matter is remanded to BLM for further proceedings consistent with this order.

DATED this 19th day of February, 2019.

/s/ H. Russel Holland
United States District Judge

---

[76]Because the court concludes that BLM violated NEPA by improperly relying on the DNA, the court need not consider plaintiffs' other claims.